SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------X

THE ROCKEFELLER UNIVERSITY,

                Plaintiff,

          v.

LIGAND PHARMACEUTICALS, INC.,

                Defendant.

-----------------------------------------------------------X

**SUMMONS**

Index No. 08/600638

Date Purchased: 3/4/08

Plaintiff designates New York
County as the place for trial

To the above named Defendant:

       YOU ARE HEREBY SUMMONED to answer the complaint in this action, and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorneys within 20 days after service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

       The basis of the venue designated is NY CPLR § 503(a).

Dated: New York, New York
      March 4, 2008

Plaintiff's Address:
The Rockefeller University
1230 York Avenue
New York, New York 10065

NEW YORK
COUNTY CLERK'S OFFICE

MAR 0 4 2008

NOT COMPARED
WITH COPY FILE

FOLEY & LARDNER LLP

By: *Peter N. Wang*
      Peter N. Wang
      Anat Hakim
      Douglas S. Heffer
      90 Park Avenue
      New York, New York 10016
      (212) 682-7474
      Attorneys for Plaintiff

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X

THE ROCKEFELLER UNIVERSITY,               :         Index No.

            Plaintiff,         :

                             :         **COMPLAINT**

        v.                  :         **JURY TRIAL REQUESTED**

LIGAND PHARMACEUTICALS, INC.         :

            Defendant.     :

-----------------------------------------------------------------X

      Plaintiff, The Rockefeller University, by its attorneys, Foley & Lardner LLP, complains and alleges as follows:

### NATURE OF THE ACTION

      The Rockefeller University (the "University") owns groundbreaking inventions that are powerful tools to screen for therapeutic drugs and that were discovered by its esteemed faculty member Dr. James E. Darnell Jr. The University exclusively licensed this valuable technology to defendant Ligand Pharmaceuticals, Incorporated ("Ligand") in 1992 ("1992 Agreement"). Working under a 1994 agreement with its exclusive sublicensee SmithKline Beecham ("SKB", now GlaxoSmithKline) ("1994 SKB/Ligand Agreement") and using the University's inventions, Ligand identified several pharmaceutical molecules and received several milestone payments from SKB. Ligand has failed to pay the University its contractual share of these milestone payments according to the 1992 Agreement, despite the University's repeated requests. Instead, in August 2007, shortly before SKB requested approval from the Food and Drug Administration of Promacta®, one of the pharmaceutical molecules identified under the 1994 SKB/Ligand Agreement, and before royalties on Promacta® are anticipated to be paid by SKB to Ligand, Ligand notified the University that Ligand was unilaterally terminating the 1992 Agreement, although not permitted to do so by its terms. The University, having fully performed

NEW YORK
COUNTY CLERK'S OFFICE

MAR 0 4 2008

NOT COMPARED
WITH COPY FILE

its contractual obligation and faced with Ligand's refusal to honor its payment obligations under the 1992 Agreement, has no other recourse but to file this action.

## PARTIES

1.      Plaintiff The Rockefeller University is, and at all times mentioned herein was, a New York corporation whose principal place of business is at 1230 York Avenue, New York, NY 10065.

2.      Defendant Ligand Pharmaceuticals, Inc. is, and at all times mentioned herein was, a Delaware corporation whose principal place of business is at 10275 Science Center Drive, San Diego, CA 92121. Ligand is a biotechnology company engaged in the discovery and development of new drugs.

## JURISDICTION AND VENUE

3.      This Court has personal jurisdiction over defendant pursuant to CPLR § 301, 302.

4.      Venue is proper in this county pursuant to CPLR § 503(a).

## BACKGROUND OF THE UNIVERSITY-LIGAND COLLABORATION

5.      Founded in 1901, Plaintiff The Rockefeller University is the nation's first biomedical research university. Today, it is internationally renowned for research and graduate education in the biomedical sciences, chemistry and physics. A total of 21 scientists associated with the University have received the Nobel Prize in medicine and physiology or chemistry, 17 University scientists have received Lasker Awards, five have been named MacArthur Fellows and 11 have garnered the National Medal of Science. More than one-third of the current faculty are elected members of the National Academy of Sciences.

6.      Dr. James E. Darnell Jr., M.D. has been a professor at The Rockefeller University since 1974. A pioneering researcher in the field of gene regulation, he is The Rockefeller University Vincent Astor Professor and head of the University's Laboratory of Molecular Cell Biology. Dr. Darnell is an elected member of the National Academy of Sciences.

7.      Prior to Dr Darnell's pioneering research, it was not understood how a large and diverse group of regulatory proteins called cytokines cause cells in the human body to change

2

their behavior in response to changes in the environment. Cytokines play an important role in regulating the human body, for example, stimulating the immune system to fight infection and activating red blood cell or platelet formation. Among Dr Darnell's many discoveries, he elucidated how the binding of a cytokine to a cell surface receptor is communicated to the nucleus of a cell to regulate the expression of a small and select number of genes. The pathway Dr Darnell discovered involves the binding of a cytokine to a cell surface receptor causing certain proteins, which he called Signal Transducers and Activators of Transcription, or STAT proteins, to accumulate in the nucleus, bind to specific genes, cause them to be expressed and thereby change cell behavior ("STATs Pathway").

8.    Dr. Darnell received numerous awards for his pioneering discovery and characterization of the STAT pathway, including the 2002 Albert Lasker Award for Special Achievement in Medical Science:  "For an exceptional career in biomedical science during which he opened two fields in biology - RNA processing and cytokine signaling - and fostered the development of many creative scientists."  In 2003, the White House awarded Dr. Darnell the National Medal of Science, the nation's highest honor for lifetime achievement in fields of scientific research.  Other awards Dr. Darnell has received include the 1997 Passano Award, the 1994 Paul Janssen Prize in Advanced Biotechnology and Medicine and the 1986 Gairdner Foundation International Award.

9.    Dr Darnell invented, based on his understanding of the STAT pathway, a high throughput screen ("HTS") for discovery of new pharmaceuticals that are agonists or antagonists of cytokines.  An agonist is a pharmaceutical that binds the same cell surface receptor as the cytokine, while an antagonist is a pharmaceutical that prevents binding of the cytokine to its cell surface.  Dr. Darnell's HTS invention was disclosed in a Rockefeller University patent application filed in September 1993.  In the HTS, a cell is exposed to a potential pharmaceutical and the activity of a reporter gene, designed by Dr Darnell based on his knowledge of the STATs Pathway, is monitored.  Potential pharmaceuticals that mimic cytokine activity and therefore serve as agonists are identified.

3

Exhibit "1"

7

**1992 LICENSE AGREEMENT BETWEEN THE UNIVERSITY AND LIGAND**

10.    The pioneering STATs Pathway technology that Dr. Darnell discovered and developed while at the University (and which was owned by the University) promised to be a powerful tool to screen for therapeutic drugs. To allow Dr. Darnell's groundbreaking discovery to be utilized for the public good, the University entered into negotiations with Ligand to use this discovery, including HTS, to find valuable new pharmaceuticals.

11.    After negotiation, on September 30, 1992, the University and Ligand entered into a License Agreement. A true and correct copy of the 1992 Agreement is attached hereto as Exhibit A and incorporated herein by reference.

12.    In the 1992 Agreement, the University granted Ligand a sole exclusive world-wide license, under the University's broadly-defined Licensed Patent Rights and Technical Information relating to the STATs Pathway technology, "to make, have made, use and sell Products or practice Processes." *See Exhibit A at Section 2.1.* The license grant to Ligand included an exclusive world-wide license to all developments of Dr. Darnell's laboratory relating to the STATs Pathway technology, existing as of the effective date of the 1992 Agreement and for five years thereafter. *See id. at Section 1.4.* In connection with the 1992 Agreement, Dr. Darnell and members of his laboratory did in fact collaborate with Ligand for years regarding the STATs Pathway technology. Over the course of several years, Dr. Darnell provided essential technical information, materials and insight to Ligand relating to the STATs Pathway technology. In addition, the University filed several patent applications and was issued several patents, describing aspects of its pioneering STATs Pathway technology.

13.    The technical information and expertise about STATs Pathway technology that Ligand acquired from the University pursuant to the 1992 Agreement was essential to the development of, among other things, a HTS to identify cytokine agonists. The HTS was key to the identification and development of pharmaceutical drug candidates.

14.    In return for the University's exclusive world-wide license to this pioneering

4

STATs Pathway technology, Ligand obligated itself to:

  a. "diligently seek to develop Products and/or Processes" using or based on the STATs Pathway technology provided to it under the 1992 Agreement. *See id. at Section 2.7;*

  b. make certain cash payment to the University during the first five years of the Agreement and to give the University an equity interest in Ligand. *See id. at Sections 2.2 and 2.3; and*

  c. pay the University a portion of any payments Ligand received from any third party "to secure the right to use Technical Information or to sell Products or Processes," (*see id. at Section 2.5)* and a royalty on Ligand's own "Net Sales of Products and on its net revenues . . . received from performance of Processes for a third party." (*see id. at Section 2.4*).

15. Section 2.5 of the 1992 Agreement, which addresses Ligand's payment obligations to the University with respect to milestone and royalty payments it receives from third parties provides:

> In the case of payments made to Ligand by a third party to secure the right to use Technical Information or to sell Products or Processes, Ligand will pay to Rockefeller and NYU twenty-five percent (25%) of the payments made to Ligand by the third party; provided, however, that in the situation where the payment to Ligand is based on the third party's revenues arising from sale of a Product or use of a Process, then Ligand shall pay to Rockefeller and NYU the lesser of twenty-five percent (25%) of the payment received from the third party or a royalty calculated pursuant to Section 2.4 by treating the third party's sales of such Products and Processes as Ligand sales. Payments by a third party to Ligand to purchase equity in Ligand and to fund research at Ligand which do not generate net revenue as defined in Section 2.4 shall not be subject to sharing under this Section 2.5.

16. Section 2.4 of the 1992 Agreement, which addresses Ligand's royalty payment obligations to the University based on Ligand's own sales of Products or performance of Processes, provides:

> Ligand will pay a royalty of five percent (5%) of its Net Sales of Products and on its net

revenues, i.e., gross revenues less fully burdened costs, received from performance of Processes for a third party. The royalty shall be paid for a term which is the longer of ten (10) years, or, on a country by country basis, expiration of the last patent in the Licensed Patent Rights having a claim which reads on the Product or Process or a method of making or using the Product or Process. Only one royalty will be owed on a Product or Process in the circumstance where the Product or Process is covered by multiple claims in the Licensed Patent Rights. Royalty payments made under this Section 2.4 and under Section 2.5 shall be made to Rockefeller and NYU in the ratio ninety percent (90%) to Rockefeller and ten percent (10%) to NYU.

17.    The 1992 Agreement provides that it "shall be interpreted and governed in accordance with the laws of the State of New York." *See id. at Section 13.*

## 1994 RESEARCH, DEVELOPMENT, AND LICENSE AGREEMENT BETWEEN LIGAND AND SMITHKLINE BEECHAM

18.    On December 29, 1994, Ligand entered into an exclusive research and development collaboration and license with SmithKline Beecham. On information and belief, under the 1994 SKB/Ligand Agreement, the HTS technology that was developed using the University's STATs Pathway technology was to be used by Ligand and SKB to discover and characterize small molecule, orally bioavailable drugs for the treatment of a variety of blood cell deficiencies. On information and belief, Ligand sub-licensed to SKB the STATs Pathway technology that the University exclusively licensed to Ligand.

19.    The 1994 SKB/Ligand Agreement entitles Ligand to payments from SKB for certain milestones reached in connection with the development of research compounds or products as well as royalty payments. In announcing Ligand's collaboration with SKB, Ligand's then-Senior Vice President and Chief Scientific Officer stated in a February 6, 1995 press release:

> We are delighted to have this, our second STATs collaboration within two years of licensing in this exciting technology from Rockefeller University. Our signal transduction area of research affords numerous drug targets to control gene expression. This alliance with the excellent research team at SB provides critical mass and expertise to exploit our recent insights in STATs and HGFs to create new medicines.

6

## DISPUTE BETWEEN THE UNIVERSITY AND LIGAND CONCERNING THE DEVELOPMENT OF PHARMACEUTICAL CANDIDATES

20.     The SKB/Ligand collaboration has led to the identification and development of several pharmaceutical compounds that act via the STATs Pathway, including but not limited to PROMACTA®/REVOLADE® ("PROMACTA®"), an orally active, non-peptide, small molecule thrombopoietin ("TPO") mimetic for the treatment of thrombocytopenia. Thrombocytopenia, or a low number of platelets in the blood, can be a life-threatening condition. Platelets are necessary to the normal process of blood clotting. When someone experiences thrombocytopenia, a cut or bruise might not heal quickly, or at all, without medical intervention. Therefore, patients with a low platelet cell count must take special precautions, and suffer significant risk.

21.     On information and belief, in the fourth quarter of 2007, SKB submitted to the Food & Drug Administration a New Drug Application for PROMACTA® for the treatment of short-term idiopathic thrombocytopenic purpura (ITP). ITP is a disorder characterized by low platelet counts leaving patients at risk of episodes of spontaneous bruising, mucosal bleeding, and in severe cases intracranial hemorrhage. On information and belief, if approved, PROMACTA® would be the first approved oral TPO mimetic. On information and belief, in the fourth quarter of 2007, SKB initiated two Phase III trials in connection with the use of PROMACTA® for hepatitis C, and SKB is studying PROMACTA® for chemotherapy-induced thrombocytopenia (CIT). On information and belief, at least one additional pharmaceutical compound, SB-559448, also developed as part of the SKB/Ligand collaboration, and described as a backup compound to PROMACTA®, is in Phase I clinical trials.

22.     On information and belief, Ligand also has its own thrombopoietin program, which it commenced after its research program with SKB ended, and that program has resulted in the identification and development of Ligand's lead, small-molecule TPO mimetic, LGD-4665, which acts via the STATs Pathway by binding to the thrombopoeitin receptor in a manner

7

similar to TPO and activates the production of platelets by the bone marrow. As of December 2007, Ligand reported that LGD-4665 generated positive Phase I results. Ligand also has stated that it expects to advance the development of LGD-4665 for multiple indications. On information and belief, several additional next generation molecules are in the research phase at Ligand with promising TPO mimetic activities.

23.     On information and belief, each of the compounds described in Paragraphs 20 -22 above, constitute a "Product", as that term is defined in Section 1.5 of the 1992 Agreement. Section 1.5 of the 1992 Agreement defines "Product" as follows:

> any product which embodies or the use of which employs any invention(s) described or claimed in Licensed Patent Rights or for which Technical Information was essential to the discovery or development thereof.

24.     The 1992 Agreement defines "Licensed Patent Rights" as follows:

> (a) the patent application(s) set forth on Exhibit "A" attached hereto and all patents which may issue thereon;
> (b) the patent applications which are divisionals, continuations, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions of the patents and/or applications described in (a) and (b) of this paragraph 1.3, and all patents which may issue thereon;
> (c ) and all other patent applications, and patents issuing thereon, filed to cover Technical Information, including divisionals, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions and patents which may issue thereon.

25.     The 1992 Agreement defines "Technical Information" as follows:

> any and all technical data, information processes, materials and know-how, whether or not patentable, owned by Rockefeller and existing or capable of description in a tangible form relating to peptidyl hormone mediated gene expression (a) developed in the laboratory of Dr. James Darnell of Rockefeller or Dr. David Levy of NYU as of the Effective Date and (b) which is subsequently developed at Rockefeller in the laboratory of Dr. James Darnell during the period ending five (5) years form the Effective Date.

26.     Consequently, under Section 2.5 of the 1992 Agreement, the University is entitled to at least 25% of milestone and royalty payments paid to Ligand by SKB to date in connection with such Products. Similarly, to the extent that Ligand has entered into collaborations with

8

other third parties from which Ligand has received or is entitled to receive payments for Products subject to Section 2.5 of the 1992 Agreement, the University would be entitled to 25% of such payments.

27.    This includes at least $1.91 Million Dollars, which is equal to 25% of the Eight Million Dollars in milestone payments SKB has already made to Ligand to date in connection with the development of PROMACTA® and SB-559448, minus amounts Ligand previously paid the University. *See Exhibit A at Section 2.5.* In addition, to the extent that the Ligand/SKB collaboration results in additional milestone payments by SKB to Ligand in connection with the continued development of PROMACTA®, SB-559448 or the development of other compounds, the University would be entitled to 25% of such milestone payments.

28.    To date, Ligand has refused to pay the University its portion of the milestone payments and has taken the position that no further milestone payments are or will be owing to the University.

29.    In addition to 25% of milestone payments received by Ligand, the University is also entitled to 25% of any royalty payments that SKB would pay to Ligand on sales of PROMACTA®. To the extent that the Ligand/SKB collaboration results in the commercialization of products other than PROMACTA®, such as, for example, products based on SB-559448, the University would be entitled to 25% of royalty payments made to Ligand based on sales of those products as well. Ligand has taken the position that the University is not entitled to any royalties under the 1992 Agreement.

30.    A couple of months before SKB submitted its New Drug Application for PROMACTA® to the Food & Drug Administration, and by letter dated August 9, 2007, Ligand informed the University that Ligand was providing written notice that "Ligand is exercising its right to terminate the above-referenced Agreement. Pursuant to Section 11.2, this termination will be effective on November 7, 2007."

31.    On September 25, 2007, representatives of Ligand and the University met to discuss Ligand's purported termination notice and the University's position that the 1992

9

Agreement could not be terminated after full performance by the University. At the meeting, the University notified Ligand that it was exercising its audit rights under Section 4.2 of the 1992 Agreement.

32.     On October 10, 2007, the University sent Ligand its preliminary audit request and a tolling agreement, which was effective through January 31, 2008.

33.     On or about November 13 or 14, 2007, the University initiated its audit of Ligand. To date, Ligand has refused to fully and adequately comply with the University's audit requests, as amended.

34.     On January 17, 2008, the University and Ligand entered into an Amended Tolling Agreement, which was effective through March 3, 2008.

## FIRST CAUSE OF ACTION

### (Breach of Contract Against Ligand)

35.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 34 of this Complaint as though fully set forth herein.

36.     The 1992 Agreement between the University and Ligand is a valid and binding contract between the University and Ligand.

37.     Upon information and belief, Plaintiff alleges that Defendant has failed to perform and is in material breach of at least its payment obligations under the 1992 Agreement as described in the foregoing paragraphs of this Complaint. As a direct and proximate result of the breach, the University has been damaged in an amount according to proof at trial, but no less than $1.91 Million Dollars.

38.     Plaintiff the University has fully performed all of its obligations and otherwise complied with all the terms and conditions of the 1992 Agreement.

39.     Plaintiff the University is entitled to recover damages from Defendant for Defendant's material breach of the 1992 Agreement alleged in this Complaint in an amount to be proven at trial.

10

## SECOND CAUSE OF ACTION

### (Unjust Enrichment/Constructive Trust)

40.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 39 of this Complaint as though fully set forth herein.

41.     A civil plaintiff may recover under the doctrine of unjust enrichment by showing that (a) the plaintiff conferred a benefit on the defendant; (b) the defendant appreciated or enjoyed such benefit; and (c) under the circumstances, it was unfair for the defendant to accept or retain the benefit without paying for it.

42.     At Ligand's specific request, and since 1992, the University provided to Ligand valuable information, know-how and services since 1992 relating to STATs Pathway technology.

43.     The University shared such information, know-how and services while Ligand and the University were in a confidential relationship.

44.     Ligand enjoyed such information, know-how and services and was and has been enriched by such information, know-how and services.

45.     Ligand was and has been unjustly enriched at the University's expense because Ligand has not compensated the University for such information, know-how and services.

46.     The reasonable value of the information, know-how and services that the University provided to Ligand and for which the University has not been compensated to date is no less than $1.91 million.

47.     In equity and good conscience, Ligand should be required to return no less than $1.91 million to the University.

48.     The University has no adequate remedy at law by which it can be compensated for this injury.

49.     By virtue of the foregoing, the University has been damaged in an amount to be proven at trial, but in no event less than $1.91 million.

50.     The University also is entitled to a constructive trust on past and future payments made to Ligand by third parties in connection with the valuable information, know-how and

11

services that the University transferred to Ligand, including but not limited to past payments received and future payments in connection with PROMACTA® and/or SB-559448.

## THIRD CAUSE OF ACTION

### (Quantum Meruit)

51.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 50 of this Complaint as though fully set forth herein.

52.     Since 1992, the University provided to Ligand valuable information, know-how and services relating to STATs Pathway technology in good faith and with the expectation, based on the parties' discussions, that the University would receive compensation for this valuable information, know-how and services.

53.     Ligand accepted the benefit of the University's valuable information, know-how and services, but has not compensated the University

54.     By virtue of the foregoing, the University has been damaged in an amount to be proven at trial, but in no event less than $1.91 million.

## FOURTH CAUSE OF ACTION

### (Specific Performance of Contractual Right to Perform Audit)

55.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 54 of this Complaint as though fully set forth herein.

56.     The University is entitled to conduct an audit under Section 4.2 of the 1992 Agreement in order to determine the payments due from Ligand to the University under the 1992 Agreement.

57.     The records that would enable the University, through its auditor, to determine the payments due from Ligand to the University under the 1992 Agreement, are within Ligand's possession and control.

58.     Ligand has failed to provide many records that were requested by the University to its auditor.

59.     The University has no adequate remedy at law.

12

Exhibit "1"

16

60.   The University is thus entitled to perform an audit of Ligand pursuant to Section 4.2 of the 1992 Agreement.

### FIFTH CAUSE OF ACTION

#### (Declaratory Relief Against Ligand)

61.   Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 60 of this Complaint as though fully set forth herein.

62.   An actual controversy now exists as to the rights and obligations of Plaintiff the University and Defendant Ligand with respect to the 1992 Agreement.  Upon information and belief, Plaintiff the University contends that it is entitled to certain milestone and/or royalty payments provided for under the 1992 Agreement in connection with Defendant's identification and continued development of at least PROMACTA® and SB-559448.  Defendant Ligand disputes Plaintiff the University's contention, and asserts that it has no obligation to Plaintiff the University under the 1992 Agreement in connection with PROMACTA® or any other compound or product.

63.   Plaintiff University desires a declaration from this Court as to its rights and Defendant's obligations under the 1992 Agreement confirming that:

  a.   PROMACTA®, SB-559448, and LGD 4665 each are a "Product", within the meaning of term as defined in the 1992 Agreement;

  b.   The University is entitled to, and Ligand is obligated to pay, 25% of all milestone payments and other consideration related to PROMACTA® and/or SB-559448, now due under the 1992 Agreement, including 25% of the milestone payments of $2 Million, $1 Million, $2 Million, and $1 Million relating to PROMACTA® and 25% of the milestone payment of $2 Million relating to SB-559448, as provided by Section 2.5 of the 1992 Agreement.

13

c. The University is entitled to, and Ligand will be obligated to pay in the future, 25% of all milestone and/or royalty payments and other consideration related to PROMACTA® and/or SB-559448 which shall become due under the 1992 Agreement hereafter.

d. The University is entitled to 25% of milestone and/or royalty payments paid to Ligand by any third party in connection with any Product as that term is defined in the 1992 Agreement.

e. The University is entitled to a 5% royalty on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own, and not in connection with a third party, as set forth in Section 2.4 of the 1992 Agreement.

64.     A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights and obligations under the 1992 Agreement and Plaintiff the University may obtain the relief to which it is entitled.

WHEREFORE, The Rockefeller University prays for judgment as follows:

1.     Damages according to proof at trial, including interest;

2.     Specific performance of the audit initiated by the University, pursuant to Section 4.2 of the 1992 Agreement;

3.     A constructive trust imposed on payments (milestone and royalty) received from a third-party by Ligand, including but not limited to such payments made in connection with PROMACTA® and/or SB-559448, and on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own;

4.     A Court Declaration confirming that:

14

a.  PROMACTA®, SB-559448, and LGD 4665 each are a "Product", within the meaning of the term as defined in the 1992 Agreement;

b.  The University is entitled to, and Ligand is obligated to pay, 25% of all milestone payments and other consideration related to PROMACTA® and/or SB-559448, now due under the 1992 Agreement, including 25% of the milestone payments of $2 Million, $1 Million, $2 Million, and $1 Million relating to PROMACTA® and 25% of the milestone payment of $2 Million relating to SB-559448, as provided by Section 2.5 of the 1992 Agreement.

c.  The University is entitled to, and Ligand will be obligated to pay in the future, 25% of all milestone and/or royalty payments and other consideration related to PROMACTA® and/or SB-559448 which shall become due under the 1992 Agreement hereafter.

d.  The University is entitled to 25% of milestone and/or royalty payments paid to Ligand by any third party in connection with any Product as that term is defined in the 1992 Agreement.

e.  The University is entitled to a 5% royalty on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own, and not in connection with a third party, as set forth in Section 4.2 of the 1992 Agreement.

5.  Costs of suit; and

6.  Such other and further relief as the Court may deem just and proper.

15

Exhibit "1"
19

7.     The University requests a jury trial on all issues so triable.

Dated: New York, New York
      March 4, 2008

                     FOLEY & LARDNER LLP

                     By: *Peter N. Wang*
                         Peter N. Wang
                         Anat Hakim
                         Douglas S. Heffer
                         90 Park Avenue
                         New York, New York 10016
                         (212) 682-7474
                         Attorneys for Plaintiff The Rockefeller
                         University

16

# EXHIBIT A

## LICENSE AGREEMENT

AGREEMENT made as of the <u>30th</u> day of <u>September</u>, 1992 ("Effective Date") by and between LIGAND PHARMACEUTICALS INCORPORATED ("Ligand"), a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 9393 Towne Centre Drive, San Diego, California 92121, and THE ROCKEFELLER UNIVERSITY ("Rockefeller"), a nonprofit education corporation organized and existing under the laws of the State of New York, having an office at 1230 York Avenue, New York, New York 10021.

### W I T N E S S E T H:

WHEREAS, Dr. James Darnell and his colleagues at Rockefeller and at NYU have developed valuable technology and know-how relating to peptidyl hormone mediated gene expression, including application for patents thereon, which constitutes core technology to be licensed hereunder;

WHEREAS, NYU has assigned to Rockefeller its rights to the core technology;

WHEREAS, Rockefeller has the right to grant exclusive license rights with respect to such core technology and to future developments relating thereto made at Rockefeller in the manner described herein; and

WHEREAS, Ligand wishes to obtain the exclusive license rights described herein for commercial development and application;

NOW, THEREFORE, in consideration of the mutual benefits to be derived hereunder, the parties hereto agree as follows:

agree\rockefeller
09\18\92



1.    <u>Definitions</u>

The following terms will have the meanings assigned to them below when used in this Agreement.

1.1    "Party" shall mean either Ligand or Rockefeller and "Parties" shall mean Ligand and Rockefeller.

1.2    "Affiliate" shall mean a corporation or other entity which directly or indirectly controls, is controlled by or under common control with Ligand. An entity shall be regarded as in control of another if it owns, or directly or indirectly controls, at least 50% of the voting stock or other ownership interest of the other entity, or if it directly or indirectly possesses the power to direct or cause the direction of the management and policies of the other entity by any means whatsoever.

1.3    "Licensed Patent Rights" shall mean

(a)    the patent application(s) set forth on Exhibit "A" attached hereto and all patents which may issue thereon;

(b)    the patent applications which are divisionals, continuations, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions of the patents and/or applications described in (a) and (b) of this paragraph 1.3, and all patents which may issue thereon;

(c)    and all other patent applications, and patents issuing thereon, filed to cover Technical Information, including divisionals, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions and patents which may issue thereon.

1.4    "Technical Information" shall mean any and all technical data, information processes, materials and know-how,

whether or not patentable, owned by Rockefeller and existing or capable of description in a tangible form relating to peptidyl hormone mediated gene expression (a) developed in the laboratory of Dr. James Darnell of Rockefeller or Dr. David Levy of NYU as of the Effective Date and (b) which is subsequently developed at Rockefeller in the laboratory of Dr. James Darnell during the period ending five (5) years from the Effective Date.

1.5    "Product" shall mean any product which embodies or the use of which employs any invention(s) described or claimed in Licensed Patent Rights or for which Technical Information was essential to the discovery or development thereof.

1.6    "Process" shall mean any process which embodies or the practice of which employees any invention(s) described or claimed in Licensed Patent Rights or for which Technical Information was essential to the discovery or development thereof.

1.7    "Territory" shall mean the entire world.

1.8    "Net Sales" shall mean, in the case of sales to non-Affiliates, the invoiced price by Ligand or Affiliates less (a) customary trade quantity and cash discounts actually allowed and taken; (b) allowances actually given for returned, rejected or recalled Products; actual charges for bad debts; (c) freight and insurance if included in the price; government mandated rebates; and (d) value added tax, sales, use or turnover taxes, excise taxes, and custom duties included in the invoiced price.

2.    License Rights
2.1    Rockefeller hereby grants to Ligand a sole exclusive license, including the right to grant royalty bearing sublicenses under terms consistent with this Agreement under Licensed Patent Rights and Technical Information, to make, have made, use and sell Products or practice Processes in any country of

agree\rockefeller
09\18\92                         3

the Territory, except to the extent that Rockefeller's right to do so may be limited under the provisions of the following:

      (a)    35 United States, Section 201 et seq., and regulations and rules promulgated thereunder, or

      (b)    other applicable laws or regulations of the United States;

Provided only that Rockefeller is satisfied that the licensee is making a substantial and good faith effort to achieve practical application of the subject invention and its public use, Rockefeller agrees to use reasonable and proper efforts to extend exclusivity of the license consistent with the aforesaid U.S. government rights and policies should U.S. government action limit such exclusivity.

      2.2    In consideration of the Ligand stock to be issued to Rockefeller and NYU as described in Section 2.3 and the cash payments to be made pursuant to Section 2.3, the license to Ligand under Section 2.1 shall be deemed to be fully paid up for research purposes including for the purposes of research done by Ligand or a Ligand sublicensee or collaboratively with a third party to the extent that the third party payments to Ligand do not exceed its fully burdened costs for performance of such research and development.

      2.3    On the Effective Date, Ligand shall transfer to Rockefeller and NYU collectively a total of 150,000 shares of Series G Preferred Stock pursuant to Stock Transfer Agreements of even date herewith, 100,000 shares of which will vest on the Effective Date and 50,000 shares of which will vest in two installments of 25,000 shares on the first and second anniversaries hereof unless this Agreement is sooner terminated as provided herein. On the Effective Date, Ligand will also grant Rockefeller and NYU collectively, five year, net issuance warrants to purchase

a total of 100,000 shares of Ligand common stock vesting and exercisable as follows:

      (i)   a total of 50,000 shares vesting at the third anniversary of the Effective Date and exercisable at $14.00 per share; and

      (ii)   a total of 50,000 shares vesting at the fourth anniversary of the Effective Date exercisable at the fair market value on the vesting date.

As further consideration, Ligand will make cash payments to Rockefeller and NYU pursuant to the following schedule:

      (a) On the Effective Date;

| | |
|---|---|
| Rockefeller | $45,000 |
| NYU | $ 5,000 |

      (b)   $67,500 to Rockefeller and $7,500 to NYU when the current Technical Information is successfully transferred to Ligand as described in Section 5;

      (c)   $67,500 to Rockefeller and $7,500 to NYU on each of the 1st — 4th anniversaries of the Effective Date.

      2.4   Ligand will pay a royalty of five percent (5%) of its Net Sales of Products and on its net revenues, i.e., gross revenues less fully burdened costs, received from performance of Processes for a third party. The royalty shall be paid for a term which is the longer of ten (10) years or, on a country by country basis, expiration of the last patent in the Licensed Patent Rights having a claim which reads on the Product or Process or a method of making or using the Product or Process. Only one royalty will be owed on a Product or Process in the circumstance where the Product or Process is covered by multiple claims in the Licensed Patent Rights. Royalty payments made under this Section 2.4 and under

Section 2.5 shall be made to Rockefeller and NYU in the ratio ninety percent (90%) to Rockefeller and ten percent (10%) to NYU.

     2.5   In the case of payments made to Ligand by a third party to secure the right to use Technical Information or to sell Products or Processes, Ligand will pay to Rockefeller and NYU twenty-five percent (25%) of the payments made to Ligand by the third party; provided, however, that in the situation where the payment to Ligand is based on the third party's revenues arising from sale of a Product or use of a Process, then Ligand shall pay to Rockefeller and NYU the lesser of twenty-five percent (25%) of the payment received from the third party or a royalty calculated pursuant to Section 2.4 by treating the third party's sales of such Products and Processes as Ligand sales. Payments by a third party to Ligand to purchase equity in Ligand and to fund research at Ligand which do not generate net revenue as defined in Section 2.4 shall not be subject to sharing under this Section 2.5.

     2.6   In the event Ligand is required to make payments to a third party to use Technical Information, it shall be entitled to credit fifty percent (50%) of that payment against any royalty owed under this Agreement but in no event may it reduce a payment owed by more than fifty percent (50%).

     2.7   Ligand will diligently seek to develop Products and/or Processes using or based on Technical Information. Ligand shall be deemed to have met its diligence obligations during the first five (5) years of the Agreement if, in the aggregate, Ligand, its Affiliates, licensees and research collaborators expend at least $4,000,000 directed toward the development of Products and Processes and support at least ten (10) full time scientist equivalents in support of that effort.

3.    Patents

3.1    The Company agrees to reimburse Rockefeller for all amounts expended prior to the date hereof for the preparation, filing, prosecution and maintenance of Licensed Patent Rights licensed to the Company pursuant to Section 2.1 of this Agreement, said amount being $20,791.18 as of September 8, 1992.

3.2    The Company shall continue to reimburse Rockefeller for such reasonable additional filing, prosecution, and maintenance costs as shall be incurred on each such patent application or patent licensed hereunder during the term of such license.

3.3    Rockefeller shall select qualified independent patent counsel reasonably satisfactory to Ligand to file and prosecute all patent applications included in Licensed Patent Rights, including divisionals, continuations, continuations-in-part, reissues, and foreign counterparts. Such counsel shall regularly meet and/or consult with Ligand and/or its designated officers and counsel to keep them advised of the status of patent matters in the normal course. Patent counsel shall be instructed not to file any papers without giving Ligand ample time and opportunity to review and comment. Ligand shall be entitled to determine the countries in which it wishes to obtain and maintain patent protection under this Agreement and shall be free, at any time and at its sole option, to abandon patent prosecution or maintenance in any country of the Territory.

3.4    Ligand shall promptly advise Rockefeller of any decision not to finance the preparation, filing, prosecution or maintenance of any patent application or patent licensed hereunder in adequate time to allow Rockefeller, at its own cost, to effectuate such preparation, filing, prosecution, or maintenance if it desires to do so; and Ligand shall, at the request of Rockefeller, take whatever steps may be necessary to return to Rockefeller all rights which Ligand may have with respect to the

applicable Licensed Patent Rights and Technical Information which it proposes to abandon.

Nothing herein is intended or shall be construed as obligating Rockefeller to apply for any U.S. or foreign patents at its own expense, or to defend, enforce, or support any patent or patent application which may be included in Licensed Patent Rights to which it has granted license rights to Ligand; provided, however, that Rockefeller will cooperate with Ligand in Ligand's activity in applying for U.S. or foreign patents or in the defense or enforcement of Licensed Patent Rights.

Nothing herein is intended or shall be construed as obligating Ligand to maintain its license with respect to any patent or application licensed hereunder and to finance the preparation, filing, prosecution or maintenance of any patent application in any bounty or jurisdiction in which it believes it is not in the best business interests.

3.5    Ligand shall have the right to institute patent infringement proceedings against third parties based on any Licensed Patent Rights licensed hereunder. If Ligand does not institute infringement proceedings against such third parties, Rockefeller shall have the right but not the obligation, to institute such proceedings. Within thirty (30) days after notice of its intention to commence such proceedings given to Ligand and provided that Ligand does not, within such thirty (3) day period, institutes its own proceedings, Rockefeller may institute such proceedings. The expenses of such proceedings, including lawyers' fees, shall be borne by the Party instituting suit. Each Party shall execute all necessary and proper documents and take all other appropriate action to allow the other Party to institute and prosecution such proceedings. Any award paid by third parties as a result of such proceedings (whether by way of settlement or otherwise) shall first be applied toward reimbursement for the legal fees and expenses incurred, and the excess, if any, shall be

shared on a pro rata basis based on the expenses incurred by each party.

3.6    Should Ligand decide at any time during the term hereof that it will no longer commercially pursue the development of any invention licensed hereunder, Ligand shall promptly notify Rockefeller of its decision and, upon request from Rockefeller, shall take whatever steps are necessary to assure reversion to Rockefeller of all rights to that invention.

3.7    Ligand shall assume the responsibility at its own expense, and using counsel of its choosing, to defend against claims of patent infringement arising from the making, using, or selling of Products and Processes.

4.    Payments and Reports

4.1    Within forty-five (45) days of the end of each calendar quarter during the term of this Agreement, beginning with the first quarter in which the obligation to make a payment to Rockefeller arises, Ligand shall submit to Rockefeller and NYU a report in writing setting forth the net revenues (revenues less Fully Burdened Costs) earned from the performance of a Process and the Net Sales of Products, and payments to Ligand which are subject to sharing with Rockefeller and NYU. The report shall include a calculation of the payments owed to Rockefeller and NYU arising therefrom and shall be accompanied by payment to Rockefeller and NYU in the full amount thereof.

4.2    Ligand shall keep adequate records in sufficient detail to enable the payments due from Ligand hereunder to Rockefeller and NYU to be determined, and permit said records to be inspected at any time during regular business hours at its principal place of business by an independent certified public accountant appointed by Rockefeller, or Rockefeller and NYU together but not NYU alone, for this purpose and who is reasonably

acceptable to Ligand.  The accountant shall be required to enter into a confidentiality agreement with Ligand substantially in the form of the provisions contained in Article 5 herein and shall only report to Rockefeller, and NYU if a joint audit is done, the discrepancy, if any, between the amount owed by Ligand for the audited period and the amount actually paid and discrepancies in the method of calculating Fully Burdened Costs.  Ligand shall maintain such records for a minimum of three years.  No more than one such audit shall be requested per calendar year.  Rockefeller, or Rockefeller and NYU if a joint audit, shall bear the cost of any such audit; provided, however, that where the auditor determines that the payments owed for an audit period exceeds that paid to Rockefeller and NYU by Ligand by more than ten (10) percent, the reasonable cost of the audit shall be borne by Ligand.


5.    Technical Information Transfer

Rockefeller will diligently cooperate with Ligand to transfer Technical Information to Ligand.  Transfer of current Technical Information will be deemed to have successfully occurred for the purposes of Section 2.3 when Rockefeller has transferred to Ligand, and Ligand has successfully expressed, functional proteins from the clones of the genes specifically described in the applications for United States Patents identified in Exhibit "A".


6.    Confidentiality

6.1    The Parties contemplate that during the course of their relationship arising under this Agreement it may be necessary to provide the other with confidential information to facilitate the performance of their obligations pursuant to this Agreement. The Parties agree, therefore, that information received from the other which is in writing and identified as confidential, or if disclosed orally, is confirmed in writing and designated confidential, shall be maintained in confidence and that reasonable

and prudent practices shall be followed to maintain the information in confidence, including, where necessary, obtaining written confidentiality agreements from employees not already bound by such agreements who have access to the confidential information. Information received in confidence shall be used by a party only for the purpose of and in connection with its performance of this Agreement. The obligation to maintain information in confidence shall survive this Agreement or termination thereof for any reason for a period of five (5) years thereafter. However, a party shall not be obliged to maintain information in confidence which it can show by written documentation: (a) to have been publicly known prior to submission to it; (b) to have been known or available to it prior to submission by the other party; (c) to have become publicly known without fault on its part subsequent to submission by the other party; (d) to have been received by it from a third party legally having possession of the information without obligations of confidentiality; (e) to be required to be disclosed pursuant to order of any court or governmental agency having jurisdiction thereof after notice to the other party sufficient to afford it an opportunity to intervene in the proceeding where disclosure is required; and (f) to be necessarily revealed in the course of marketing any Product or Process which is licensed hereunder.

7.    <u>Academic Freedom</u>

Rockefeller and Ligand recognize the traditional freedom of all scientists to publish and present promptly the results of their research. Rockefeller and Ligand also recognize that exclusive patent rights can be jeopardized by public disclosure prior to the filing of suitable patent applications. Therefore, Rockefeller will assure that each proposed publication concerning any technology described in Licensed Patent Rights or which may constitute an Improvement thereof, before submission to a publisher, will be submitted to Ligand for review in connection with preservation of exclusive patent rights. Ligand shall have

agree\rockefeller
09\18\92                       11

thirty (30) days in which to review the publication, which may be extended for an additional thirty (30) days when Ligand provides substantial and reasonable need for such extension.    By mutual agreement, this period may be further extended for not more than an additional three (3) months.    Ligand will allow for simultaneous submission of the publication to the publisher and Ligand, where appropriate.    Any publication by Ligand personnel will also be subject to similar pre-review before publication.    Scientists at Rockefeller and Ligand will be expected to treat matters of authorship in a proper collaborative spirit, giving credit where it is due and proceeding in a manner which fosters cooperation and communication.

8.    Warranty

     8.1    Rockefeller warrants that it has the right to grant to the full extent thereof the license granted Ligand hereunder and that it has and will discharge their duty of disclosure to the United States Patent and Trademark Office.

     8.2    EXCEPT AS WARRANTED IN THE PRIOR SECTION 8.01, ROCKEFELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE.

9.    Publicity

     Ligand will not use directly or by implication the name of Rockefeller, or the name of any member of the faculty or staff of Rockefeller, or any unpublished information or data relating to the investigation for any business, promotional, commercial or other purpose, without the prior written approval of Rockefeller and the faculty or staff member involved; except Ligand may use and disclose such names in its internal communications or in any required governmental reports and filings upon prior disclosure and consultation with Rockefeller, as appropriate.

10.  Product Liability

Ligand agrees to indemnify and hold harmless Rockefeller, its trustees, officers, agents, faculty, employees, and students from any and all liability arising from injury or damage to persons or property resulting directly or indirectly from Ligand's acquisition, use, manufacture, or sale of any Product covered by Licensed Patent Rights or Technical Information licensed hereunder. Ligand further agrees, so long as it is selling any Product, to obtain and maintain in force product liability insurance coverage in amounts reasonably satisfactory to Rockefeller, as appropriate to the risk as determined by reference to reliable standards in the industry, such insurance to specifically name Rockefeller as an additional insured.

11.  Termination

11.1    The licenses herein granted shall continue for the full term of any patents licensed hereunder as the same or the effectiveness thereof may be extended by any governmental authority, rule or regulation applicable thereto.

11.2    Ligand shall have the right to terminate any license grant at any time upon ninety (90) days' prior written notice to Rockefeller, provided, however, that termination shall not affect Rockefeller's and NYU's rights and privileges as a stockholder of Ligand or their ownership of any vested shares of Ligand.

11.3    Any Party may terminate this Agreement in the event of a material breach by the other party, provided only that the offending Party is given notice of the breach and a reasonable time, not to exceed sixty (60) days, in which to cure such breach.

11.4    Any termination of this Agreement and of any option and/or license granted hereunder shall also terminate any applicable sublicense thereunder.

agree\rockefeller
09\18\92                            13

11.5   The Parties acknowledge that Ligand's right to the future developments made at Rockefeller in the laboratory of Dr. James Darnell are an important element of this Agreement. Therefore, in the event that Dr. Darnell for health reasons or otherwise ceases to actively conduct research at Rockefeller as a full time member of the faculty, then Ligand can, without loss of rights under the Agreement, terminate the making of anniversary cash payments under Section 2.3.

12.  <u>Notices</u>

Any notice required to be given pursuant to this Agreement shall be made by personal delivery or, if by mail, then by registered or certified mail, return receipt requested, with postage and fees prepaid, by one Party to the other Party at the addresses noted below.

> In the case of Ligand, notice should be sent to:
>
>> Ligand Pharmaceuticals Incorporated
>> 9393 Towne Centre Drive, Suite 100
>> San Diego, CA  92121
>> Attn:  General Counsel
>
> In the case of Rockefeller, notice should be sent to:
>
>> The Rockefeller University
>> 1230 York Avenue
>> New York, NY  10021
>> Attn:  Office of the General Counsel

13.  <u>Law to Govern</u>

This Agreement shall be interpreted and governed in accordance with the laws of the State of New York.

14.  <u>No Partnership</u>

This Agreement shall not constitute a partnership or a joint venture, and neither Party may be bound by the other to any

contract, arrangement or understanding except as specifically stated herein.

### 15. <u>No Waiver</u>

The failure of either party to enforce at any time any of the provisions of this Agreement, or any rights in respect thereto, or to exercise any election herein provided, shall in no way be considered to be a waiver of such provisions, rights or elections, or in any way to affect the validity of this Agreement. Exercise by either party any of its rights herein or any of its elections under the terms or covenants herein shall not preclude either party from exercising the same or any other rights in this Agreement, irrespective of any previous action or proceeding taken by either party hereunder.

### 16. <u>Severability</u>

If any provision of this Agreement is judicially determined to be void or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain in full force and effect. Either Party may request that a provision otherwise void or unenforceable be reformed so as to be valid and enforceable to the maximum extent permitted by law.

### 17. <u>Assignment</u>

This Agreement may not be assigned by either Party without the prior written consent of the other, which consent shall

not be unreasonably withheld except that Ligand may assign this Agreement to a successor entity in the case of a merger, acquisition or other reorganization.

18.  Resolution of Dispute

     The Parties agree that in the event of a dispute between them arising from concerning, or in any way relating to this Agreement, the Parties shall undertake good faith efforts to resolve the same amicably between themselves.

19.  Force Majeure

     The Parties shall not be liable in any manner for failure or delay in fulfillment of all or party of this Agreement, directly or indirectly caused by acts of God, governmental orders or restrictions, war, war-like condition, revolution, riot, looting, strike, lockout, fire, flood or other similar or dissimilar causes or circumstances beyond the non-performing Party's control.  The non-performing Party shall promptly notify the other Party of the cause or circumstance and shall recommence its performance of its obligations as soon as practicable after the cause or circumstance ceases.

20.  Entire Understanding

     This Agreement, together with the Exhibits hereto, and the further documents and agreements executed in connection with the transactions contemplated hereby constitute the entire agreement between the Parties and supersedes all prior

understandings and agreements by the Parties with respect to the subject matter hereof.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

THE ROCKEFELLER UNIVERSITY

By _____

Title  President

LIGAND PHARMACEUTICALS INCORPORATED

By _____

Title  President and CEO

EXHIBIT "A"

## U. S. PATENT APPLICATIONS

1. **TITLE:** "RECEPTOR RECOGNITION FACTOR AND METHODS OF USE THEREOF"
   **INVENTORS:** Darnell and Levy
   **SERIAL NO.:** 07/613,326
   **FILED:** November 14, 1990

2. **TITLE:** "RECEPTOR RECOGNITION FACTORS, PROTEIN SEQUENCES AND METHODS OF USE THEREOF"
   **INVENTORS:** Darnell, Schindler and Fu
   **SERIAL NO.:** 07/854,296
   **FILED:** March 19, 1992

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE ROCKEFELLER UNIVERSITY,

Plaintiff,

-against-

LIGLAND PHARMACEUTICALS, INC.,

Defendant.

## SUMMONS AND COMPLAINT

**Foley & Lardner LLP**

**ATTORNEYS FOR** Plaintiff

### 90 PARK AVENUE

**BOROUGH OF MANHATTAN**          **NEW YORK CITY**

(212) 682-7474

Due and timely serve of      copy of the within

is hereby admitted this    day of    20__

Attorney for

NEW YORK
COUNTY CLERK'S OFFICE

Exhibit "1"
40

# COMPLETE
# THIS STUB

ndorse This INDEX NUMBER ON All
apers and advise your adversary of
e number assigned. Sec. 202.5,
niform Rules Of Trial Courts

DO NOT DETACH

**INDEX NUMBER FEE**
**$210.00**

Title of Action or Proceeding to be TYPED or PRINTED by applicant
**SUPREME COURT, NEW YORK COUNTY**

*The Rockefeller University*

v.

*Ligand Pharmaceuticals, Inc.*

08600638

```
          RECEIPT
    NEW YORK COUNTY CLERK
       60 CENTRE STREET
      NEW YORK, NY 10007
           R141


  DEPARTMENT                 AMOUNT

  50 COMMERCIAL              165.00
   7 SURCHARGE                45.00

  TOTAL                     210.00
  CHECK                      210.00


  CONS  CASHIER    DATE    TIME   TERM
  21565  2345    08 MAR 04 9:02 AM 41-1
```