UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE ROCKEFELLER UNIVERSITY,

   Plaintiff,

  v.

LIGAND PHARMACEUTICALS
INCORPORATED,

   Defendant.

08-CV-2775 (KPC)(HP)

## DEFENDANT LIGAND PHARMACEUTICALS INCORPORATE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS, OR, IN THE ALTERNATIVE, TO TRANSFER TO THE SOUTHERN DISTRICT OF CALIFORNIA

GREENBERG TRAURIG, LLP
Attorneys for Plaintiffs
200 Park Avenue
New York, New York
Telephone: (212) 801 9200
Fax: (212) 801 6400

# TABLE OF CONTENTS

PAGE

I. STATEMENT OF PERTINENT FACTS ........................................................................1

II. THIS COURT LACKS PERSONAL JURISDICTION OVER LIGAND ...................4

    A.    The Exercise of Jurisdiction Would be Improper Under State Law ...........4

        1.    This Court does not have general personal jurisdiction over Ligand because Ligand is not continuously present in New York.......................................................................................5

        2.    This Court lacks specific jurisdiction because the claim does not arise out of Ligand business transacted within New York ........5

    B.    The Exercise of Jurisdiction Would Violate Due Process ...........................6

III. ALTERNATIVE MOTION TO TRANSFER -- 28 U.S.C. § 1404(a) .........................7

    A.    Transfer to the Southern District of California is Appropriate in This Case................................................................................................7

    B.    The Relevant Factors Strongly Weigh Toward Transfer In This Case........7

        1.    The events giving rise to the suit occurred in California................8

        2.    California would be more convenient to the parties .......................8

        3.    California would be more convenient to the witnesses ..................9

        4.    Most of the relevant proof is located in California .........................9

        5.    Many more witnesses can only be served process in California ...10

        6.    The plaintiff's choice of forum favors transfer..............................10

        7.    The forum's familiarity with governing law is at most a neutral factor ..............................................................................11

        8.    Transferring this case to California would promote trial efficiency.................................................................................12

        9.    The interest of justice would be better served in California ..........13

i

C.    Transfer to the Southern District of California is Warranted In This Case ............................................................................................. 13

IV. CONCLUSION............................................................................................................ 14

ii

## TABLE OF AUTHORITIES

**Cases**

*800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F.Supp. 128 (S.D.N.Y.1992) .......7

*Arrow Electronics, Inc. v. Ducommun Inc.*, 724 F.Supp. 264 (S.D.N.Y.1989).................10

*Ashe v. Pepsico*, 443 F.Supp. 84 (S.D.N.Y. 1997) ................................................8

*Atlantic Mut. Ins. Co. v. M/V HUMACAO*, 169 F.Supp.2d 211 (S.D.N.Y. 2001).............12

*Bellepointe, Inc. v. Kohl's Dept. Stores, Inc.* 975 F.Supp. 562 (S.D.N.Y. 1997) ...........4, 5

*Billing v Commerce One Inc.*, 186 F.Supp.2d 375 (S.D.N.Y. 2002)..................................8

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ............................................6

*Credit Suisse Securities (USA) LLC v. Hilliard*, 469 F. Supp.2d 103 (S.D.N.Y. 2007) ...10

*G. Angel Ltd. v. Camper & Nicholsons USA, Inc.*, 2008 WL 351660 (S.D.N.Y. 2008)..........................................................................8, 9

*Hanson v. Denckla*, 357 U.S. 235 (1958) ................................................................6

*Hoffritz for Cutlery, Inc. v. Amjac, Ltd.*, 763 F.2d 55 (2d Cir.1985) ...........................5

*Landoil Res. Corp. v. Alexander & Alexander Servs. Inc.*, 918 F.2d 1039 (2d Cir.1991)...5

*Malone v. Commonwealth Edison Co.*, 2 F. Supp. 2d 545 (S.D.N.Y. 1998).......................7

*Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899 (2d Cir. 1981) ...............................12

*Markman v. Westview Instruments, Inc.*, 116 S. Ct. 1384 (1995) .................................11

*McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 283 N.Y.S.2d 34 (1967) ..........6

*Nat'l Patent Dev. Corp. v. Am. Hosp. Supply Corp.*, 616 F.Supp. 114 (S.D.N.Y.1984)...11

*Perrin v. Pearlstein*, 314 F.2d 863 (2d Cir. 1963).................................................11

*Royal Ins. Co.*, 2002 WL 31385815 (S.D.N.Y. 2002).............................................11

*Schnabel v. Ramsey Quantitative Sys., Inc.*, 322 F.Supp.2d 505 (S.D.N.Y.2004) .............9

*Trophy Productions, Inc. v. Cinema-Vue Corp.*, 53 A.D.2d 18 (1976)...........................11

*Veronica Siverls-Dunhamn et al. v. Sueng Huen Lee*, 2006 WL 3298964
(S.D.N.Y. 2006) ................................................................................................7

*Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196 (2d Cir. 2001) ...........................................4

*Yurman Designs, Inc. v. A.R. Morris Jewelers, L.L.C.*, 41 F. Supp.2d. 453
(S.D.N.Y. 1999) ...............................................................................................5

**Federal Statutes**

28 U.S.C. § 1391 ...............................................................................................10

28 U.S.C. § 1404 ................................................................................................7

**Californai Statutes**

Cal. Civ. Proc. Code § 410.10 .......................................................................7, 10

**New York Statutes**

CPLR § 302 ........................................................................................................5

iv

Defendant Ligand Pharmaceuticals Incorporated ("Ligand") respectfully submits this memorandum of law in support of its motion, pursuant to Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure to dismiss the Complaint, dated March 4, 2008 (the "Complaint") of Plaintiff The Rockefeller University ("Rockefeller") for lack of personal jurisdiction over Ligand. In the alternative, Ligand moves to transfer this case to the Southern District of California under 28 U.S.C. §1404(a) in favor of Ligand's lawsuit for Declaratory Judgment filed on March 4, 2008, the same date that this lawsuit was originally filed in state court.

This Court lacks personal jurisdiction because Ligand lacks sufficient contacts with this forum to give rise to general or specific personal jurisdiction over Ligand under New York State's long-arm statue or under the Constitution of the United States. Ligand is a Delaware Corporation with headquarters in San Diego, California that has no current business presence in New York.

## I. STATEMENT OF PERTINENT FACTS

### A. Ligand Currently Has No General "Presence" in New York

Formed in 1987, Ligand is a relatively small biotech company that focuses on discovering and developing new drugs for the treatment of various diseases. *Ligand Pharm., Inc. Annual Report (Form 10-K)*, at 4, 36 (Mar. 16, 2007), Declaration of Alan Kessler, ¶¶2-4, Exhibit B; Exhibit A. Ligand is a Delaware corporation, based in San Diego, California, where all of its facilities and employees are located, and where it performs all of its basic discovery research activities. Declaration of Audrey Warfield-Graham ¶4, Exhibit C.

As of March 4, 2008, the date the complaint in this action was filed in state court, Ligand had no "presence" in New York. Specifically, when the complaint was filed, Ligand (1) was not selling any goods or services in New York, (2) did not own, lease or rent any real property in New York, (3) had no facilities of any kind in New York, (4) had no employees, sales representatives or independent contractors in New York, (5) had no telephone listings or mailing addresses in New York, (6) was not conducting any marketing or advertising directed specifically to residents of New York, (7) had no officers who were residents of or domiciled in

1

New York, and (8) had never brought suit in the New York courts. *Ligand Pharm., Inc. Annual Report (Form 10-K)*, at 17, 24, 105 (Mar. 16, 2007), Exhibit A; Declaration of Audrey Warfield-Graham, ¶¶5-9, Exhibit C.

**B. Ligand's Past Sales Activities in New York Are Discontinued and Unrelated to This Suit**

From about 1998 to about 2007, Ligand did sell two product lines nationwide, and had at least one salesperson in New York. Declaration of Audrey Warfield-Graham, ¶10, Exhibit C. As a result, in 1998, Ligand registered to do business in New York. Declaration of Alan Kessler, ¶5, Exhibit B; N.Y. Secretary of State Records, Exhibit D. However, long before this lawsuit was filed, Ligand sold off both of these product lines and had ceased all of its sales activities in New York. *Ligand Pharmaceuticals Inc. Annual Report (Form 10-K)*, at 3 (March 16, 2007), Exhibit A. Since 2007, Ligand has sold no goods or services in New York (or anywhere else) ceasing its commercial sales activities. Instead, Ligand's ongoing business is premised on targeted internal research activities, which are based out of its San Diego facilities. *Id.*

Importantly, none of the aforementioned, now-discontinued sales activity in New York had any relation or relevance to the current dispute with Rockefeller. Rockefeller's complaint alleges that three thrombopoeitin ("TPO") mimetic compounds (the TPO Compounds) were developed using technology that Rockefeller had licensed to Ligand. *See* Complaint ¶¶20-22. Rockefeller expressly asks this Court for a declaration that eltrombopag (PROMACTA®), SB-559448 and LGD-4665 are each a "Product" within the meaning of the term defined in the 1992 Agreement. Complaint ¶63. As is apparent from Rockefeller's Complaint, none of these compounds has yet to be approved for sale in the United States. See Complaint ¶¶20-22. None of the discontinued products, previously sold by Ligand, were TPO compounds or had any relation to such compounds. Declaration of Keith Marschke, ¶6 Exhibit E.

**C. This Dispute Concerns Ligand's Research Activity in San Diego**

Starting in 1987, Ligand invented, in-licensed, developed and used various assays to identify and discover potentially useful small molecule drugs. Declaration of Alan Kessler, ¶¶2-4, Exhibit B; *Ligand Pharm., Inc. Annual Report (Form 10-K)*, at 23, 29, 40 (Mar. 31, 1997), Exhibit F. In 1992, Ligand entered into a License Agreement with Rockefeller ("the

2 Exhibit "7"

Agreement," attached to Complaint as Exhibit A). *Id.* at 24. Under the Agreement, Rockefeller licensed certain "Technical Information" and "Patent Rights" developed in part by Dr. Robert B. Darnell, M.D., Ph.D. ("Darnell"). *Agreement* at 1. Darnell served on Ligand's Scientific Advisory Board for several years and visited with Ligand scientists in San Diego from 1996 until at least 2001. Declaration of Keith Marschke, ¶12, Exhibit E.

The present dispute concerns whether Ligand used Rockefeller's Patent Rights or Technical Information in the development of the three TPO compounds. Ligand will show that, although it may have used Rockefeller's technology in various programs over the years, none of *those* programs led to the TPO compounds that form the basis of Rockefeller's complaint.

All of the relevant Ligand work was performed in San Diego. Specifically, eltrombopag and SB-559448 were discovered as part of a 1997-2001 research program, conducted under a 1994 Research Development and License Agreement ("GSK License") with SmithKline Beecham Corporation, now GlaxoSmithKline ("GSK"). Declaration of Alan Kessler, ¶¶2-4, Exhibit B; *Ligand Pharm., Inc. Annual Report (Form 10-K)*, at 20 (Mar. 13, 2006), Exhibit G. All of Ligand's work under the GSK License was performed in San Diego. Declaration of Keith Marschke, ¶16, Exhibit E. To the extent any work performed by GSK is relevant to this litigation; none of that work was performed in New York. *Id.* LGD-4665 is a potential pharmaceutical product that was discovered by Ligand in San Diego in a research program that started no earlier than the second half of 2003. *Ligand Pharm., Inc. Annual Report (Form 10-K)*, at 6 (Mar. 16, 2007). GSK had no involvement in the development of LGD-4665. Declaration of Keith Marschke, ¶9, Exhibit E.

Not only was the Ligand work performed in San Diego, all of the laboratory notebooks and other records documenting that work are stored in San Diego. Declaration of Keith Marschke, ¶10, Exhibit E. Moreover, to a great extent, the personnel involved in that work remain in California, although many are no longer in Ligand's employ. Ligand plans to elicit the testimony of individuals who have knowledge about the research efforts that lead to the TPO Compounds. At present, Ligand expects that testimony of at least fifty (50) individuals, all believed to be current California residents, will be relevant in this case. Spreadsheet of Potential

3

Witnesses, Exhibit H, Declaration of Keith Marschke, ¶¶14-15, Exhibit E; Declaration of Audrey Warfield-Graham, ¶¶14-15, Exhibit C. Accordingly, the evidence and witnesses relating to the Ligand research work at issue are located in California.

**D. This Dispute Should Proceed in the Suit Pending in San Diego Federal Court**

In a letter dated August 9, 2007, Ligand terminated the Agreement under Section 11.2. ("Ligand shall have the right to terminate any license grant at any time..."). For several months, a tolling agreement protected the parties from a first strike lawsuit as the parties attempted to resolve the dispute. However, the day after the tolling agreement expired, Ligand and Rockefeller each filed a lawsuit in its home forum. Thus, on March 4, Rockefeller filed the present suit in New York state court and Ligand filed a declaratory judgment action in federal court in the Southern District of California. California Complaint, Exhibit I. Ligand submits that if the present case is not dismissed, it should be transferred and consolidated with the suit pending in the Southern District of California.

## II. THIS COURT LACKS PERSONAL JURISDICTION OVER LIGAND

Ligand moves to dismiss this action under Rule 12(b)(2) of the Federal Rules of Civil Procedure. On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff (Rockefeller) bears the burden to demonstrate that the court has jurisdiction. *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). To do so, Rockefeller must demonstrate both that jurisdiction is proper in New York under the applicable statute and that the exercise of jurisdiction in New York meets the requirements of due process. *Id.* Rockefeller can show neither.

**A.    The Exercise of Jurisdiction Would be Improper Under State Law**

New York law allows for the exercise of jurisdiction on a foreign corporation such as Ligand under its long arm statute on only two grounds, neither of which apply here: "(1) if the corporation is 'present' in New York, or (2) if the plaintiff's claim arises out of the corporation's transaction of business within the state." *Bellepointe, Inc. v. Kohl's Dept. Stores, Inc.* 975 F.Supp. 562, 564 (S.D.N.Y. 1997) (internal citations omitted).

4

1.    **This Court does not have general personal jurisdiction over Ligand because Ligand is not continuously present in New York**

Under C.P.L.R. §301 a foreign corporation may be subjected to personal jurisdiction if it is "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *Landoil Res. Corp. v. Alexander & Alexander Servs. Inc.*, 918 F.2d 1039, 1043 (2d Cir.1991). The defendant must be present in New York not occasionally or casually, but with a fair measure of permanence and continuity at the time suit is filed. *Landoil*, 918 F.2d at 1043; *Yurman Designs, Inc. v. A.R. Morris Jewelers, L.L.C.*, 41 F. Supp.2d. 453, 457. Ligand has no meaningful presence in this forum, as it has no office, solicits no business, and has no employees in New York. *See, Hoffritz for Cutlery, Inc. v. Amjac, Ltd.*, 763 F.2d 55, 58 (2d Cir.1985). Furthermore, the mere fact that Ligand appointed an agent for service of process in New York in 1998 is insufficient to subject it to personal jurisdiction in New York. *See, Bellepointe, Inc. v. Kohl's Department Stores, Inc.*, 975 F.Supp. 562, 564 (S.D.N.Y.1997).

As noted above, the inquiry focuses on Ligand's "presence" in New York at time the suit was filed: March 4, 2008. As of that date, Ligand had no presence in New York and, therefore, cannot be brought into court under the general jurisdiction provision of New York's long-arm statute. Ligand no longer sells or advertises any goods or services in New York and has no employees or sales persons in New York. Ligand has no facilities of any kind in New York and does not own, lease or rent any real property in New York. Ligand has no telephone listings or addresses in New York. Thus, Ligand does not perform business in New York with the continuity necessary to find general jurisdiction under the statute.

2.    **This Court lacks specific jurisdiction because the claim does not arise out of Ligand business transacted within New York**

Under New York C.P.L.R. § 302(a)(1), a foreign corporation may be subject to personal jurisdiction if it "transacts any business within the state or contracts anywhere to provide goods or services in the state" and plaintiff's claim arises out of that business activity. To "transact business" in New York, however, the foreign corporation must "purposely avail [ ] itself of the

privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34 (1967) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The "totality of the circumstances" determines whether a party has transacted business in New York.

Here, Rockefeller's claim relates to Ligand's activities in discovering and developing the TPO Compounds. This work was simply not conducted in New York. Instead, it occurred in California.

In sum, Ligand is not subject to specific jurisdiction in this forum. Ligand did not transact business in New York and Rockefeller's claim arises out of acts that occurred in California, not New York. Because Ligand has not been continuously present in New York and because the Rockefeller's claim arises out of acts that occurred in California, there is no statutory authority upon which to bring Ligand into this Court. Accordingly, Ligand urges that this suit be dismissed for lack of personal jurisdiction.

**B.    The Exercise of Jurisdiction Would Violate Due Process**

Even if this court had statutory authority to subject Ligand to personal jurisdiction, doing so would violate Ligand's right to due process. In order for a plaintiff to establish "minimum contacts," the defendant must have purposefully availed itself of the privilege of conducting activities in the forum state. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). In its minimum contacts analysis, the court should consider the quality and nature of the contacts. *Id.* Contacts which are random, fortuitous, or attenuated cannot establish personal jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 486 (1985). Once it has been established that a defendant has minimum contacts with the forum state, the court may evaluate whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *Id.* at 476, citing *Int'l Shoe*, 326 U.S. at 320. Rockefeller cannot meet its burden to show those minimum contacts or that the exercise of jurisdiction here would be fair. Thus, even if this Court finds that the exercise of jurisdiction is proper under New York's long arm statute, Ligand urges that the Court still dismiss this suit for lack of personal jurisdiction in order to protect Ligand's right to due process.

Because, Rockefeller can not meet its burden to show minimum contacts under the New York standard this Court "need not reach the due process analysis." *Veronica Siverls-Dunhamn et al. v. Sueng Huen Lee*, 2006 WL 3298964 at *4 (S.D.N.Y. 2006) (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 471).

### III. ALTERNATIVE MOTION TO TRANSFER – 28 U.S.C. §1404(a)

In the alternative, Ligand moves to transfer venue to the Southern District of California under 28 U.S.C. §1404(a). Title 28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

This dispute revolves around Ligand's use of its assay technology in connection with its own potential product, LGD 4665, and in providing services to GSK per the GSK License. The relevant witnesses and documents are almost exclusively in California, more specifically in San Diego. Where those evidentiary issues dominate, transfer is often ordered. *See, 800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F.Supp. 128, 134 (S.D.N.Y.1992).

**A.    Transfer to the Southern District of California is Appropriate in This Case**

This action could have been brought in the Southern District of California because that district has personal jurisdiction over Ligand and venue is proper there. See 28 U.S.C. § 1391 (providing that a civil action may be brought in "a judicial district where any defendant resides, if all defendants reside in the same State"); Cal. Civ. Proc. Code § 410.10 (West 2006) (a California court may exercise jurisdiction on any basis not inconsistent with the California or U.S. Constitution). Ligand, the only defendant in this matter, resides in California and is located in the Southern District of California.

**B.    The Relevant Factors Strongly Weigh Toward Transfer In This Case**

This Court has considered nine factors in determining whether a transfer to a foreign district is proper: (1) the location of the events giving rise to the suit; (2) the convenience of the parties; (3) the convenience of the witnesses;(4) the relative ease of access of proof; (5) the availability of process for unwilling witnesses; (6) the plaintiff's choice of forum; (7) a forum's familiarity with the governing law; (8) trial efficiency; and (9) the interest of justice. *Malone v.*

*Commonwealth Edison Co.*, 2 F. Supp. 2d 545, 547 (S.D.N.Y. 1998). Of these nine factors, eight favor transfer and one is, at worst, neutral. Furthermore, "[i]n making [the determination of whether to transfer the case], the court cannot resort to the usual rule of thumb according priority to the suit which is first in time, for both of the actions under consideration here were instituted on the same day. Rather, the court must look to the balance of convenience between the available forums." *Ashe v. Pepsico*, 443 F.Supp. 84, 85 (S.D.N.Y. 1997) [internal citations omitted]

### 1.    The events giving rise to the suit occurred in California

"Courts routinely transfer cases when the principal events occurred in another district and the principal witnesses are located there." *G. Angel Ltd. v. Camper & Nicholsons USA, Inc.*, 2008 WL 351660 at *4 (S.D.N.Y. 2008) (*citing Billing v Commerce One Inc.*, 186 F.Supp.2d 375, 377, S.D.N.Y. 2002). This Court has found that the location the locus of operative facts is "important factor to be considered in deciding where a case should be tried." *800-Flowers* 860 F.Supp. at 134. In order to determine the locus of operative facts, this Court looks for the "the site of events from which the claim arises." *Id.*

This lawsuit concerns events that occurred in San Diego, California. Ligand's work with the Technical Information provided by Darnell took place in San Diego. Ligand's development of its screening assay technology for the TPO Compounds occurred at its laboratories in San Diego, California. Ligand keeps all of its records and documents about this work in California and all of Ligand's employees who worked on TPO Compounds are, or were at the time, residents of California. See Spreadsheet of Potential Witnesses, Exhibit H; Declaration of Keith Marschke, ¶¶14-15, Exhibit E; Declaration of Audrey Warfield-Graham, ¶¶14-15, Exhibit C.

### 2.    California would be more convenient to the parties

Ligand is in possession of most of the evidence that will be relevant to this case. Because of this fact, it would be a greater burden for Ligand to litigate this controversy in New York than it would be for Rockefeller to bring its case in California. Ligand has over 50 employees and former employees who are potential witnesses in this action, of which almost all reside in California. Rockefeller will most likely only need the testimony of Darnell and a few others.

8

Because most of the questions of fact concern the research activities of Ligand's employees and the evidence in Ligand's possession, it would be much more expensive for Ligand to move its proof and send its witnesses to New York than it would be for Rockefeller to attend proceedings in California. Furthermore, given the relative size of the parties (for example, Ligand has fewer than 60 employees, whereas Rockefeller has substantially more than 1,000), any cost or inconvenience involved has a greater impact on Ligand than it does on Rockefeller. Because Ligand's inconvenience will be substantially greater if it has to defend a suit in New York than Rockefeller's would be if it were made to answer in California, this factor weighs strongly in favor of a transfer to the Southern District of California.

### 3.    California would be more convenient to the witnesses

The convenience of the forum for witnesses "is probably considered the single most important factor in the analysis of whether a transfer should be granted." *Schnabel v. Ramsey Quantitative Sys., Inc.*, 322 F.Supp.2d 505, 516 (S.D.N.Y.2004). "When weighing this factor, the Court considers the materiality, nature, and quality of each witness, in addition to the number of witnesses in each district." *G. Angel*, 2008 WL 351660 at *4. "Generally, the convenience of a non-party witness is given greater weight than that of a party witness." *Id. (citing* 2002 WL 31385815, at *5).

Most of the key witnesses in this case will be Ligand officers, employees, and former employees. As seen in Exhibit H, potential witnesses are no longer employed at Ligand. The main facts that will be at issue relate to Ligand's development of the TPO Compounds and what information Ligand used in making those developments. Ligand has over 50 employees and former employees who will be potential witnesses in this action. The only potential witnesses from Rockefeller who may be located in New York are Darnell and a reasonably small number of other individuals.

### 4.    Most of the relevant proof is located in California

In order to determine whether any Patent Rights or Technical Information was used in the creation of the TPO Compounds, it will be necessary to depose the numerous Ligand employees and former employees who worked on their development. Furthermore, any and all of Ligand's

relevant lab records, notebooks, documents and test results are implicated in this law suit.

**5.      Many more witnesses can only be served process in California**

"The availability of process to compel the testimony of important witnesses is an important consideration in transfer motions." *Arrow Electronics, Inc. v. Ducommun Inc.*, 724 F.Supp. 264, 266 (S.D.N.Y.1989). Rockefeller and its employees have a strong interest in the present suit, and are likely to readily testify in either forum. On the other hand, many of Ligand's key witnesses are former employees who may not be willing to come to court and testify. For instance, there are several witnesses who have been involved in the development of the TPO Compounds who still reside in California and may not come to court unless subpoenaed. See Exhibit H.

If this action proceeds in this Court, it will not be possible to compel unwilling California witnesses to testify in New York at trial under Fed. R. Civ. Proc. 45(b)(2). Conversely, if this action were to proceed in San Diego, subpoenas could issue directly from that court under Fed. R. Civ. Proc 45(b)(2)(C) and 90. Cal. Civ. Proc. Code § 410.10 and the California court could compel unwilling witnesses to appear.

Each of the California witnesses would be unavailable for service of process in this forum, but would be available if this matter were transferred to the Southern District of California. Because the California court could compel several key witnesses to appear at trial, this factor strongly favors transfer.

**6.      The plaintiff's choice of forum favors transfer**

If the Court grants Ligand's motion, Rockefeller's choice of forum for this action will be denied, but denial of this motion would deny Ligand's choice of forum in San Diego for its separate action. This factor, therefore, at first blush, would appear to be neutral because either outcome is likely to preserve one Plaintiff's and deny the other Plaintiff's choice of forum. However, in this case Rockefeller's choice of forum should be given less weight because Ligand is not subject to personal jurisdiction in New York. This Court has found that transfer is often appropriate in cases in which there is a serious question as to whether the court has personal jurisdiction over the defendants. *See Credit Suisse Securities (USA) LLC v. Hilliard*, 469 F.

Supp.2d 103, 112 (S.D.N.Y. 2007). Here transfer is appropriate because there is, at a minimum, a serious question over whether this court has personal jurisdiction over Ligand.

### 7.    The forum's familiarity with governing law is at most a neutral factor

Here, the Agreement has a choice-of-law clause selecting New York state law, but it is not clear that this is controlling. Such provisions are not controlling and may be disregarded where the most significant contacts with the matter in dispute are in another State. *Perrin v. Pearlstein,* 314 F.2d 863, 867 (2d Cir. 1963). Moreover, in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied. *Trophy Productions, Inc. v. Cinema-Vue Corp.,* 53 A.D.2d 18, 22, (1976). The Agreement does not mandate venue of any dispute and is silent on the choice of forum. Thus, fora other than New York were contemplated.

Even if New York law is found to be governing, this factor should be given very little weight here because there are no complex issues of New York law at the center of this dispute. "[T]he applicable law factor is entitled to little weight in cases where 'the governing law presents no complex legal questions and has not been shown to be unclear, unsettled or difficult.'" *Royal Ins. Co.,* 2002 WL 31385815, at *8 (quoting *Nat'l Patent Dev. Corp. v. Am. Hosp. Supply Corp.,* 616 F.Supp. 114, 119 (S.D.N.Y.1984)).

In fact, the governing state law is contract law which is not generally unclear, unsettled, or difficult. Moreover, many of the key issues in the case arise under federal patent law. For instance, whether Ligand's TPO compounds fall within Rockefeller's Patent Rights and whether Rockefeller has breached the agreement by failing to discharge its duty of disclosure to the PTO are issues of federal patent law which require, *inter alia,* the Court's determination of the meaning of the claim terms. *See Markman v. Westview Instruments, Inc.,* 116 S. Ct. 1384, aff'g 52 F.3d 967 (Fed. Civ. 1995). These issues arise as a matter of federal patent law, not New York law. Because this case will involve substantial issues of federal law, the importance of the choice of law provision is mitigated.

To the extent interpretation of New York state law is required, there is no doubt that New York businesses often transact business in California and, therefore California courts are quite

familiar with New York. Contracts stipulating to New York law are ubiquitous and there is no reason to believe that the Southern District of California will face any significant difficulty in applying New York law to this controversy, if so required. Because the laws of New York are routinely interpreted by courts of California, this factor should not influence a decision to transfer.

**8.    Transferring this case to California would promote trial efficiency**

Although a Court may initially find that it has jurisdiction over a plaintiff before allowing discovery, the question cannot be finally settled without a pretrial evidentiary hearing or at trial. *Atlantic Mut. Ins. Co. v. M/V HUMACAO*, 169 F.Supp.2d 211, 214 (S.D.N.Y. 2001)( "While a *prima facie* showing of jurisdiction is adequate to defeat a 12(b)(2) motion made before discovery, the party asserting jurisdiction bears the ultimate burden of proving by a preponderance of the evidence at trial or an evidentiary hearing that the court has jurisdiction over the defendant."); *Marine Midland Bank, N.A. v. Miller*, 664 F.2d. 899, 904 ("Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial.").

If this action were to proceed in New York, the parties would ultimately need to engage in jurisdictional discovery and court proceedings on that issue. Moreover, even if this action were to survive a second jurisdictional challenge, the issue would be subject to appeal to the Second Circuit.

In sharp contrast, if this Court transfers the present action to the Southern District of California in its current form then Ligand will be in the position of the defendant and will readily submit to personal jurisdiction in that court. Thus, such a transfer would obviate the need for expensive and time consuming jurisdictional inquiries.

Because transferring this action to the Southern District of California would eliminate the need for jurisdictional discovery, future motions to dismiss, and potential appellate review thereof, such a ruling is interest of trial efficiency. Because granting the present motion would save both parties and the courts considerable amounts of time and resources, this factor weighs strongly in transferring this action to the Southern District of California.

9.     **The interest of justice would be better served in California**

As noted above, a considerable proportion of Ligand's key witnesses may not voluntarily appear in any forum. If this case proceeds to a jury trial it is very likely that Darnell will be Rockefeller's key witness. If Ligand is unable to bring most important fact witnesses into the courtroom, Ligand may be unable to compete with Darnell's prestige and charisma. Depriving Ligand access to its key witnesses while allowing Darnell to speak to the jury would unfairly tip the scales in favor of Rockefeller. Thus, Ligand's will be disadvantaged if this case proceeds in a court that does not have subpoena power in California. In order to avoid an unjust result, this case should be transferred to the Southern District of California where Ligand will be able to subpoena all of its key fact witnesses.

Proceeding in New York is also unfair and fails to serve the interests of justice or efficiency in view of the significant issue regarding the lack of personal jurisdiction over Ligand in New York that will result in additional discovery, briefing and possibly appeal if the case is not dismissed or transferred.

C.     **Transfer to The Southern District of California is Warranted In This Case**

Ligand urges the Court to transfer this case to the Southern District of California on the factors discussed above. Each of the factors above weighs in favor of transfer to the Southern District of California, or is neutral as to transfer. The conveniences of the witnesses and parties, and the interests of justice would be best served by moving this action to the Southern District of California where the entirety of the dispute is already at issue.

## IV. CONCLUSION

For the reasons above, Ligand respectfully requests that this Court grant Ligand's motions to dismiss for lack of personal jurisdiction. In the alternative, Ligand respectfully requests that this Court grant Ligand's alternative motion to transfer this action to the Southern District of California.

Dated: New York, New York
      March 21, 2008

GREENBERG TRAURIG, LLP

Simon Miller
Sean P. Cameron
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

Attorneys for Defendant
LIGAND PHARMACEUTICALS
INCORPORATED

OF COUNSEL:

Darrell L. Olson
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

and

Joseph M. Reisman
Ali S. Razai
KNOBBE, MARTENS, OLSON & BEAR, LLP
550 West C Street, Suite 1200
San Diego, CA 92101
Telephone: (619) 687-2121
Facsimile: (619) 235-0176



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE ROCKEFELLER UNIVERSITY,

        Plaintiff,

      v.

LIGAND PHARMACEUTICALS
INCORPORATED,

        Defendant.

**08-CV-2755 (KPC)(HP)**

**<u>NOTICE OF MOTION</u>**

**<u>ORAL ARGUMENT REQUESTED</u>**

PLEASE TAKE NOTICE, that upon the accompanying Affirmation of Simon Miller, dated March 21, 2008, and the exhibits attached thereto, and the Memorandum of Law dated March 21, 2008, Defendant Ligand Pharmaceuticals Incorporated ("Ligand"), will move this Court, before the Honorable Kevin P. Castel, at the United States Courthouse, 500 Pearl Street, New York, New York at a date and time to be decided by the Court, for an Order dismissing the Complaint of Plaintiff, The Rockefeller University ("Rockefeller"), for lack of personal jurisdiction over Ligand pursuant to Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure, or, in the alternative, to transfer the above-styled action to the Southern District of California pursuant to 28 U.S.C. § 1404(a).

Dated: New York, New York
     March 21, 2008

GREENBERG TRAURIG, LLP

By: _____
    Simon Miller (SM-6728)
    200 Park Avenue
    New York, New York 10166
    (212) 801-9200
    *Attorneys for Defendant*
    -and-
    KNOBBE, MARTENS, OLSON
    & BEAR, LLP
    Darrell L. Olson
    2040 Main Street, 14th Floor
    Irvine, CA 92614
    (949) 760-0404

    *Of Counsel for Defendant*

    KNOBBE, MARTENS, OLSON
    & BEAR, LLP
    Joseph M. Reisman
    Ali S. Razai
    550 West C Street
    Suite 1200
    San Diego, CA 92101
    (619) 687-2121

    *Of Counsel for Defendant*

TO:   Anat Hakim
     FOLEY & LARDNER LLP
     *Attorneys for Plaintiff*
     3000 K Street, N.W.
     Suite 500
     Washington, DC 20007
     (202) 672-5300

     Peter Wang
     Douglas S. Heffer
     FOLEY & LARDNER LLP
     *Attorneys for Plaintiff*
     90 Park Avenue
     New York, NY 10016
     (212) 682-7474

Exhibit "7"
98

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE ROCKEFELLER UNIVERSITY, a          Case No. 08 cv 2755 KPC-HP
New York not-for-profit corporation,

          Plaintiff,          **AFFIRMATION IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS
UNDER FRCP 12(B)(2) OR, IN THE
ALTERNATIVE, FRCP 12(B)(3)**

     v.

LIGAND PHARMACEUTICALS
INCORPORATED, a Delaware corporation,

          Defendant.

---

SIMON MILLER, under penalties of perjury, affirms and says:

1.     I am a Shareholder in the law firm of Greenberg Traurig, LLP, counsel for Ligand Pharmaceuticals Incorporated ("Ligand"), defendant in the above referenced matter.  I respectfully submit this affirmation in support of Ligand' motion to the dismiss the Complaint, dated March 4, 2008 (the "Complaint") pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(3) of the Rules of Civil Procedure and under 28 U.S.C. § 1391 to dismiss the complaint of Plaintiff, The Rockefeller University ("Rockefeller"), for lack of personal jurisdiction over Ligand or improper venue.  In the alternative, Ligand moves to transfer this case to the Southern District of California under 28 U.S.C. § 1404(a).  A copending case already exists in the Southern District of California, *Ligand Pharmaceuticals Incorporated v. The Rockefeller University*, Civil Action No. 08 CV 401 BEN WMc, in favor of Ligand's lawsuit for declaratory judgment filed on March 4, 2008, the same date that this lawsuit was originally filed in state court.

1.     A copy of the Complaint is annexed hereto Exhibit K.

2.     This Motion is also supported by Exhibits A through J and a supporting memorandum of law, all of which are incorporated by reference herein.

1

WHEREFORE, Ligand Pharmaceuticals Inc. respectfully requests that this case be dismissed for lack of personal jurisdiction or improper venue or, in the alternative, that the case be transferred to the Southern District of California.

Dated: New York, New York
      March 21, 2008

SIMON MILLER

2

# EXHIBIT A

# LIGAND PHARMACEUTICALS INC

## FORM 10-K
(Annual Report)

## Filed 3/16/2007 For Period Ending 12/31/2006

| | |
|---|---|
| Address | 10275 SCIENCE CENTER DRIVE |
| | SAN DIEGO, California 92121-1117 |
| Telephone | 858-550-7500 |
| CIK | 0000886163 |
| Industry | Biotechnology & Drugs |
| Sector | Healthcare |
| Fiscal Year | 12/31 |

Powered By EDGAR Online

http://www.edgar-online.com/
© Copyright 2006. All Rights Reserved
Distribution and use of this document restricted under EDGAR Online's Terms of Use.

Exhibit A
Page 1

Table of Contents

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

Mark One

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Fiscal Year Ended December 31, 2006

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

Commission File No. 0-20720

# LIGAND PHARMACEUTICALS INCORPORATED
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 77-0160744 |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| 10275 Science Center Drive San Diego, CA | 92121-1117 (Zip Code) |
| (Address of Principal Executive Offices) | |

Registrant's telephone number, including area code: (858) 550-7500

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, par value $.001 per share | The NASDAQ Global Market of The NASDAQ Stock Market LLC |
| Preferred Share Purchase Rights | The NASDAQ Global Market of The NASDAQ Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 of Section 15(d) of the Securities Exchange Act of 1934. Yes ☐   No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer.
Large Accelerated Filer ☐     Accelerated Filer ☑     Non-accelerated Filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2 of the Exchange Act). Yes ☐   No ☑

The aggregate market value of the Registrant's voting and non-voting stock held by non-affiliates was approximately $597.4 million based

Exhibit A

Page 2

Exhibit "7"

103

Table of Contents

PART I

## Item 1. Business

*Caution: This discussion and analysis may contain predictions, estimates and other forward-looking statements that involve a number of risks and uncertainties, including those discussed in Item 1A. "Risk Factors." This outlook represents our current judgment on the future direction of our business. These statements include those related to our restructuring process, AVINZA royalty revenues, product returns, product development, our 2005 restatement, and material weaknesses or deficiencies in internal control over financial reporting. Actual events or results may differ materially from Ligand's expectations. For example, there can be no assurance that our recognized revenues or expenses will meet any expectations or follow any trend(s), that our internal control over financial reporting will be effective or produce reliable financial information on a timely basis, or that our restructuring process will be successful or yield preferred results. We cannot assure you that the Company will be able to successfully or timely complete its restructuring, that we will receive expected AVINZA royalties to support our ongoing business, or that our internal or partnered pipeline products will progress in their development, gain marketing approval or success in the market. In addition, the Company's ongoing SEC investigation may have an adverse effect on the Company. Such risks and uncertainties, and others, could cause actual results to differ materially from any future performance suggested. We undertake no obligation to release publicly the results of any revisions to these forward-looking statements to reflect events or circumstances arising after the date of this annual report. This caution is made under the safe harbor provisions of Section 21E of the Securities Exchange Act of 1934 as amended.*

References to Ligand Pharmaceuticals Incorporated ("Ligand", the "Company", "we" or "our") include our wholly owned subsidiaries — Ligand Pharmaceuticals (Canada) Incorporated; Ligand Pharmaceuticals International, Inc.; Seragen, Inc. ("Seragen"); and Nexus Equity VI LLC ("Nexus").

We were incorporated in Delaware in 1987. Our principal executive offices are located at 10275 Science Center Drive, San Diego, California, 92121. Our telephone number is (858) 550-7500.

## Overview

We are an early-stage biotech company that focuses on discovering and developing new drugs that address critical unmet medical needs in the areas of thrombocytopenia, cancer, hepatitis C, hormone-related diseases, osteoporosis and inflammatory diseases. We strive to develop drugs that are more effective and/or safer than existing therapies, that are more convenient to administer and that are cost effective. We plan to build a profitable company by generating income from research, milestone, royalty and co-promotion revenues resulting from our collaborations with pharmaceutical partners.

In October 2006, we completed the sale of our oncology product line to Eisai Co., LTD (Tokyo) and Eisai Inc. (New Jersey) for approximately $205.0 million. Of this amount, $185.0 million was received in cash and $20.0 million was funded into an escrow account to support any indemnification claims made by Eisai following the closing of the sale. Such cash proceeds are exclusive of transaction fees and costs. The sale included our four marketed oncology drugs: ONTAK, Targretin capsules, Targretin gel and Panretin gel. In addition, certain of our employees were offered employment by Eisai.

In February 2007, we completed the sale of our AVINZA product line to King Pharmaceuticals, Inc ("King"). We received $280.4 million in net cash proceeds at the closing from King which is net of $15.0 million that was funded into an escrow account to support any indemnification claims made by King following the closing of the sale. The net cash amount represents a purchase price of $246.3 million which includes certain inventory-related adjustments, plus approximately $49.1 million in reimbursement of payments to Organon and others. Such net cash proceeds are exclusive of transaction fees and costs. We have now completed the sale of our commercial businesses, thus allowing us to focus our business strategy on a targeted internal research and development effort. We have what we believe are promising products through our internal development programs, including the potential of LGD-4665, which is currently in clinical development.

We have formed research and development collaborations for our products with numerous global pharmaceutical companies with ongoing clinical programs at GlaxoSmithKline, Wyeth, Pfizer Inc. and TAP Pharmaceutical

3

Table of Contents

| Program | Disease/Indication | Development Phase |
|---|---|---|
| LGD-4665 (Thrombopoietin oral mimetic) | Idiopathic Thrombocytopenia Purpura; other thrombocytopenias | Phase I |
| Selective androgen receptor modulators (agonists) | Hypogonadism, osteoporosis, sexual dysfunction, frailty, cachexia | Pre-clinical |
| Selective glucocorticoid receptor modulators | Inflammation, cancer | Research |
| Selective androgen receptor modulators (antagonists) | Prostate cancer Research | Research |

*Thrombopoietin ("TPO") Research Programs*

In our TPO program, we seek to develop our own drug candidates that mimic the activity of thrombopoietin for use in the treatment or prophylaxis of thrombocytopenia with indications in a variety of conditions including Idiopathic Thrombocytopenic Purpura ("ITP"), cancer, hepatitis C and other disorders of blood cell formation. These are large markets with unmet medical needs. For example, the US prevalence of a few target diseases with thrombocytopenia is 200,000 patients with ITP, 1.3 million cancer patients receiving chemotherapy and 2.7 million patients with hepatitis C.

Thrombocytopenia can be caused by insufficient platelet production, splenic sequestration of platelets or increased destruction of platelets predominantly by a patient's own immune system. Thrombocytopenia in cancer patients can be treatment-related (chemotherapy) or cancer-related. Platelet transfusion is the standard of care for thrombocytopenia. However, repeated transfusions can result in the development of platelet alloantibodies that could significantly reduce the effectiveness of transfusions. In addition, patients are at increased risk of infections and allergic reactions. Currently, there is only one approved drug (Neumega) for the prevention of severe thrombocytopenia and the reduction of the need for platelet transfusions in patients with nonmyeloid malignancies. However, we believe that there is a substantial medical need for improved platelet enhancing agents for use in the treatment of thrombocytopenia due to the significant side effects seen with current therapies. Thus, a small molecule TPO mimetic with no apparent immunogenic potential and oral activity that may facilitate dosing may provide an attractive therapeutic profile for a major unmet medical need.

In 1997, we formed a joint research and development alliance with SmithKline Beecham (now GlaxoSmithKline) to focus on the discovery and development of small molecule TPO mimetics. Our partner has two TPO mimetics that were part of our collaboration with them in clinical trials: eltrombopag (Promacta) in Phase II and Phase III trials for multiple indications and SB-559448 in Phase I. For a discussion of these clinical trials, see "Collaborative Research and Development Programs – Thrombopoietin (TPO) Mimetics Collaborative Program – GlaxoSmithKline Collaboration."

After a "wash-out" period following the termination of the research collaboration with GlaxoSmithKline, each party retained rights to perform research and development of new drugs to control hematopoiesis. This wash-out period ended in February 2003 at which time we began to research and later selected a TPO mimetic, LGD-4665, as a clinical candidate and completed preclinical studies in 2006. We initiated Phase I clinical studies in November 2006. We may pursue the specialty applications emerging from our TPO mimetics internally, but may seek collaborations with major pharmaceutical companies to exploit broader clinical applications.

*Selective Androgen Receptor Modulators ("SARM") Research and Development Programs*

We are pioneering the development of tissue selective SARMs, a novel class of non-steroidal, orally active molecules that selectively modulate the activity of the androgen receptor in different tissues, providing a wide range of opportunities for the treatment of many diseases and disorders in both men and women. Tissue-selective androgen receptor agonists may provide utility in the treatment of patients with hypogonadism, osteoporosis, sexual dysfunction and frailty. Tissue-selective androgen receptor antagonists may provide utility in the treatment of patients with prostate cancer, acne, androgenetic alopecia and other diseases. The use of androgen antagonists has shown efficacy in the treatment of prostate cancer, with three androgen antagonists currently approved by the FDA

6

Table of Contents

We are also increasingly subject to regulation by the states. A number of states now regulate, for example, pharmaceutical marketing practices and the reporting of marketing activities, controlled substances, clinical trials and general commercial practices. We have developed and are developing a number of policies and procedures to ensure our compliance with these state laws, in addition to the federal regulations described above. Significant resources are now required on an ongoing basis to ensure such compliance. For a discussion of the risks associated with government regulations, see below under "Item 1A. Risk Factors."

**Patents and Proprietary Rights**

We believe that patents and other proprietary rights are important to our business. Our policy is to file patent applications to protect technology, inventions and improvements to our inventions that are considered important to the development of our business. We also rely upon trade secrets, know-how, continuing technological innovations and licensing opportunities to develop and maintain our competitive position.

As of December 31, 2006, we have filed or participated as licensee in the filing of approximately 37 currently pending patent applications in the United States relating to our technology, as well as foreign counterparts of certain of these applications in multiple countries. In addition, we own or have licensed rights covered by approximately 260 patents issued or applications, granted or allowed worldwide, including United States patents and foreign counterparts to United States patents. Except for a few patents and applications that are not material to our commercial success, these patents and applications will expire between 2008 and 2023. Starting in 2007, we receive royalties from King Pharmaceuticals Inc. on AVINZA representing substantially all of our ongoing revenue. AVINZA is expected to have patent protection in the United States until November 2017. Subject to compliance with the terms of the respective agreements, our rights under our licenses with our exclusive licensors extend for the life of the patents covering such developments. For a discussion of the risks associated with patent and proprietary rights, see below under "Item 1A. Risk Factors."

**Human Resources**

As of March 12, 2007, we had 122 full-time employees including 37 employees who will be supporting the Company providing transitional services for various time periods throughout 2007, following the restructuring announced in January 2007. Following the termination of the transitional employees, we expect to have approximately 85 full time employees of whom 55 will be involved directly in scientific research and development activities. Of these employees, 32 hold Ph.D. or M.D. degrees.

16

Table of Contents

### ITEM 1A. RISK FACTORS

*The following is a summary description of some of the many risks we face in our business. You should carefully review these risks in evaluating our business, including the businesses of our subsidiaries. You should also consider the other information described in this report.*

*Risks Related To Us and Our Business.*

*Failure to timely or successfully restructure our business could have adverse consequences for the Company.*

✱ We completed the sale of our commercial businesses in February 2007. In connection with these sales we are also restructuring our remaining businesses, principally our research and development. We will also be consolidating our staff and facilities. If we are unable to successfully and timely complete this restructuring, our remaining assets could lose value, we may not be able to retain key employees, we may not have sufficient resources to successfully manage those assets or our business, and we may not be able to perform our obligations under various contracts and commitments. Any of these could have substantial negative impacts on our business and our stock price.

*We are substantially dependent on AVINZA royalties for our revenues.*

✱ We recently completed the sale of our two commercial product lines, oncology and pain, which in recent years provided substantially all of our continuing revenue. In each sale we received a one-time upfront cash payment. The consideration for the sale of the pain (AVINZA) franchise also included royalties that we will receive in the future from sales of AVINZA by King Pharmaceuticals, Inc., who acquired the AVINZA rights from us. These consist of a 15% royalty on AVINZA sales for the first 20 months, and then royalty payments ranging from 5-15% of AVINZA sales, depending on the level of total annual sales. These royalties represent and will represent substantially all of our ongoing revenue for the foreseeable future. Although we may also receive royalties and milestones from our partners in various past and future collaborations, the amount of revenue from these royalties and milestones is unknown and highly uncertain.

Thus, any setback that may occur with respect to AVINZA could significantly impair our operating results and/or reduce the market price for our securities. Setbacks could include problems with shipping, distribution, manufacturing, product safety, marketing, government licenses and approvals, intellectual property rights, competition with existing or new products and physician or patient acceptance of the product, as well as higher than expected total rebates, returns or discounts.

AVINZA was licensed from Elan Corporation which is its sole manufacturer. Any problems with Elan's manufacturing operations or capacity could reduce sales of AVINZA, as could any licensing or other contract disputes with Elan, raw materials suppliers, or others.

Similarly, King's AVINZA sales efforts could be affected by a number of factors and decisions regarding its organization, operations, and activities as well as events both related and unrelated to AVINZA. Historically, AVINZA sales efforts, including our own and our prior co-promotion partners, have encountered a number of difficulties, uncertainties and challenges, including sales force reorganizations and lower than expected sales call and prescription volumes, which have hurt and could continue to hurt AVINZA sales growth. AVINZA could also face stiffer competition from existing or future pain products. The negative impact on the product's sales growth in turn may cause our royalties, revenues and earnings to be disappointing.

AVINZA sales also may be susceptible to higher than expected discounts (especially PBM/GPO rebates and Medicaid rebates, which can be substantial), returns and chargebacks and/or slower than expected market penetration that could reduce sales. Other setbacks that AVINZA could face in the sustained-release opioid market include product safety and abuse issues, regulatory action, intellectual property disputes and the inability to obtain sufficient quotas of morphine from the Drug Enforcement Agency ("DEA") to support production requirements.

In particular, with respect to regulatory action and product safety issues, the FDA previously requested expanded warnings on the AVINZA label to alert doctors and patients to the dangers of using AVINZA with alcohol.

17

Table of Contents

regulations, we are required to contract with third parties at substantial cost to us. Our annual cost of compliance with these regulations is approximately $0.7 million. We cannot completely eliminate the risk of accidental contamination or injury from the handling and disposing of hazardous materials, whether by us or by our third-party contractors. In the event of any accident, we could be held liable for any damages that result, which could be significant. We believe that we carry reasonably adequate insurance for toxic tort claims.

***Our shareholder rights plan and charter documents may hinder or prevent change of control transactions.***

Our shareholder rights plan and provisions contained in our certificate of incorporation and bylaws may discourage transactions involving an actual or potential change in our ownership. In addition, our Board of Directors may issue shares of preferred stock without any further action by you. Such issuances may have the effect of delaying or preventing a change in our ownership. If changes in our ownership are discouraged, delayed or prevented, it would be more difficult for our current Board of Directors to be removed and replaced, even if you or our other stockholders believe that such actions are in the best interests of us and our stockholders.

## Item 1B. Unresolved Staff Comments

None.

## Item 2. Properties

We currently lease and occupy office and laboratory facilities in San Diego, California. These include a 52,800 square foot facility leased through July 2015 and an 82,500 square foot facility leased through November 2021, which is a building we previously owned and sold and leased back on November 9, 2006 (see note 21). We expect to consolidate our ongoing operations into the 82,500 square foot facility in 2007 and believe that this location will be adequate to meet our near-term space requirements. Following this consolidation, we plan to sub-lease the 52,800 square foot facility.

## Item 3. Legal Proceedings

*Securities Litigation*

The Company was involved in several securities class action and shareholder derivative actions which followed announcements by the Company in 2004 and the subsequent restatement of its financial results in 2005. In June 2006, we announced that these lawsuits had been settled, subject to certain conditions such as court approval.

*Background*

Beginning in August 2004, several purported class action stockholder lawsuits were filed in the United States District Court for the Southern District of California against the Company and certain of its directors and officers. The actions were brought on behalf of purchasers of the Company's common stock during several time periods, the longest of which runs from July 28, 2003 through August 2, 2004. The complaints generally alleged that the Company violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange Commission by making false and misleading statements, or concealing information about the Company's business, forecasts and financial performance, in particular statements and information related to drug development issues and AVINZA inventory levels. These lawsuits were consolidated and lead plaintiffs appointed. A consolidated complaint was filed by the plaintiffs in March 2005. On September 27, 2005, the court granted the Company's motion to dismiss the consolidated complaint, with leave for plaintiffs to file an amended complaint within 30 days. In December 2005, the plaintiffs filed a second amended complaint again alleging claims under Section 10(b) and 20(a) of the Securities Exchange Act against the Company, David Robinson and Paul Maier. The amended complaint also asserted an expanded Class Period of March 19, 2001 through May 20, 2005 and included allegations arising from the Company's announcement on May 20, 2005 that it would restate certain financial results.

Beginning on or about August 13, 2004, several derivative actions were filed on behalf of the Company by individual stockholders in the Superior Court of California. The complaints named the Company's directors and

24

Table of Contents

commencing as of January 10, 2007. In addition, Mr. Higgins has a performance bonus opportunity with a target of 50% of his salary, up to a maximum of 75%, and received a restricted stock award grant of 150,000 shares of our common stock which vests over two years. We also provided Mr. Higgins with a lump-sum relocation benefit of $100,000. Mr. Higgins' employment agreement provides for severance payments and benefits in the event that employment is terminated under various scenarios, such as a change in control of the Company.

*Reductions in Workforce*

In December 2006, and following the sale of our Oncology Product Line to Eisai, we entered into a plan to eliminate 40 employee positions, across all functional areas, which were no longer deemed necessary considering our decision to sell our commercial assets. Additionally, we terminated 23 AVINZA sales representatives and regional business managers who were not offered positions with King or declined King's offer of employment. The affected employees were informed of the plan in December 2006 with an effective termination date of January 2, 2007. In connection with the termination plan, we recognized operating expenses of approximately $2.9 million in the fourth quarter of 2006, comprised of one-time severance benefits of $2.3 million, stock compensation of $0.3 million, and other costs of $0.3 million. The stock compensation charge resulted from the accelerated vesting and extension of the exercise period of stock options in accordance with severance arrangements of certain senior management members. We paid $0.5 million in December 2006 and the remaining balance in January 2007.

On January 31, 2007 we announced an additional restructuring plan calling for the further elimination of approximately 204 positions across all functional areas. This reduction was made in connection with our efforts to refocus the Company, following the sale of our commercial assets, as a smaller, highly focused research and development and royalty-driven biotech company. Associated with the restructuring and refocused business model, several of our executive officers agreed to step down including our Chief Financial Officer, Chief Scientific Officer and General Counsel. We also announced that our primary operations are expected to be consolidated into one building with the goal to sublet unutilized space. In connection with the restructuring, we expect to take a charge to earnings, the majority of which will be recorded in the first quarter of 2007, of approximately $10.8 million, comprised of one-time severance benefits of $7.5 million, stock compensation of $2.2 million, and other costs of $1.1 million. The stock compensation charge results from the accelerated vesting and extension of the exercise period of stock options in accordance with severance arrangements of certain senior management members.

*Sale and Leaseback of Premises*

On October 25, 2006, we, along with our wholly-owned subsidiary Nexus Equity VI, LLC ("Nexus") entered into an agreement with Slough Estates USA, Inc. ("Slough") for the sale of our real property located in San Diego, California for a purchase price of approximately $47.6 million. This property, with a net book value of approximately $14.5 million, includes one building totaling approximately 82,500 square feet, the land on which the building is situated, and two adjacent vacant lots. As part of the sale transaction, we agreed to leaseback the building for a period of 15 years, as further described below. In connection with the sale transaction, on November 6, 2006, we also paid off the existing mortgage on the building of approximately $11.6 million. The early payment triggered a prepayment penalty of approximately $0.4 million. The sale transaction subsequently closed on November 9, 2006.

Under the terms of the lease, we will pay a basic annual rent of $3.0 million (subject to an annual fixed percentage increase, as set forth in the agreement), plus a 1% annual management fee, property taxes and other normal and necessary expenses associated with the lease such as utilities, repairs and maintenance, etc. We will have the right to extend the lease for two five-year terms and will have the first right of refusal to lease, at market rates, any facilities built on the sold lots.

In accordance with SFAS 13, *Accounting for Leases* , we recognized an immediate pre-tax gain on the sale transaction of approximately $3.1 million and deferred a gain of approximately $29.5 million on the sale of the building. The deferred gain will be recognized on a straight-line basis over the 15 year term of the lease at a rate of approximately $2.0 million per year.

36

Table of Contents

*Reduction in Workforce*

On January 31, 2007, the Company announced an additional restructuring plan calling for the elimination of approximately 204 positions across all functional areas. This reduction was made in connection with the efforts to refocus the Company, following the sale of the Company's commercial assets, as a smaller, highly focused research and development and royalty-driven biotech company. Associated with the restructuring and refocused business model, several of the Company's executive officers agreed to step down including the Chief Financial Officer, Chief Scientific Officer and General Counsel. The Company also announced that primary operations are expected to be consolidated into one building with the goal to sublet un-utilized space. In connection with the restructuring, the Company expects to take a charge to earnings, the majority of which will be recorded in the first quarter of 2007, of approximately $10.8 million, comprised of one-time severance benefits of $7.5 million, stock compensation of $2.2 million, and other costs of $1.1 million. The stock compensation charge results from the accelerated vesting and extension of the exercise period of stock options in accordance with severance arrangements of certain senior management members.

*Sale of AVINZA Product Line*

On September 6, 2006, Ligand and King Pharmaceuticals, Inc. ("King"), entered into a purchase agreement (the "AVINZA Purchase Agreement"), pursuant to which King agreed to acquire all of the Company's rights in and to AVINZA in the United States, its territories and Canada, including, among other things, all AVINZA inventory, records and related intellectual property, and assume certain liabilities as set forth in the AVINZA Purchase Agreement (collectively, the "Transaction"). In addition, King, subject to the terms and conditions of the AVINZA Purchase Agreement, agreed to offer employment following the closing of the Transaction (the "Closing") to certain of the Company's existing AVINZA sales representatives or otherwise reimburse the Company for agreed upon severance arrangements offered to any such non-hired representatives.

Pursuant to the AVINZA Purchase Agreement, at Closing on February 26, 2007 (the "Closing Date"), the Company received $280.4 million in net cash proceeds, which is net of $15.0 million that was funded into an escrow account to support potential indemnification claims made by King following the Closing. The net cash received includes the purchase price of $246.3 million which is net of an adjustment of approximately $12.7 million due to estimated retail inventory levels of AVINZA at the Closing Date exceeding targeted levels. This adjustment is subject to the outcome of final studies and review by King which could therefore result in a subsequent adjustment to the net purchase price. The purchase price also reflects a reduction of $6.0 million for anticipated higher cost of goods for King related to the Cardinal Health PTS, LLC ("Cardinal") manufacturing and packaging agreement (see Note 12). At the closing, Ligand agreed to not assign the Cardinal agreement to King, wind down the contract, and remain responsible for any resulting liabilities. The Company will record a charge as a reduction to the gain on the sale of the AVINZA product line in the first quarter of 2007 for any liabilities incurred in connection with the winding down of the Cardinal agreement.

105

# EXHIBIT B

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THE ROCKEFELLER UNIVERSITY, a          Case No. 08 cv 2755-KPC-HP
New York not-for-profit corporation,

        Plaintiff,

    v.

LIGAND PHARMACEUTICALS
INCORPORATED, a Delaware corporation,

        Defendant.

## DECLARATION OF ALAN KESSLER

I, Alan Kessler, declare as follows:

1.     I am employed by Knobbe Martens Olson & Bear LLP of San Diego California as an Associate. I have been employed by Knobbe for the past six months.

2.     I have knowledge about and a general understanding of SEC filings of Ligand and records of the filings for Ligand. In addition to paper records, I am familiar with the Ligand website, http://investors.ligand.com/index.cfm, where copies of SEC filings from the years 1996 through the present are available for public and investor access.

3.     The SEC filings of Ligand includes reports and other documents made at or near the relevant time period during the course of Ligand's regular business activities and as required by the SEC.

4.     Exhibits A, F and G to the motion to dismiss or transfer, to which I understand this declaration is attached, are true and correct copies of portions of filings made by Ligand with the SEC. The type of filing, Form 10K or other filing, is indicated on the face of the respective Exhibit.

5.     I went to the New York and California Secretary of State on-line records for Ligand Pharmaceuticals and reviewed the State documents. I printed out a compilation of both

New York and California records which are attached as Exhibit D. Exhibit D is a true and correct copy of compilations of Secretary of State Documents from New York and California pertaining to Ligand.

6.     Attached is a true and accurate copy of Rockefeller University's Motion to Dismiss or, In the Alternative, Stay this Action which was filed in the United States District Court- Southern District which I obtained from PACER. This copy is labeled as Exhibit J.

7.     Attached is a true and accurate copy of Ligand Pharmaceuticals' complaint as it was filed in the Southern District of California and which I obtained from the files of Knobbe Martens Olson & Bear LLP. This copy is labeled as Exhibit I.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on March 20th, 2008 in San Diego, California.

Name:  _Alan Kessler_
       Alan Kessler

5031762
031808

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THE ROCKEFELLER UNIVERSITY, a
New York not-for-profit corporation,

        Plaintiff,

    v.

LIGAND PHARMACEUTICALS
INCORPORATED, a Delaware corporation,

        Defendant.

Case No. 08 cv 2755-KPC-HP

## DECLARATION OF AUDREY WARFIELD-GRAHAM

I, Audrey Warfield-Graham, declare as follows:

1.    I am employed by Ligand Pharmaceuticals, Inc. ("Ligand") as Vice President, Human Resources. I have held that position for the past three months and have worked for Ligand for the past thirteen (13) years, all in Human Resources.

2.    I reside in San Diego, California.

3.    As part of my responsibilities as Vice President, Human Resources, I have an understanding of the history of the business of Ligand, including product sales as well as Ligand's business activities in California and elsewhere. Each of the following statements is true to the best of my knowledge:

4.    Ligand is a Delaware corporation, based in San Diego, California, where all of its facilities and employees are located, and where it performs all of its basic discovery research activities.

5.    Ligand owns no real estate nor does it lease or rent any real property in New York.

Exhibit C
Page 1

6.    Ligand maintains no telephone listing or mailing addresses in the State of New York.

7.    Ligand does not sell products in the State of New York, nor does it market or advertise directly to the residents thereof.

8.    Ligand has no research facility, no employees or sales representatives in the State of New York.

9.    Ligand has never brought a lawsuit in the State of New York.

10.    I am familiar with Ligand's past commercial activities as well as those at present. From about 1998 to about 2007, Ligand sold two product lines nationwide, including in the State of New York, an oncology product line and a pain and inflammation product known as AVINZA®.

11.    By 2007 Ligand ceased selling and marketing both the oncology line and the AVINZA® product.

12.    By the end of 2007, Ligand's activities were limited to internal research and development activities, virtually all of which is based in Ligand's scientific facility in San Diego, California. Ligand has no facilities outside San Diego.

13.    As part of my job responsibilities for Ligand, I have personal knowledge about Ligand's past and present employees and about the nature of the records and other information kept by Ligand regarding its current and former employees.

14.    I have participated in preparing and have reviewed Exhibit H, which is a true and accurate list of persons employed or formerly employed by Ligand in connection with the development of assays and/or products at issue in this lawsuit.

15.    Exhibit H includes each person's name, last know address, by city and state only to protect confidentiality, and job title, all of which I verified from records I maintain for Ligand or which I personally determined, if there was no current record.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Exhibit C
Page 2
Exhibit "7"
117

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March _19_, 2008 in San Diego, California.

Name:_____

Audrey Warfield-Graham

Exhibit C
Page 3
Exhibit "7"
118

# EXHIBIT D

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: LIGAND PHARMACEUTICALS INCORPORATED

Selected Entity Status Information

**Current Entity Name:** LIGAND PHARMACEUTICALS INCORPORATED
**Initial DOS Filing Date:** SEPTEMBER 16, 1998
**County:** NEW YORK
**Jurisdiction:** DELAWARE
**Entity Type:** FOREIGN BUSINESS CORPORATION
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

**Chairman or Chief Executive Officer**
DAVID E ROBINSON
10275 SCIENCE CENTER DR
SAN DIEGO, CALIFORNIA, 92121-1117

**Principal Executive Office**
LIGAND PHARMACEUTICALS INCORPORATED
10275 SCIENCE CENTER DR
SAN DIEGO, CALIFORNIA, 92121-1117

**Registered Agent**
C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page     NYS Department of State Home Page

http://appsext8.dos.state.ny.us/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_...     3/5/2008

Exhibit D
Page 1

California Business Search

Page 1 of 1

# California Business Portal

Secretary of State DEBRA BOWEN

**DISCLAIMER:** The information displayed here is current as of FEB 29, 2008 and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| LIGAND PHARMACEUTICALS INCORPORATED | | |
| **Number:** C1598280 | **Date Filed:** 10/13/1987 | **Status:** active |
| **Jurisdiction:** DELAWARE | | |
| **Address** | | |
| 10275 SCIENCE CENTER DR | | |
| SAN DIEGO, CA 92121 | | |
| **Agent for Service of Process** | | |
| WARNER R BROADDUS | | |
| 10275 SCIENCE CENTER DR | | |
| SAN DIEGO, CA 92121 | | |

Blank fields indicate the information is not contained in the computer file.

If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code Section 2114 for information relating to service upon corporations that have surrendered.

http://kepler.sos.ca.gov/corpdata/ShowAllList?QueryCorpNumber=C1598280&printer=yes    3/5/2008

Exhibit D
Page 2
Exhibit "7"
121

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THE ROCKEFELLER UNIVERSITY, a           Case No. 08 cv 2755-KPC-HP
New York not-for-profit corporation,

        Plaintiff,

   v.

LIGAND PHARMACEUTICALS
INCORPORATED, a Delaware corporation,

        Defendant.


## DECLARATION OF KEITH B. MARSCHKE

I, Keith B. Marschke, declare as follows:

1.     I am employed by Ligand Pharmaceuticals, Inc. ("Ligand") as Senior Director of Molecular Science. I have held my current position since October of 2007 and I have worked for Ligand for fourteen (14) years.

2.     I reside in San Diego, California.

3.     As part of my responsibilities as Senior Director, I have an understanding of the history of the business of Ligand, including its research and development and product sales as well as Ligand's research activities in California and elsewhere. Each of the following statements is true to the best of my knowledge.

4.     I have a B.S in Science from Oklahoma Baptist University in 1980 and a Ph.D. in Molecular Pathobiology from Wake Forest University in 1988.

5.     I did a post-doctoral fellowship at the University of North Carolina from 1988 to 1994, at which time I joined Ligand.

6.     I have a technical understanding and knowledge about Ligand's oncology product line and the AVINZA® product, neither of which is currently made or sold by Ligand. Neither is

related to the technology I understand is involved in this lawsuit, thrombopoeitin ("TPO") mimetic compounds and assays for the identification of TPO mimetic compounds.

7.   I know Ligand entered into an agreement (the "GSK Agreement") in 1994 with SmithKline Beecham Corporation, which is now known as GlaxoSmithKline ("GSK").

8.   Virtually all of the work performed by Ligand pursuant to the GSK Agreement was performed in San Diego, California.

9.   LGD-4665 is a potential pharmaceutical product that was discovered by Ligand in San Diego in a research program that started no earlier than the second half of 2003. GSK had no involvement in the development of LGD-4665.

10.   With respect to LGD-4665, all of the laboratory notebooks and other records documenting the development of LGD-4665 are located in San Diego, California.

11.   In addition, the large majority of the personnel who were involved in the discovery and research of LGD-4665 are presently located in California, as shown in Exhibit H attached to a motion to dismiss or transfer filed in this lawsuit.

12.   Dr. James Darnell is associated with The Rockefeller University, plaintiff in the above-identified lawsuit. Dr. Darnell has served on Ligand's Scientific Advisory Board for several years and visited Ligand scientists in San Diego for Scientific Advisory Board meetings I attended from 1996 until at least 2001.

13.   As part of my job responsibilities, both past and present, for Ligand, I supervise the people working in research and development of new assays for pharmaceutical compounds. It is and has been my responsibility to have knowledge of the specific skills and job responsibilities of those individuals under my supervision.

14.   I have reviewed the document that is attached to a motion to dismiss or transfer filed in this lawsuit as Exhibit H. Exhibit H is a true and accurate list of scientists and technical persons employed or formerly employed by Ligand in connection with the development of assays and/or products at issue in this lawsuit. I am familiar with the technical skills and specific job responsibilities of each of the persons listed.

15.    I participated in the preparation of the document referenced as Exhibit H by identifying those persons involved in development of the drugs identified respectively as eltrombopag and LGD-4665.

16.    I am familiar with the work done by Ligand and GSK in connection with the GSK Agreement.  Ligand's work under the agreement was performed only in San Diego, California and nowhere else.  For instance, Ligand performed no such work in New York State.

17.    I am familiar with the work performed by Ligand on LGD-4665.  That work has been independent of the GSK Agreement.

18.    Nearly all of persons knowledgeable about both the GSK Agreement and LGD-4665 reside in or near San Diego, California.  Further, all of the laboratory notebooks and other records documenting that work are kept and stored in Ligand's offices in San Diego, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 20, 2008 in Cambridge, MA.

Name: _Keith B. Marschke_
Keith B. Marschke

# EXHIBIT F

# LIGAND PHARMACEUTICALS INC

## FORM 10-K
(Annual Report)

### Filed 3/31/1997 For Period Ending 12/31/1996

| | |
|---|---|
| Address | 10275 SCIENCE CENTER DRIVE |
| | SAN DIEGO, California 92121-1117 |
| Telephone | 858-550-7500 |
| CIK | 0000886163 |
| Industry | Biotechnology & Drugs |
| Sector | Healthcare |
| Fiscal Year | 12/31 |

Generated by EDGAR Online Pro
http://pro.edgar-online.com



Contact EDGAR Online
Customer Service 203-852-5666
Corporate Sales 212-457-8200

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549
# FORM 10-K
### MARK ONE

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES
EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED DECEMBER 31, 1996, OR

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934 (NO FEE REQUIRED)

FOR THE TRANSITION PERIOD COMMISSION FILE NUMBER: 0-20720
FROM _____ TO _____ .

# LIGAND PHARMACEUTICALS INCORPORATED
### (EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| | |
|---|---|
| DELAWARE | 77-0160744 |
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |
| 9393 TOWNE CENTRE DRIVE SAN DIEGO, CA | 92121 (ZIP CODE) |
| (ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) | |

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (619) 535-3900

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:
NONE
SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
COMMON STOCK, $.001 PAR VALUE
(TITLE OF CLASS)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X No ___

Indicate by check mark if disclosure of delinquent filers pursuant to

Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

The aggregate market value of the Registrant's voting stock held by non-affiliates as of February 28, 1997 was $341,654,552. For purposes of this calculation, shares of Common Stock held by directors, officers and 5% stockholders known to Registrant have been deemed to be owned by affiliates.

As of February 28,1997 the registrant had 32,017,640 shares of Common Stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's Proxy Statement to be filed not later than 120 days after December 31, 1996, in connection with the Registrant's 1997 Annual Meeting of Stockholders, referred to herein as the "Proxy Statement", are incorporated by reference into Part III of this Form 10-K.

and June 2000. If Ligand exercises the ALRT Stock Purchase Option, Allergan has an option to purchase an undivided 50% interest in all of the assets of ALRT at prices ranging from $8.9 million to $15.0 million. Since 1992, Allergan Ireland, a wholly owned subsidiary of Allergan, has made $30.0 million in equity investments in Ligand. As of December 31, 1996, ALRT had provided approximately $30.6 million in research funding to Ligand under the Research and Development Agreement. Based on the current level of product development expenditures, ALRT has announced that it could use substantially all of the funds available for research and development in late 1997 or early 1998, which would trigger the ALRT Stock Purchase Option. The Company has made no determination concerning the exercise of either the ALRT 1057 option or the ALRT Stock Purchase Option.

Pfizer Inc. In May 1991, Ligand entered into a five-year collaborative research and development and license agreement with Pfizer to develop better alternative therapies for osteoporosis. Pfizer agreed to provide up to $3.0 million per year in research funding to Ligand in addition to committing significant internal resources. In November 1993, Ligand and Pfizer announced the successful completion of the research phase of their alliance with the identification of a development candidate and backups for the prevention and treatment of osteoporosis. In preclinical studies, the candidates from the program mimic the beneficial effects of estrogen on bone and have an impact on blood serum lipids often associated with cardiac benefits without increasing uterine or breast tissue proliferation. Under the terms of the collaboration, Pfizer has primary responsibility for pharmacology, medicinal chemistry to optimize the drug candidates, preclinical testing, and clinical trials of drug candidates for marketing approval by the FDA and certain other regulatory agencies. Ligand has granted Pfizer exclusive worldwide rights to manufacture and market any compounds jointly developed for osteoporosis. Ligand is to receive up to $7.5 million in milestone payments as development objectives are achieved, in addition to royalties on sales of successful drugs that emerge from the alliance. As of December 31, 1993, Pfizer had made a total of $7.5 million of equity investments in Ligand and had funded approximately $9.4 million in research funding.

In December 1994, Ligand filed suit against Pfizer in the Superior Court of California in San Diego County for breach of contract and for a declaration of future rights as they relate to droloxifene, a compound upon which Ligand performed work at Pfizer's request during the collaboration between Pfizer and Ligand to develop drugs in the field of osteoporosis. Droloxifene is an estrogen antagonist/partial agonist with potential indications in the treatment of osteoporosis and breast cancer as well as other applications. Ligand and Pfizer entered into a settlement agreement with respect to the lawsuit in April 1996. Under the terms of the settlement agreement, Ligand is entitled to receive milestone payments if Pfizer continues development and royalties if Pfizer commercializes droloxifene. At the option of either party, milestone and royalty payments owed Ligand can be satisfied by Pfizer transferring to Ligand shares of Common Stock at an exchange ratio of $12.375 per share. To date, Ligand has received approximately $1.3 million in milestone payments from Pfizer as a result of the continued development of droloxifene. These milestones were paid in the form of an aggregate of 101,011 shares of Common Stock, which were subsequently retired from treasury stock in September 1996. According to announcements by Pfizer, droloxifene has entered Phase II clinical trials for osteoporosis and Phase III clinical trials for breast cancer.

The Salk Institute of Biological Studies. In October 1988, Ligand established an exclusive relationship with The Salk Institute which is one of the leading research centers in the area of IR technology. Dr. Ronald Evans, who cloned and characterized the first IR in 1985 and who invented the co-transfection assay used by Ligand, is a professor in the Gene Expression Laboratory of The Salk Institute and an Investigator of the Howard Hughes Medical Institute. Under the agreement, Ligand has an exclusive, worldwide license to the intracellular receptor technology developed by Dr. Evans' laboratory at The Salk Institute. Subject to compliance with the terms of the agreement, the term of the license extends for the life of the patents covering such developments.

Under the agreement, Ligand made an initial payment to The Salk Institute and issued shares of Common Stock as partial consideration for the license. Ligand is also obligated to make certain royalty payments based on sales of certain products developed using the licensed technology, as well as certain minimum annual royalty payments.

Ligand also entered into exclusive consulting agreements with Dr. Evans that continue through July 1998. Under these agreements, Dr. Evans has purchased Common Stock and has been granted options to purchase Common Stock. As a consultant, Dr. Evans meets on a regular basis with Company personnel to review ongoing research and to assist Ligand in defining the technical objectives of future research. Dr. Evans is also involved in identifying new developments made in other leading academic laboratories which relate to Ligand's research interests. Dr. Evans serves as Chairman of Ligand's Scientific Advisory Board.

Baylor College of Medicine. In January 1990, Ligand established an exclusive relationship with Baylor, which is a leading center of IR technology. Dr. Bert W. O'Malley is a professor and the Chairman of the Center for Reproductive Biology at Baylor and

23

leads IR research at that institution. Important features of Ligand's co-transfection assay were developed in Dr. O'Malley's laboratory and are exclusively licensed by Ligand. Ligand has entered into a series of agreements with Baylor under which it has an exclusive, worldwide license to IR technology developed at Baylor and to future improvements made in Dr. O'Malley's laboratory through March 1997. Subject to compliance with the terms of the agreements, the term of the license may extend for the life of the patents covering such developments.

Ligand works closely with Dr. O'Malley and Baylor in scientific IR research, particularly in the area of sex steroids and orphan IRs. Under the agreement, Ligand is obligated to make payments to Baylor College of Medicine in support of research done in Dr. O'Malley's laboratory for the period from April 1992 through March 1997. Ligand is also obligated to make certain royalty payments based on the sales of products developed using the licensed technology. Ligand also entered into an exclusive consulting agreement with Dr. O'Malley through September 1996. Dr. O'Malley is a member of Ligand's Scientific Advisory Board. Dr. O'Malley has purchased Common Stock and has been granted options to purchase Common Stock.

Rockefeller University. In September 1992, Ligand entered into a worldwide, exclusive license agreement with Rockefeller University and exclusive consulting agreements with Dr. James Darnell of Rockefeller University and Dr. David Levy of NYU to develop and commercialize certain technology involving STATs to control gene expression. Dr. Darnell is one of the leading investigators of the control of gene expression by STATs. Rockefeller University will receive (i) payments upon the transfer of the technology to Ligand and upon the first four anniversary dates of the agreement, (ii) a royalty on any commercialized products and (iii) subject to a vesting schedule, shares of Common Stock and warrants to purchase shares of Common Stock. In consideration of related technology assigned by NYU to Rockefeller University and covered by the license agreement with Ligand, NYU received, subject to a vesting schedule, shares of Common Stock and warrants to purchase shares of Common Stock. Subject to a vesting schedule tied to their consulting agreements, Dr. Darnell and Dr. Levy received shares of Common Stock. In addition, in October 1994 Ligand granted Dr. Darnell options to purchase shares of Common Stock.

In addition to the collaborations discussed above, the Company also has a number of other consulting, licensing, development and academic agreements by which it strives to advance its technology.

## PATENTS AND PROPRIETARY RIGHTS

Ligand believes that patents and other proprietary rights are important to its business. Ligand's policy is to file patent applications to protect technology, inventions and improvements to its inventions that are considered important to the development of its business. Ligand also relies upon trade secrets, know-how, continuing technological innovations and licensing opportunities to develop and maintain its competitive position.

To date, Ligand has filed or participated as licensee in the filing of over 190 currently pending patent applications in the United States relating to Ligand's technology, as well as foreign counterparts of certain of these applications in many countries. In addition, Ligand is the exclusive licensee to rights covered by 150 patents issued or allowed worldwide to The Salk Institute, Baylor and other licensors. Subject to compliance with the terms of the respective agreements, Ligand's rights under its license with The Salk Institute, and other exclusive licensors, extend for the life of the patents covering such developments.

The patent positions of pharmaceutical and biotechnology firms, including Ligand, are uncertain and involve complex legal and factual questions for which important legal principles are largely unresolved. In addition, the coverage claimed in a patent application can be significantly reduced before or after a patent is issued. The situation is also affected by the fact that the patent law of the United States is changed from time to time. For example, during 1995, the patent term was changed from 17 years from patent grant to 20 years from the filing date of the application for patent. Since a patent has no effect until granted, and because the time during which a patent application spends before the Patent Office cannot be predicted, the actual term of a patent cannot be known until it is granted and that term may be substantially less than the 17 years allowed under former law. Also during 1995, certain advantages of U.S. inventors over foreign inventors were eliminated from the patent law. There are currently pending before the Congress other changes to the patent law which may adversely affect pharmaceutical and biotechnology firms. The extent to which the changes made in 1995 and changes which might occur if pending legislation is adopted would affect the operations of Ligand cannot be ascertained. There can be no assurance that any patent applications will result in the issuance of patents or, if any patents are issued, that they will provide significant proprietary protection or, instead, will be circumvented or invalidated. Since under current law patent applications in the United States are maintained in secrecy until foreign counterparts, if any, publish or patents issue and since publication of discoveries in the scientific or patent literature often lag behind actual discoveries, Ligand

24

that have been developed and successfully commercialized that interact directly with STATs. Much remains to be learned about the location and function of IRs and STATs. Most of the Company's potential products will require extensive additional development, including preclinical testing and clinical trials, as well as regulatory approvals, prior to commercialization. No assurance can be given that the Company's product development efforts will be successful, that required regulatory approvals from the FDA or equivalent foreign authorities for any indication will be obtained or that any products, if introduced, will be capable of being produced in commercial quantities at reasonable costs or will be successfully marketed. Further, the Company has no sales and only limited marketing capabilities outside Canada, and even if the Company's products in internal development are approved for marketing, there can be no assurance that the Company will be able to develop such capabilities or successfully market such products.

HISTORY OF OPERATING LOSSES; ACCUMULATED DEFICIT; FUTURE CAPITAL NEEDS; UNCERTAINTY OF ADDITIONAL FUNDING. Ligand has experienced significant operating losses since its inception in 1987. As of December 31, 1996, Ligand had an accumulated deficit of approximately $177.6 million. To date, substantially all of Ligand's revenues have consisted of amounts received under collaborative arrangements. The Company expects to incur additional losses at least over the next several years and expects losses to increase as the Company's research and development efforts and clinical trials progress.

The discovery and development of products will require the commitment of substantial resources to conduct research, preclinical testing and clinical trials, to establish pilot scale and commercial scale manufacturing processes and facilities, and to establish and develop quality control, regulatory, marketing, sales and administrative capabilities. The future capital requirements of the Company will depend on many factors, including the pace of scientific progress in its research and development programs, the magnitude of these programs, the scope and results of preclinical testing and clinical trials, the time and costs involved in obtaining regulatory approvals, the costs involved in preparing, filing, prosecuting, maintaining and enforcing patent claims, competing technological and market developments, the ability to establish additional collaborations, changes in existing collaborations, the cost of manufacturing scale-up and the effectiveness of the Company's commercialization activities. To date, Ligand has not generated any revenue from the sales of products developed by Ligand or its collaborative partners. There can be no assurance that Ligand independently or through its collaborations will successfully develop, manufacture or market any products or ever achieve or sustain revenues or profitability from the commercialization of such products. Moreover, even if profitability is achieved, the level of that profitability cannot be accurately predicted. Ligand expects that operating results will fluctuate from quarter to quarter as a result of differences in the timing of expenses incurred and the revenues received from collaborative arrangements and other sources. Some of these fluctuations may be significant. The Company believes that its available cash, cash equivalents, marketable securities and existing sources of funding will be adequate to satisfy its anticipated capital requirements through 1998, assuming the Company does not exercise for cash its options to acquire either the assets related to Oral Panretin (ALRT1057) or Topical Panretin (ALRT1057) or the outstanding callable common stock of ALRT. Based on the current level of product development expenditures, ALRT has announced it could use substantially all of the funds available for research and development in late 1997 or early 1998, which would trigger the ALRT Stock Purchase Option. The Company has made no determination concerning the exercise of either the ALRT1057 Option or the ALRT Stock Purchase Option.

Glycomed's outstanding indebtedness includes $50 million principal amount of 7 1/2% Convertible Subordinated Debentures Due 2003 (the "Debentures"). There can be no assurance that Glycomed will have the funds necessary to pay the interest on and the principal of the Debentures or, if not, that it will be able to refinance the Debentures.

The Company expects that it will seek any additional capital needed to fund its operations through new collaborations, the extension of existing collaborations, or through public or private equity or debt financings. There can be no assurance that additional financing will be available on acceptable terms, if at all. Any inability of the Company to obtain additional financing or of Glycomed to service its obligations under the Debentures could have a material adverse effect on the Company.

UNCERTAINTIES RELATED TO CLINICAL TRIALS. Before obtaining required regulatory approvals for the commercial sale of each product under development, the Company and its collaborators must demonstrate through preclinical studies and clinical trials that such product is safe and efficacious for use. The results of preclinical studies and initial clinical trials are not necessarily predictive of results that will be obtained from large-scale clinical trials, and there can be no assurance that clinical trials of any product under development will demonstrate the safety and efficacy of such product or will result in a marketable product. The safety and efficacy of a therapeutic product under development by the Company must be supported by extensive data from clinical trials. A number of companies have suffered significant setbacks in advanced clinical trials, despite promising results in earlier trials. The failure to demonstrate adequately the safety and efficacy of a therapeutic drug under development would delay or prevent regulatory approval

29

Exhibit F
Page 5

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

This annual report on Form 10-K may contain predictions, estimates and other forward-looking statements that involve a number of risks and uncertainties, including those discussed in Item 1 above at "Risks and Uncertainties." While this outlook represents management's current judgment on the future direction of the business, such risks and uncertainties could cause actual results to differ materially from any future performance suggested below. The Company undertakes no obligation to release publicly the results of any revisions to these forward-looking statements to reflect events or circumstances arising after the date hereof.

## OVERVIEW

Since January 1989, the Company has devoted substantially all of its resources to its intracellular receptor and Signal Transducers and Activators of Transcription drug discovery and development programs. The Company has been unprofitable since its inception and expects to incur substantial additional operating losses for the next several years, due to continued requirements for research and development, preclinical testing, regulatory activities, establishment of manufacturing processes and sales and marketing capabilities. The Company expects that losses will fluctuate from quarter to quarter as a result of differences in the timing of expenses incurred and the revenues earned from collaborative arrangements. Some of these fluctuations may be significant. As of December 31, 1996, the Company's accumulated deficit was approximately $177.6 million. In October 1996, the Company completed a public offering of 3,162,500 shares of common stock at $12.00 per share, for net proceeds of approximately $35.3 million.

In May 1995, Glycomed Incorporated ("Glycomed") was merged into a wholly-owned subsidiary of the Company ("the Merger"). Glycomed is a biopharmaceutical company conducting research and development of pharmaceuticals based on biological activities of complex carbohydrates. Each outstanding share of Glycomed common stock was converted into 0.5301 shares of the Company's common stock, resulting in the issuance of 6,942,911 shares of the Company's common stock to Glycomed shareholders. The Merger was accounted for using the purchase method of accounting. The excess of the purchase price over the fair value of the net assets acquired was allocated to in-process technology and was written off, resulting in a one time non-cash charge to results of operations of approximately $19.6 million. The results of operations of Glycomed are included in the Company's consolidated results of operations from the date of the Merger.

In December 1994, the Company and Allergan, Inc. ("Allergan") formed Allergan Ligand Retinoid Therapeutics, Inc. ("ALRT") to continue the research and development activities previously conducted by the Allergan Ligand Joint Venture (the "Joint Venture"). In June 1995, the Company and ALRT completed a public offering of 3,250,000 units (the "Units") with aggregate proceeds of $32.5 million ( the "ALRT Offering") and cash contributions by Allergan and the Company of $50.0 million and $17.5 million, respectively, providing for net proceeds of $94.3 million for retinoid product research and development. Each Unit consisted of one share of ALRT's callable common stock and two warrants, each warrant entitling the holder to purchase one share of the common stock of the Company. Immediately prior to the consummation of the ALRT Offering on June 3, 1995, Allergan Pharmaceuticals (Ireland) Ltd., Inc. made a $6.0 million investment in the Company's common stock. The Company's $17.5 million cash contribution resulted in a one-time charge to operations. The Company also recorded a warrant subscription receivable and corresponding increase in paid-in capital of $5.9 million pursuant to the ALRT Offering. Since June 3, 1995, cash received from ALRT pursuant to a Research and Development Agreement was prorated between contract revenue and the warrant subscription receivable based on their respective values. For the years ended 1996 and 1995, $2.1 million and $1.3 million, respectively, of the revenue proceeds received from ALRT were applied to the warrant subscription receivable. In conjunction with the consummation of the ALRT Offering, all rights held by the Joint Venture were licensed to ALRT. The Company, Allergan and ALRT entered into certain other agreements in connection with the funding of ALRT, including, a Technology License Agreement, a Commercialization Agreement and Services and Administrative Agreements and ALRT granted to Ligand and Allergan an option to acquire certain assets related to Oral and Topical Panretin (ALRT 1057) (the "ALRT 1057 Option") and an option to acquire all the outstanding shares of ALRT callable common stock (the "ALRT Stock Purchase Option").

## RESULTS OF OPERATIONS

Year Ended December 31, 1996 ("1996"), Compared with Year Ended December 31, 1995 ("1995")

The Company had revenues of $ 36.8 million for 1996 compared to revenues of $24.5 million for 1995. The increase in revenues is primarily due to increased revenues from ALRT, milestone revenues from Pfizer Inc. ("Pfizer"), increased revenues under an expanded and amended research and development agreement entered into in January 1996 (which began in September 1994) with Wyeth-Ayerst Laboratories, the pharmaceutical division of American Home Products Corporation ("AHP"), and a full year effect of

40

# EXHIBIT G

# LIGAND PHARMACEUTICALS INC

### FORM 10-K
(Annual Report)

### Filed 3/31/2006 For Period Ending 12/31/2005

| | |
|---|---|
| Address | 10275 SCIENCE CENTER DRIVE |
| | SAN DIEGO, California 92121-1117 |
| Telephone | 858-550-7500 |
| CIK | 0000886163 |
| Industry | Biotechnology & Drugs |
| Sector | Healthcare |
| Fiscal Year | 12/31 |

Powered By EDGAR Online

http://www.edgar-online.com/
© Copyright 2006. All Rights Reserved
Distribution and use of this document restricted under EDGAR Onlines Terms of Use.

Table of Contents

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

**Mark One**

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Fiscal Year Ended December 31, 2005

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____ .

Commission File No. 0-20720

# LIGAND PHARMACEUTICALS INCORPORATED

### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0160744** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| **10275 Science Center Drive** **San Diego, CA** | **92121-1117** |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: (858) 550-7500

Securities registered pursuant to Section 12(b) of the Act:
None

Securities registered pursuant to Section 12(g) of the Act:
Common Stock, $.001 par value

Preferred Share Purchase Rights
(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐    No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 of Section 15(d) of the Securities Exchange Act of 1934. Yes ☐    No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):
Large accelerated filer ☐      Accelerated filer ☑      Non-accelerated filer ☐

Exhibit G

Page 2

Table of Contents

IND track, the compound numbers for which have not been disclosed. If IND's are filed by May 2006, the Company will continue to qualify for milestones and royalties.

*Inflammatory Disease Collaborative Program*

   *Abbot Collaboration.* In July 1994, we entered into a research and development collaboration with Abbott Laboratories ("Abbott") to discover and develop small molecule compounds for the prevention or treatment of inflammatory diseases. The collaborative program includes several molecular approaches to discovering modulators of glucocorticoid receptor activity that have significantly improved therapeutic profiles relative to currently known anti-inflammatory steroids such as prednisone and dexamethasone. The collaboration was focused on the development of novel non-steroidal glucocorticoids that maintain the efficacy of corticosteroids, but lack some or all of corticosteroids' dose-limiting side effects. The research phase concluded in July 1999.

   When the research phase of the collaboration ended in July 1999, Abbott retained rights to certain selective glucocorticoid receptor modulators, or SGRMs, whose development has now been slowed or halted. We retained rights to all other compounds discovered through the collaboration, as well as recaptured technology rights. Abbott will make milestone and royalty payments on products targeted at inflammation resulting from the collaboration. Each party will be responsible for the development, registration, and commercialization of the products in its respective field.

*TPO / Inflamatory Disease / Oncology Collaborative Program*

   *GlaxoSmithKline Collaboration.* In February 1995, we entered into a research and development collaboration with SmithKline Beecham (now GlaxoSmithKline) to use our proprietary expertise to discover and characterize small molecule, orally bioavailable drugs to control hematopoiesis (the formation and development of blood cells) for the treatment of a variety of blood cell deficiencies. In 1998, we announced the discovery of the first non-peptide small molecule that mimics in mice the activity of Granulocyte-Colony Stimulating Factor ("G-CSF"), a natural protein that stimulates production of infection-fighting neutrophils (a type of white blood cell). While this lead compound has only been shown to be active in mice, its discovery is a major scientific milestone and suggests that orally active, small-molecule mimics can be developed not only for G-CSF, but for other cytokines as well.

   A number of lead molecules have been found that mimic the activity of natural growth factors for white cells and platelets. In the fourth quarter of 2002, we earned a $2.0 million milestone payment from GlaxoSmithKline, in connection with the commencement of human trials of eltrombopag (formerly SB-497115, hereafter referred to as "eltrombopag"), an oral, small molecule drug that mimics the activity of thrombopoietin (TPO), a protein factor that promotes growth and production of blood platelets. In February 2005, we announced that we had earned a $1.0 million milestone payment from GlaxoSmithKline with that company's commencement of Phase II trials of eltrombopag. In June 2005, we earned a $2.0 million milestone payment as SB-559448, a second TPO agonist, began Phase I development. Additionally, in February 2006, we earned a $2.0 million milestone in connection with the commencement of Phase III trials of eltrombopag. There are no approved oral TPO agents for the treatment or prevention of thrombocytopenias (decreased platelet count). Investigational use of injectable forms of recombinant human TPO has been effective in raising platelet levels in cancer patients undergoing chemotherapy, and has led to accelerated hematopoietic recovery when given to stem cell donors. Some of these investigational treatments have not moved forward to registration due to the development of neutralizing antibodies. Thus, a small molecule TPO mimic with no apparent immunogenic potential and oral activity that may facilitate dosing may provide an attractive therapeutic profile for a major unmet medical need.

   The research phase of the collaboration concluded in February 2001. Under the collaboration, we have the right to, but have not, selected up to three compounds related to hematopoietic targets for development as anti-cancer products other than those compounds selected for development by GlaxoSmithKline. GlaxoSmithKline has the option to co-promote any selected products with us in North America and to develop and market such products outside North America.

20

# LIGAND PHARMACEUTICALS INC

## FORM NT 10-K
(Notification that Annual Report will be submitted late)

## Filed 3/16/2006 For Period Ending 12/31/2005

| | |
|---|---|
| Address | 10275 SCIENCE CENTER DRIVE |
| | SAN DIEGO, California 92121-1117 |
| Telephone | 858-550-7500 |
| CIK | 0000886163 |
| Industry | Biotechnology & Drugs |
| Sector | Healthcare |
| Fiscal Year | 12/31 |

Powered By EDGAR Online

http://www.edgar-online.com/
© Copyright 2005. All Rights Reserved
Distribution and use of this document restricted under EDGAR Online Terms of Use.

Exhibit G

Page 4

Exhibit "7"

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

# FORM 12B-25

### NOTIFICATION OF LATE FILING

(Check one): /X/ Form 10-K / /Form 20-F / /Form 11-K / /Form 10-Q
/ /Form N-SAR LJ / /Form N-CSR

For Period Ended: 12/31/05

/ /Transition Report on Form 10-K
/ /Transition Report on Form 20-F
/ /Transition Report on Form 11-K
/ /Transition Report on Form 10-Q
/ /Transition Report on Form N-SAR For the Transition Period Ended:

Read instruction (on back page) Before Preparing Form. Please Print or Type.

**NOTHING IN THIS FORM SHALL BE CONSTRUED TO IMPLY THAT THE COMMISSION HAS
VERIFIED ANY INFORMATION CONTAINED HEREIN.**

If the notification relates to a portion of the filing checked above, identify
the Item(s) to which the notification relates:

NOT APPLICABLE

### PART I -- REGISTRANT INFORMATION

**LIGAND PHARMACEUTICALS INCORPORATED**

Full Name of Registrant

NOT APPLICABLE

Former Name if Applicable

**10275 SCIENCE CENTER DRIVE**

Address of Principal Executive Office (`Street and Number)

SAN DIEGO, CA 92121

City, State and Zip Code

Exhibit G
Page 5

## PART II - RULES 12B-25(B) AND (C)

If the subject report could not be filed without unreasonable effort or expense and the registrant seeks relief pursuant to Rule 12b-25(b), the following should be completed. (Check box if appropriate)

(a) The reason described in reasonable detail in Part III of this form could not be eliminated without unreasonable effort or expense

/ / (b) The subject annual report, semi-annual report, transition report on Form 10-K, Form 20-F, Form 11-K, Form LII N-SAR or Form N-CSR, or portion thereof, will be filed on or before the fifteenth calendar day following the prescribed due date; or the subject quarterly report or transition report on Form 10-Q, or portion thereof, will be filed on or before the fifth calendar day following the prescribed due date; and

(c) The accountant's statement or other exhibit required by Rule 1 2b-25(c) has been attached if applicable.

## PART III - NARRATIVE

State below in reasonable detail why Forms 10-K, 20-F, Il-K, 10-Q, N-SAR, N-CSR, or the transition report or portion thereof, could not be filed within the prescribed time period.

The annual report on Form 10-K of Ligand Pharmaceuticals Incorporated (the "Company") for the period ended December 31, 2005 could not be filed with the Securities and Exchange Commission on a timely basis without unreasonable effort or expense due to the following reasons:

The Company announced that the filing of the Annual Report on Form 10-K for fiscal year 2005 would be delayed to provide additional time to complete the evaluation and audit of internal control over financial reporting required by Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX 404 Review"). The SOX 404 Review was delayed as a result of the restatement of our consolidated financial statements which did not conclude until late in 2005. The Company expects to receive a disclaimer of opinion, i.e., the non-expression of an opinion, related to management's assessment of internal control over financial reporting and the effectiveness of the Company's internal control over financial reporting. The Company also expects to report material weaknesses in internal control over financial reporting when the Form 10-K is filed.

The Company has provided additional information concerning the status of its SOX 404 Review and the Company's current expectations on this and related topics in a press release issued after the market close on March 16, 2006, a copy of which was filed by the Company as an exhibit to its current report on Form 8-K filed with the SEC on March 16, 2006.

## PART IV - OTHER INFORMATION

1. Name and telephone number of person to contact in regard to this notification

| Warner R. Broaddus | (858) | 550-7500 |
|---|---|---|
| (Name) | (Area Code) | (Telephone Number) |

2. Have all other periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934 or Section 30 of the Investment Company Act of 1940 during the preceding 12 months or for such shorter period that the registrant was required to file such report(s) been filed? If answer is no, identify report(s). Yes /X/ No/ /

Exhibit G
Page 6
Exhibit "7"
139

3. Is it anticipated that any significant change in results of operations from the corresponding period for the last fiscal year will be reflected by the earnings statements to be included in the subject report or portion thereof? Yes /X/ No/ /

If so, attach an explanation of the anticipated change, both narratively and quantitatively, and, if appropriate, state the reasons why a reasonable estimate of the results cannot be made.

Preliminary unaudited results of operations for fiscal year 2005, and comparisons of those results to prior periods, along with a preliminary discussion of those results and comparisons, are included in the Company's press release dated March 16, 2006 and its current report on Form 8-K filed with the SEC on March 16, 2006. The 2005 and the fourth quarter 2005 financial data and discussions presented in the press release are preliminary, unaudited, and unreviewed by BDO Seidman, LLP ("BDO"), the Company's independent public accountants. Consequently, they should be viewed as reflecting the Company's current expectations with due regard to items still to be completed as discussed in the press release. Since the completion of the integrated audit required by the PCAOB's Audit Standard No. 2 for fiscal year 2005 is still ongoing, the 2005 financial data provided in this press release is subject to change and the changes, individually or in the aggregate, may be material to the Company's consolidated financial position, results of operation, or liquidity.

## LIGAND PHARMACEUTICALS INCORPORATED

(Name of Registrant as Specified in Charter)

has caused this notification to be signed on its behalf by the undersigned hereunto duly authorized.

Date    MARCH 16, 2006
_____

By    /S/WARNER R. BROADDUS
_____
       Warner R. Broaddus
       General Counsel, Vice President & Secretary

Exhibit G
Page 7
Exhibit "7"
140

# EXHIBIT H

# The Rockefeller University v. Ligand Pharmaceuticals

## Ligand Witnesses with Scientific Role in Development of Eltrombopag and LGD-4665

| Potential Witness | Last Known Location | Ligand Title | Anticipated Testimony |
|---|---|---|---|
| Abramian, Donara S | ROCKVILLE, MD 20850 | Assistant Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Apuy, Julius | SAN DIEGO, CA 92139 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Cahiwat, Joseph R. | LA VERNE, CA 91750 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Chen, Jyun-Hua | SAN DIEGO, CA 92122 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Dalgard, Jackline E. | DEL MAR, CA 92014 | Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Dana, Sharon L. | CARLSBAD, CA 92010 | Research Investigator | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| de Grandpre, Louise | SAN DIEGO, CA 92129 | Staff Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Delorme, Evelyn * | SAN DIEGO, CA 92122 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Fields, Antonio | OCEANSIDE, CA 92054 | Research Assistant | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Fike, John R | WEST LAFAYETTE, IN 47906 | Assistant Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Gaylord, Natalie | SPRING VALLEY, CA 91977 | Sr. Mgr. Vivarium | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Giampa, Leslie * | EL CAJON, CA 92019 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Gillespie, Gerald A. | SAN DIEGO, CA 92129 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Gross, Catherine E. | SAN DIEGO, CA 92109 | Sr. Research Associate | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Haslam, Jennifer A | SAN DIEGO, CA 92124 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Hong, Mei Hua | SAN DIEGO, CA 92130 | Sr. Research Investigator | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| NG, Beng (Huang, Mingli) | SAN DIEGO, CA 92130 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Huang, Ruo | SAN DIEGO, CA 92117 | Sr. Research Associate | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Igno, Cesar | SAN DIEGO, CA 92139 | Sr. Research Associate | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Iskander, Maya * | SAN DIEGO, CA 92117 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |

5033652

Exhibit H
Page 1

Exhibit "7"
142

3/19/2008

| Potential Witness | Last Known Location | Ligand Title | Anticipated Testimony |
|---|---|---|---|
| Kallel, E. Adam | ESCONDIDO, CA 92026 | Sr. Research Investigator | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Kessler, Linda V | POWAY, CA 92064 | Staff Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Lamb, Peter | SOUTH SAN FRANCISCO, CA 94083 | Director, Transcription Research | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Lau, Thomas | SAN DIEGO, CA 92131 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Lee, Yong-Hee | SAN DIEGO, CA 92129 | Dir. Drug, Safety & Disposition | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Luo, Wen | SAN DIEGO, CA 92130 | Research Investigator | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Mais, Dale E. | VALLEY CENTER, CA 92082 | Research Investigator | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Marschke, Keith | SAN DIEGO, CA 92128 | Sr. Dir. Molecular Sciences | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| McNeill, Matthew H. | SAN CLEMENTE, CA 92673 | Assistant Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Meglasson, Martin | SAN DIEGO, CA 92130 | VP, Discovery Research | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Miller, Stephen G. * | SAN DIEGO, CA 92130 | Director, New Leads | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Miller, Todd A. | SAN MARCOS, CA 92069 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Milocco, Lawrence H | SOLANA BEACH, CA 92075 | Asst Scientist / Proj Mgt / Mkt Res Analyst | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Negro-Vilar, Andres F. | WASHINGTON, DC 20037 | SVP, Research & Dev, CSO | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Nguyen, Bao N. | SAN DIEGO, CA 92126 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Penuliar, Richard J. | SAN DIEGO, CA 92120 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Phillips, Dean P. | SAN MARCOS, CA 92069 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Rosen, Jonathan I | SAN DIEGO, CA 92131 | VP, Head, Early Discovery Res. | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 & Eltrombopag |
| Rungta, Deepa | SAN DIEGO, CA 92130 | Director of New Leads | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Ruppar, Daniel A. | SAN ANTONIO, TX 78258 | Assistant Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Saliba, Iris | SAN DIEGO, CA 92129 | Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |

5033652

3/19/2008

| Potential Witness | Last Known Location | Ligand Title | Anticipated Testimony |
|---|---|---|---|
| Sanders, Jennifer | ENCINITAS, CA 92024 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Seidel, Martin | SAN DIEGO, CA 92122 | Associate Director, Transcription Res | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Stein, Robert B | WILMINGTON, DE 19807 | SVP, Research & CSO | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Sun, Hong | SAN DIEGO, CA 92130 | Staff Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Syka, Peter | SAN DIEGO, CA 92129 | Staff Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Tapley, Peter * | COLLEGEVILLE, PA 19426 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Tian, Shin-Shay | SAN DIEGO, CA 92130 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Tyree, Curtis * | SAN DIEGO, CA 92129 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Valencia, Jorge | CHULA VISTA, CA 91910 | Sr. Research Associate | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Wardlow, Marilyn | SAN DIEGO, CA 92123 | Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Zhi, Lin | SAN DIEGO, CA 92130 | Sr. Dir. Chemistry & Pharma Sci | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |

5033652

3/19/2008

# The Rockefeller University v. Ligand Pharmaceuticals

## Other Witnesses

| Potential Witness | Last Known Location | Ligand Title (if applicable) | Anticipated Testimony |
|---|---|---|---|
| Darnell, James | | | Patents and Technology, Rockefeller |
| Griesar, William | CHAMBERLAIN, MAINE | | License Agreement Negotiations for Rockefeller |
| Respess, William L | RANCHO SANTA FE, CA  92067 | SVP, General Counsel | Ligand Scientific Personnel Involved in the License Agreement Negotiations for Ligand |
| Robinson, Earl David | RANCHO SANTA FE, CA  92067 | President & CEO | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag, License Agreement Negotiations for Ligand |
| Tantl, Wendy | CHIRON CORPORATION, CALIFORNIA | | License Agreement Negotiations for Rockefeller |

5025703

Exhibit H
Page 4
Exhibit "7"
145

# EXHIBIT I

COPY

1  Darrell Olson (State Bar No. 77633)
   KNOBBE, MARTENS, OLSON & BEAR, LLP
2  2040 Main Street
   Fourteenth Floor
3  Irvine, CA 92614
   Phone: (949) 760-0404
4  Facsimile: (949) 760-9502

5  Joseph M. Reisman (State Bar No. 246922)
   Ali S. Razai (State Bar No. 196122)
6  KNOBBE, MARTENS, OLSON & BEAR, LLP
   550 West C Street
7  Suite 1200
   San Diego, CA 92101
8  Phone: (619) 235-8550
   Facsimile: (619) 235-0176

9

10 Attorneys for Plaintiff
   LIGAND PHARMACEUTICALS INCORPORATED

11

12

13

14                IN THE UNITED STATES DISTRICT COURT

15              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

16

17                                    '08 CV 4 0 1   BEN WMc

18 LIGAND PHARMACEUTICALS            )
   INCORPORATED, a Delaware corporation, )  Civil Action No.
19                                    )
        Plaintiff,                    )  **COMPLAINT FOR DECLARATORY**
20                                    )  **JUDGMENT**
        v.                            )
21                                    )
   THE ROCKEFELLER UNIVERSITY, a      )
22 New York not-for-profit corporation, )
                                      )
23      Defendant.                    )
                                      )
24 ─────────────────────────────────── )

25

26

27

28

FILED
MAR 0 4 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Exhibit I
Page 1

Exhibit "7"
147

# I. NATURE OF THE ACTION

1.      This is a civil action under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., for declaration of rights between the parties under a License Agreement dated September 30, 1992 ("License Agreement," attached as Exhibit A and incorporated by reference) and under certain United States patents related to the License Agreement.

## II. PARTIES

2.      Plaintiff LIGAND PHARMACEUTICALS INCORPORATED (hereinafter "Ligand" or "Plaintiff") is a Delaware corporation with its principal place of business at 10275 Science Center Drive San Diego, California 92121.

3.      Ligand was incorporated in 1987 and since then has been engaged in, *inter alia*, the research and development of drugs for various diseases and disorders.    Ligand currently has less than sixty (60) employees.

4.      Defendant THE ROCKEFELLER UNIVERSITY (hereinafter "Rockefeller" or "Defendant") is a New York not-for-profit corporation with its principal place of business at 1230 York Avenue, New York, New York 10021.

5.      Rockefeller is a university periodically engaged in research and development. Rockefeller currently has 69 heads of laboratories, 200 research and clinical scientists, 350 postdoctoral investigators, 1,050 support staff, 150 Ph.D. students, 50 M.D.-Ph.D. students and 960 alumni according to the Rockefeller website.

6.      NEW YORK UNIVERSITY ("NYU") is a New York not-for-profit corporation with its principal place of business at 70 Washington Square S, New York, New York 10012.

7.      NYU is a university periodically engaged in research and development. NYU is not a party to the License Agreement or this lawsuit, but in the past it has received payments due to it under the License Agreement.

## III. JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over Defendant Rockefeller by virtue of its presence and activities in the state of California, including but not limited to entering into

-1-

Exhibit I
Page 2
Exhibit "7"
148

1  the License Agreement, as rights granted by the License Agreement were to be used in this

2  judicial district, its past ownership interest in Ligand (located in this judicial district) under

3  the License Agreement, as well as activities of Dr. James E. Darnell ("Darnell") in

4  performing services in this judicial district under a Professional Services Agreement

5  ("Services Agreement") dated September 30, 1992.

6       9.      NYU is not being joined in this lawsuit for the following reasons. It is not a

7  party to the License Agreement. Its interests under the License Agreement are subordinate to

8  those of Rockefeller and, on information and belief, those interests are adequately protected

9  by Rockefeller.  Finally, Rockefeller, not NYU, is the owner of any intellectual property

10  rights licensed under the License Agreement.

11      10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332, 1338

12  and 2201.

13      11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and

14  (c).

15                    **IV. TECHNOLOGY**

16      12.     Since its inception, and prior to entering into the License Agreement with

17  Rockefeller, Ligand has been actively involved in small molecule drug discovery.  For

18  example, Ligand owns intracellular receptor ("IR") technology that relates to families of

19  transcription factors that change cell function by selectively turning on or off specific genes

20  in response to circulating signals that act on cells.  Ligand developed (and/or in-licensed from

21  one or more sources other than Rockefeller) certain IR-based transcriptional assays to screen

22  candidate drugs.

23      13.     Thrombopoietin ("TPO") is a peptidyl hormone that activates a signaling

24  cascade in a cell by binding to a receptor on a cell surface.  Once bound by TPO, the cell

25  surface receptor initiates a signaling cascade from the cell surface to the nucleus, where

26  specific genes are selectively turned on in response to TPO.  This gene regulation is mediated

27  by transcription factors activated by the TPO signaling cascade and has a major effect on cell

28  fate decisions by regulating cell proliferation and differentiation.

-2-

Exhibit I
Page 3
Exhibit "7"
149

14.     Ligand developed cell-based assays to screen candidate TPO mimics. These assays included cell proliferation and cell differentiation assays, as well as transcriptional assays. The transcriptional assays developed by Ligand to screen candidate TPO mimics were analogous to the transcriptional assays developed for Ligand's IR program.

15.     The transcriptional assays involved use of a reporter construct with produces a signal in response to activated transcription factors in the cell.

16.     Ligand's assays were used to discover and develop new drugs that mimic the action of TPO and may be useful in the treatment of a wide variety of diseases and disorders.

## V. FACTUAL BACKGROUND

17.     Darnell served on Ligand's Scientific Advisory Board for several years and visited with Ligand scientists at Ligand's facilities and elsewhere in San Diego many times in connection with the License Agreement and/or the Services Agreement.

18.     On information and belief, at all times relevant here to, Darnell acted in conjunction with Rockefeller and had authority to act on behalf of Rockefeller to fulfill Rockefeller's obligations under the License Agreement.

19.     After negotiations between the parties, Ligand executed two separate agreements on September 30, 1992, the License Agreement with Rockefeller and the Services Agreement with Darnell.

20.     The License Agreement was generally directed to the licensing of "Licensed Patent Rights" and "Technical Information" relating to peptidyl hormone mediated gene expression.

21.     The Licensed Patent Rights are defined in Section 1.3 of the License Agreement to be patent applications identified in Exhibit A to the License Agreement, related "divisionals, continuations, continuations-in-part, reissues, renewals, foreign counterparts, extension or additions," and any patents which may issue thereon. (Section 1.3, License Agreement).

22.     Rockefeller is the identified assignee of United States patents, including: U.S. Pat. No. 6,605,442; U.S. Pat. No. 5,976,835; U.S. Pat. No. 6,013,475; U.S. Pat. No.

-3-

Exhibit I
Page 4

Exhibit "7"
150

1    6,030,808; U.S. Pat. No. 6,338,949; U.S. Pat. No. 6,124,118; U.S. Pat. No. 7,060,682; U.S.

2    Pat. No. 5,716,622; U.S. Pat. No. 5,883,228; U.S. Pat. No. 6,030,780; U.S. Pat. No.

3    6,720,154; U.S. Pat. No. 7,115,567; U.S. Pat. No. 6,960,647; and U.S. Pat. No. 7,211,655

4    ("Rockefeller Patents" attached as Exhibits B through O), which all either claim priority back

5    to the patent applications listed in Exhibit A to the License Agreement or relate to what

6    Rockefeller argues is Technical Information under the License Agreement.

7        23.    Technical Information is defined in Section 1.4 of the License Agreement to

8    include "technical data, information processes, materials and know-how, whether or not

9    patentable" relating to peptidyl mediated gene expression that is owned by Rockefeller and

10   was developed as of the effective date of the License Agreement or during the next five (5)

11   years. (Section 1.4, License Agreement).

12       24.    The License Agreement between Ligand and Rockefeller contemplated that

13   certain of the intellectual property of Rockefeller might be used by Ligand in development of

14   new pharmaceutical agents. (Sections 2.4 and 2.5, License Agreement).  Nothing in the

15   License Agreement prohibited Ligand from developing processes and products relating to

16   cell-based assays to screen candidate drugs independent of Rockefeller's intellectual

17   property, as Ligand had done previously with its IR technology.

18       25.    Independent of the rights acquired under the License Agreement, on December

19   29, 1994, Ligand entered into a Research Development and License Agreement ("GSK

20   License") with SmithKline Beecham Corporation, now GlaxoSmithKline ("GSK").  The

21   GSK License relates to a joint research and development effort by Ligand and GSK directed

22   to discovery of small molecule compounds which act as modulators of certain

23   HEMATOPOIETIC GROWTH FACTORS (including TPO, as defined in Section 1.17 of the

24   GSK License) and to develop pharmaceutical products from such compounds.

25       26.    On information and belief, Rockefeller has been aware of the GSK License

26   since it was signed by Ligand and GSK in 1994.

27       27.    Under the RESEARCH PROGRAM as defined in the GSK License, a cell-

28   based high throughput screen was developed by Ligand to help identify at least one

-4-

Exhibit I
Page 5

potentially useful drug known as eltrombopag or PROMACTA® and a back-up thereto known as SB-559448 ("GSK Products"). Under the GSK License, GSK has paid Ligand milestone payments amounting to $8 million for achieving certain milestones under the GSK License.

28.     GSK has made significant progress toward gaining approval for at least one of the GSK Products through the regulatory process before the Food and Drug Administration.

29.     As early as October 2003, Rockefeller became specifically aware of the GSK Products and inquired about and demanded payment from Ligand under the License Agreement for what Rockefeller alleged were uses of its Licensed Patent Rights or Technical Information covered by the License Agreement.

30.     Ligand disputes that the GSK Products are subject to payments under the License Agreement.

31.     Section 2.5 of the License Agreement obligates Ligand to pay Rockefeller only under certain circumstances. The payments described in Section 2.5 generally are twenty five per cent (25%) of payments received from third parties by Ligand if those payments were to secure the right to use Technical Information or the right to sell Products or Processes.

32.     The GSK Products are not Products as the term "Product" is defined under Section 1.5 of the License Agreement. They do not embody or use any invention described or claimed in the Licensed Patent Rights. Furthermore, Technical Information was not essential to their discovery or development. GSK's payments to Ligand are not and will not be to secure any Rockefeller rights that would otherwise prevent GSK from selling the GSK Products. Rockefeller does not own any Licensed Patent Rights or Technical Information that GSK would need to sell the GSK Products. Thus, no payments are due to Rockefeller under the License Agreement.

33.     Rockefeller has alleged the GSK Products embody or use one or more invention(s) described or claimed in the Licensed Patent Rights. In order to qualify as an invention in a claim of an issued patent, however, the alleged invention must be defined by a claim that is valid and enforceable.

-5-

Exhibit I
Page 6
Exhibit "7"
152

34.    Section 11.2 of the License Agreement provides that Ligand shall have the right to terminate any license grant at any time upon ninety days written notice.

35.    On August 9, 2007, pursuant to Section 11.2, Ligand sent by facsimile and U.S. Mail a notice to Rockefeller of its intent to terminate the License Agreement. Pursuant to Section 11.2, the termination was effective under the License Agreement ninety days thereafter or on November 7, 2007.

36.    Since termination of the License Agreement under Section 11.2, Rockefeller has claimed that the License Agreement was not terminated. Rockefeller contends that 25% of past and future payments related to GSK Products received by Ligand must be shared with Rockefeller.

37.    The parties entered into a tolling agreement that contemplated the parties would try to resolve the controversy without the need for litigation. The tolling agreement expired on March 3, 2008. Rockefeller's communications prior to March 3, 2008, including their refusal to extend the tolling agreement and their specific threat of filing a lawsuit against Ligand at the expiration of the tolling agreement, have made Ligand reasonably afraid that it will be sued by Rockefeller on these issues today or within the next few days.

## VI. FIRST CLAIM FOR RELIEF – DECLARATORY JUDGMENT SCOPE OF LICENSED PATENT RIGHTS

38.    Ligand incorporates by reference as though fully set forth herein paragraphs 1 through 37 of this Complaint.

39.    The License Agreement between Ligand and Rockefeller provides for, among other things, a license of Licensed Patent Rights. (Section 2.1, License Agreement).

40.    Rockefeller has alleged that the Rockefeller Patents are included within the Licensed Patent Rights and also that the GSK Products or their use embody or employ the Licensed Patent Rights.

41.    Applying the plain meaning of the words of the License Agreement, the GSK Products and their use do not embody or employ any invention described or claimed in the Licensed Patent Rights.

-6-

Exhibit I
Page 7
Exhibit "7"
153

42.     An actual controversy exists between Rockefeller and Ligand as to whether or not the GSK Products or their use embody or employ Licensed Patent Rights, whether or not the GSK Products or their use embody or employ any invention described or claimed in the Rockefeller Patents and whether or not the payments Rockefeller is demanding under the License Agreement are in fact due.

43.     Even if the GSK Products embody or use an invention merely described in the Rockefeller Patents, the patent laws of the United States protect only inventions defined by valid and enforceable claims and there is an actual controversy as to whether or not any claim of the Rockefeller Patents is valid for failure to comply with any one of 35 USC §§ 101 et seq.

44.     On information and belief, Rockefeller has filed one or more  patent applications for the purpose of claiming the GSK Products are subject to payments under the License Agreement, and Rockefeller did so with knowledge that no valid patent should issue. There is an actual controversy as to whether the GSK Products or their use embody or employ any invention described or claimed in any pending patent application and whether any such patent application filed after learning of the GSK Products was filed in good faith under the License Agreement.

## VII. SECOND CLAIM FOR RELIEF – DECLARATORY JUDGMENT SCOPE OF TECHNICAL INFORMATION

45.     Ligand incorporates by reference as though fully set forth herein paragraphs 1 through 44 of this Complaint.

46.     The License Agreement between Ligand and Rockefeller provides for, among other things, a license of Technical Information of Rockefeller. (Section 2.1, License Agreement).

47.     Rockefeller alleges that Technical Information was essential to the discovery or development of the GSK Products.

48.     Ligand, relying on the plain meaning of the License Agreement, alleges that Technical Information was not used in the discovery or development of the GSK Products.

-7-

Exhibit I
Page 8
Exhibit "7"
154

1   Ligand further alleges under Section 1.4 of the License Agreement Technical Information

2   must be owned by Rockefeller and existing or capable of description in a tangible form and

3   must have been developed in the laboratory of Darnell or of David Levy of NYU as of

4   September 30, 1992 or by Darnell at his laboratory on or before five years from September

5   30, 1992 or by September 30, 1997. The GSK Products were not developed using Technical

6   Information but rather used either publicly known information, information known or

7   discovered by Ligand and/or GSK, or information received from third parties.

8       49.     An actual controversy exists between Rockefeller and Ligand as to whether or

9   not Technical Information was essential to the discovery or development of the GSK

10  Products.

11  **VII. THIRD CLAIM FOR RELIEF – DECLARATORY JUDGMENT**

12  **TERMINATION**

13      50.     Ligand here incorporates by reference as though fully set forth herein

14  paragraphs 1 through 49 of this Complaint.

15      51.     Rockefeller relies on Section 11.3 of the License Agreement in asserting that,

16  absent a material breach, the "Agreement" cannot be terminated.

17      52.     Ligand claims, in the alternative, that the notice dated August 9, 2007 either

18  terminated the License Agreement in its entirety, subject only to certain specified rights

19  which survived termination, or to the extent any different, terminated all then existing license

20  rights, again subject only to any rights that might survive termination.

21      53.     An actual controversy exists between Rockefeller and Ligand as to whether or

22  not the License Agreement has been terminated and as to the nature of the rights terminated.

23

24  **VIII. DEMAND FOR JUDGMENT**

25  WHEREFORE, Plaintiff requests that:

26      1.      This Court enter a judgment declaring the GSK Products do not embody any

27  invention(s) described or claimed in the Licensed Patent Rights and that the use of the GSK

28  Products do not employ any invention(s) described or claimed in the Licensed Patent Rights;

-8-

Exhibit I
PageExhibit "7"
155

Mar 03 08 08:37p      Darrell and Betsy Olson                      949-709-2380              p.1

1      2.     This Court enter a judgment declaring that Technical Information was not
2  essential to the discovery or development of the GSK Products;
3      3.     This Court enter a judgment declaring that Ligand is not liable for any
4  additional payments under the License Agreement beyond those that have already been made;
5      4.     This Court enter a judgment declaring that the License Agreement    was
6  terminated as of November 7, 2007 and that subsequent to termination of the License
7  Agreement, Ligand is not liable for any future payments under the License Agreement;
8      5.     Plaintiff be awarded costs, attorneys' fees and other relief, both legal and
9  equitable, to which it may be justly entitled;
10     6.     Plaintiff be awarded relief under 28 U.S.C. § 2202; and
11     7.     Plaintiff be awarded such other and further relief as this Court deems proper.
12                                 Respectfully submitted,
13                                 KNOBBE, MARTENS, OLSON & BEAR, LLP
14
15  Dated:__3/3/08_____     By:____Darrell Olson_____
16                                 Darrell Olson (signature via facsimile)
17                                 Attorneys for Plaintiff
18                                 LIGAND PHARMACEUTICALS INCORPORATED
19
20
21
22
23
24
25
26
27
28
                                    -9-

Exhibit I
Page 10

Exhibit "7"
156

# EXHIBIT J

1  **FOLEY & LARDNER LLP**
   402 W. BROADWAY, SUITE 2100
2  SAN DIEGO, CA 92101-3542
   TELEPHONE:     619.234.6655
   FACSIMILE:     619.234.3510
3
   KENNETH S. KLEIN, CA BAR NO. 129172
4
   **FOLEY & LARDNER LLP**
   3000 K STREET, NW - SUITE 500
5  WASHINGTON, DC 20007-5101
   TELEPHONE:     202.672-5300
   FACSIMILE:     202.672-5399
6
   ANAT HAKIM, (to be admitted *pro hac vice*)
7
   Attorneys for Defendant The Rockefeller University, a New York not-for-profit
8  corporation,

9                    UNITED STATES DISTRICT COURT

10               SOUTHERN DISTRICT OF CALIFORNIA

11

12  Ligand Pharmaceuticals Incorporated, a    Case No:  08-CV-401 BEN (WMc)
    Delaware corporation,
13                                            **MEMORANDUM IN SUPPORT OF**
                Plaintiff,                    **THE ROCKEFELLER UNIVERSITY'S**
14                                            **MOTION TO DISMISS OR, IN THE**
         vs.                                  **ALTERNATIVE, STAY THIS ACTION**
15  The Rockefeller University, a New York
    not-for-profit corporation,              Judge:        Roger T. Benitez
16
                Defendant.                   Date:         April 14, 2008
17                                           Time:         10:30 a.m.
                                             Courtroom:    3
18

19

20

21

22

23

24

25

26

27

28

SDCA_1019324.1                                              08-CV-401 BEN WMC

Exhibit J
Page 1
Exhibit "7"
158

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF CONTENTS

Page

BACKGROUND..................................................................................................... 1

ARGUMENT .......................................................................................................... 6

I.      PLAINTIFF'S DECLARATORY JUDGMENT ACTION SHOULD BE
DISMISSED IN DEFERENCE TO THE UNIVERSITY'S PENDING NEW
YORK STATE COURT ACTION. ....................................................................... 6

      A.    It Is Well Established That This Court Has The Discretion And
Authority To Decline To Hear This Declaratory Judgment Action. ... 6

      B.    Ligand's California Declaratory Judgment Action Should Be
Dismissed In Deference To The University's Pending
New York State Court Proceeding..................................................... 8

      C.    Dismissal Of A Federal Declaratory Judgment Action Is
Particularly Appropriate Where The Other Pending
Action Is A State Court Proceeding Involving Issues
Predominantly Of State Law............................................................. 10

      D.    Any Jurisdiction And/Or Venue Arguments Ligand
May Seek To Raise In Connection With The New York
State Suit, Are Properly Considered By New York Courts
Rather Than This Court...................................................................... 12

II.     IN THE ALTERNATIVE, THIS ACTION SHOULD BE STAYED................... 14

CONCLUSION ....................................................................................................... 14

i

08-CV-401 BEN WMC

SDCA_1019324.1

## <u>TABLE OF CONTENTS (CONT.)</u>

**Page**

*Prize Frize, Inc. v. Matrix (U.S.) Inc.,*
    167 F.3d 1261 (9th Cir. 1999) ............................................................... 11

*Shell Oil Co. v. Frusetta,*
    290 F.2d 689 (9th Cir. 1961) ................................................................. 13

*Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.,*
    819 F.2d 746 (7th Cir. 1987) ................................................................. 13

*Trippe Mfg. Co. v. Am. Power Conversion Corp.,*
    46 F.3d 624 (7th Cir. 1995) ................................................................... 13

*Wilton v. Seven Falls Co.,*
    515 U.S. 277 (1995) ..................................................................... *Passim*

*Xoxide, Inc. v. Ford Motor Co.,*
    448 F. Supp.2d 1188 (C.D. Cal. 2006) ............................................... 8-9


**FEDERAL STATUTES**

28 U.S.C. §1332 .......................................................................................... 12

28 U.S.C. §1338 .......................................................................................... 12

28 U.S.C. §2201 .......................................................................................... 12

28 U.S.C. §1338 ...................................................................................... 11-12

28 U.S.C. § .................................................................................................. 13

28 U.S.C. § 1453(b) ................................................................................... 13

28 U.S.C. § 2201 ........................................................................................... 6

28 U.S.C. §§ 2201, et seq. ........................................................................... 4

28 U.S.C.A. § 400 ......................................................................................... 7

28 U.S.C. Section 2201-02 .......................................................................... 7

SDCA_1019324.1

1   The Rockefeller University (the "University") submits this memorandum in

2   support of its motion to dismiss, or, in the alternative, to stay Plaintiff Ligand

3   Pharmaceuticals, Inc.'s ("Ligand") declaratory action filed in this Court, in deference to a

4   pending New York state action.

5       In the New York state action, which was the earlier filed and served matter, the

6   University seeks damages and injunctive relief based on claims for breach of a September

7   30, 1992 License Agreement between the University and Ligand (the "1992

8   Agreement"), unjust enrichment/constructive trust, quantum meruit, specific performance

9   of the University's contractual right under the 1992 Agreement to perform an audit of

10  Ligand, and a declaration that certain products are subject to the terms and payment

11  provisions of the 1992 Agreement. The New York state action and this declaratory

12  action (which appears to have been filed by Ligand as a preemptive strike against the

13  University) involve the same state law issues of contract interpretation of the 1992

14  Agreement, which, by its terms, must be interpreted and governed according to New

15  York law. Furthermore, as discussed within, many key witnesses are located in New

16  York, and Ligand, having elected to have a presence in New York, cannot claim that New

17  York is an inconvenient forum. Finally, whereas this Court is being asked for a

18  discretionary declaration of rights, the New York state action will necessarily decide

19  those same issues in the context of a suit, alleging actual injury to the University. Under

20  circumstances such as this, the Ninth Circuit has affirmed the exercise of district court

21  discretion in dismissing a federal declaratory action in favor of a parallel state proceeding

22  that involves the same issues (especially, where as here, the New York state court

23  regularly interprets and enforces contracts under New York law) and parties. The

24  University respectfully submits that there are ample reasons for this Court to dismiss this

25  action.

26  ## BACKGROUND

27      The Rockefeller University owns groundbreaking inventions that are powerful

28  tools to screen for therapeutic drugs which were discovered by Rockefeller University

1

08-CV-401 BEN WMC

1  Professor James E. Darnell Jr. The University exclusively licensed this valuable

2  technology to Ligand under the 1992 Agreement. Working under a 1994 agreement with

3  its exclusive sublicensee SmithKline Beecham ("SKB", now GlaxoSmithKline) ("1994

4  SKB/Ligand Agreement") and using the University's inventions, Ligand identified

5  several pharmaceutical molecules and received several milestone payments from SKB.

6  Ligand has failed to pay the University its contractual share of these milestone payments

7  according to the 1992 Agreement, despite the University's repeated payment requests.

8  Instead, in August 2007, shortly before SKB requested approval from the Food and Drug

9  Administration of Promacta®, one of the pharmaceutical molecules identified under the

10  1994 SKB/Ligand Agreement, and before royalties on Promacta® are anticipated to be

11  paid by SKB to Ligand, Ligand notified the University that Ligand was unilaterally

12  terminating the 1992 Agreement, although not permitted to do so by the license's terms.

13  The University, having fully performed its contractual obligation and faced with Ligand's

14  refusal to honor its payment obligations under the 1992 Agreement, had no recourse but

15  to file suit, and did so in the Supreme Court of the State of New York, County of New

16  York. (*See* Complaint filed in *The Rockefeller University v. Ligand Pharmaceuticals,*

17  *Inc.,* Case No. 08/600638, filed at 9:02 a.m. EST on March 4, 2008, in the Supreme Court

18  of the State of New York in the County of New York (hereinafter, the "New York

19  Complaint"), attached as Exhibit 1 to the Declaration of Anat Hakim ("Hakim Decl."), at

20  pp. 1-2.)

21        Under Section 2.1 of the 1992 Agreement, the University granted Ligand a sole

22  exclusive world-wide license, under the University's broadly-defined Licensed Patent

23  Rights and Technical Information "to make, have made, use and sell Products or practice

24  Processes." (*See* the 1992 License Agreement, attached as Exhibit 2 to the Hakim Decl.)

25  The license related to pioneering technology, which the New York Complaint describes

26  in detail and which is referred to as the STATs Pathway technology. The STATs

27  Pathway technology was discovered by Professor Darnell. Under Section 1.4 of the 1992

28  Agreement, the license grant to Ligand included an exclusive world-wide license to all

2

1   developments of Professor Darnell's laboratory relating to the STATs Pathway
2   technology, existing as of the effective date of the 1992 Agreement and for five years
3   thereafter. In connection with the 1992 Agreement, Professor Darnell and members of
4   his laboratory did in fact collaborate with Ligand for years regarding the STATs Pathway
5   technology. Over the course of several years, Dr. Darnell provided essential technical
6   information, materials and insight to Ligand relating to the STATs Pathway technology.
7   In addition, the University filed several patent applications and was issued several
8   patents, describing aspects of its pioneering STATs Pathway technology. The technical
9   information and expertise about STATs Pathway technology acquired by Ligand from the
10  University pursuant to the 1992 Agreement was essential to the development of, among
11  other things, a high throughput screen ("HTS") to identify cytokine agonists. The HTS
12  was key to the identification and development of pharmaceutical drug candidates. *(See*
13  Hakim Decl., Exhibit 1 at ¶¶12 and 13).

14      In return for the University's exclusive world-wide license to this pioneering
15  STATs Pathway technology, Ligand obligated itself to:

    a.  "diligently seek to develop Products and/or Processes" using or based on the
        STATs Pathway technology provided to it under the 1992 Agreement (Section
        2.7 of the 1992 Agreement);

    b.  make certain cash payment to the University during the first five years of the
        Agreement and to give the University an equity interest in Ligand (Sections
        2.2 and 2.3 of the 1992 Agreement); and

    c.  pay the University a portion of any payments Ligand received from any third
        party "to secure the right to use Technical Information or to sell Products or
        Processes," (Section 2.5 of the 1992 Agreement*)* and a royalty on Ligand's
        own "Net Sales of Products and on its net revenues . . . received from
        performance of Processes for a third party." (Section 2.4 of the 1992
        Agreement).

28  (*See* Hakim Decl., Exhibit 1 at ¶14, Exhibit 2).

1    The parties' dispute centers on the language of Sections 2.4 and 2.5 of the 1992

2  Agreement, which address Ligand's payment obligations as to the University's share of

3  milestone and royalty payments from third parties (Section 2.5) and Ligand's royalty

4  payment obligations to the University based on Ligand's own sales of Products or

5  performance of Processes (Section 2.4). (*See* Hakim Decl., Exhibit 1). In addition, the

6  parties dispute whether Ligand effectively terminated the 1992 Agreement on August 9,

7  2007, which the University contends was not effective under the express termination

8  provisions of the 1992 Agreement. (*See Id.*). Any judicial determination of these

9  disputed contract terms will be made pursuant to New York law -- the 1992 Agreement

10  states that it "shall be interpreted and governed in accordance with the laws of the State

11  of New York." (*See* Hakim Decl., Exhibit 2, Section 13).

12    The parties have had ongoing negotiations in an attempt to resolve their dispute

13  without litigation for some time. On October 10, 2007, the parties entered into a Tolling

14  Agreement, which was effective through January 31, 2008. (*See* Hakim Decl., Exhibit 1

15  at ¶32). On January 17, 2008, the parties amended the Tolling Agreement, extending the

16  period through March 3, 2008. (*See Id.* at ¶34). During these discussions, the

17  University's counsel informed Ligand's counsel that the University would sue Ligand for

18  breach of the 1992 Agreement after expiration of the Tolling Agreement, in order to

19  preserve the University's claims.

20    Knowing that the University would file suit after the Tolling Agreement expired,

21  Ligand rushed to file a Complaint for Declaratory Judgment in this Court at 11:33 a.m.

22  EST (8:33 a.m. PST) on March 4 (hereinafter, the "California Declaratory Judgment

23  Complaint").[1]  Ligand's California Declaratory Judgment Complaint contains three

24  claims for relief, all under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq.,

25  seeking a declaration of rights between the parties under the 1992 Agreement.

26  Specifically, Ligand seeks a declaration as to (1) the applicability and scope of two

27  ──────────────────────────

28    [1] Solely for the purposes of this Motion to Dismiss or Stay, the University will treat the allegations
that Plaintiff made in its Complaint as if they were true.

4

Exhibit J
Page 8
Exhibit "7"
164

1  defined terms in the 1992 Agreement ("Licensed Patent Rights" in Section 1.3 and

2  "Technical Information" in Section 1.4) as they apply to Ligand's payment obligations

3  under Sections 2.4 and 2.5; and (2) whether the 1992 Agreement has been terminated and

4  the nature of any rights terminated. (*See* California Declaratory Judgment Complaint

5  attached as Exhibit 3 to the Hakim Decl.). All of these are questions are governed by

6  New York state law.

7       A few hours before Ligand filed its California Declaratory Judgment Complaint,

8  the University had filed the New York Complaint. Both lawsuits are pending.

9       New York state court is the proper forum to determine the parties' contract

10  dispute. New York courts routinely apply and interpret New York law, as required here

11  under the 1992 Agreement. The University is a New York corporation, with its principal

12  place of business in New York City, New York. (*See* Hakim. Decl. Exhibit 1, ¶1).

13  Ligand has elected to register to do business in New York. (*See* (unofficial) New York

14  Department of State record, attached as Exhibit 4 to the Hakim Decl.). Professor Darnell,

15  who is 82 years old and a key witness for the University, resides and works in New York,

16  and several former members of Dr. Darnell's laboratory who worked on the pioneering

17  STATs technology with Dr. Darnell and have knowledge about meetings with and

18  information provided to Ligand by the University under the 1992 Agreement, continue to

19  work in New York. Another key third-party witness, SKB (now GlaxoSmithKline) –

20  Ligand's exclusive sublicensee under the 1992 Agreement, is located on the East Coast in

21  Philadelphia, not far from New York. For all of these third-party witnesses, New York is

22  a more convenient forum. Because the issues raised in Ligand's California Declaratory

23  Judgment Complaint are duplicative of those raised in the University's New York

24  Complaint, and because the contract issues to be determined under New York law would

25  be more properly addressed by the New York state action seeking actual damages or

26  coercive relief rather than in this California declaratory action, this Court should dismiss,

27  or in the alternative, stay the California action in deference to the pending New York

28  state suit.

Exhibit J
Page 9
Exhibit "7"

**ARGUMENT**

I.  **PLAINTIFF'S DECLARATORY JUDGMENT ACTION SHOULD BE DISMISSED IN DEFERENCE TO THE UNIVERSITY'S PENDING NEW YORK STATE COURT ACTION.**

    A.  It Is Well Established That This Court Has The Discretion And Authority To Decline To Hear This Declaratory Judgment Action.

Ligand's lawsuit asks solely for declaratory relief, invoking this Court's authority to decide matters pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.[2] This statute confers discretionary jurisdiction and provides that a district court "may declare the rights and other legal relations of any interested party seeking such declaration." *Id.* A lawsuit seeking federal declaratory relief must pass constitutional muster by presenting an actual case or controversy and must also fulfill statutory jurisdictional prerequisites. *See Gov't Employees Ins. Co. v. Dizol,* 133 F. 3d 1220, 1222-23 (9th Cir. 1998) (en banc). Entertaining the declaratory judgment action must also be "appropriate." *See Id.* at 1223.

The Ninth Circuit, the Federal Circuit, and the U.S. Supreme Court all have held that federal district courts have discretion to decline to hear a declaratory judgment action, even though it is within their jurisdiction. *Id.* (explaining that it is within the district court's discretion to determine whether a declaratory action is appropriate); *MedImmune, Inc. v. Genentech, Inc.,* 127 S. Ct. 764, 776 (2007) (reaffirming that trial courts have "unique and substantial discretion" in determining whether to decide cases over which they have declaratory judgment jurisdiction) (quoting *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286 (1995)); *see also Brillhart v. Excess Ins. Co. of America,* 316 U.S.

---

[2] The Declaratory Judgment Act, 28 U.S.C. Section 2201-02 states, in relevant part, that:

    In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

6

491, 494 (1942) ("Although the District Court had jurisdiction of the suit under the Federal Declaratory Judgments Act, 28 U.S.C.A. § 400, it was under no compulsion to exercise that jurisdiction."); *Wilton*, 515 U.S. at 287 (describing "the unique breadth of [a federal court's] discretion to decline to enter a declaratory judgment"). According to the Ninth Circuit, factors articulated by the Supreme Court in *Brillhart* "remain the philosophic touchstone for the district court" when it is deciding whether to hear a declaratory judgment action:

> The district court should avoid needless determination of state law issues; it should discourage litigants from filing declaratory actions as a means of forum shopping; and it should avoid duplicative litigation. . . If there are parallel state proceedings involving the same issues and parties pending at the time the federal declaratory action is filed, there is a presumption that the entire suit should be heard in state court. . . . federal courts should generally decline to entertain reactive declaratory actions.

*Dizol*, 133 F.3d at 1225. In addition to the *Brillhart* factors, the Ninth Circuit points to other considerations, such as:

> whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage; or whether the use of a declaratory action will result in entanglement between the federal and state court systems. In addition, the district court might also consider the convenience of the parties, and the availability and relative

7

1    convenience of other remedies.

2

3    *Id.* n. 5 (citation omitted).

4        It is thus well within this Court's discretion and authority to decline to exercise

5    jurisdiction over Ligand's California Declaratory Judgment action.  Here, it is appropriate

6    for the Court to decline jurisdiction in the exercise of its discretion.

7        B.    Ligand's California Declaratory Judgment Action Should Be

8    Dismissed In Deference To The University's Pending New York State Court Proceeding.

9        Where, as here, there is a parallel state suit pending, the district court's discretion

10   to dismiss a suit for declaratory relief is broad.  *See Wilton,* 515 U.S. at 282 (citing

11   *Brillhart,* 316 U.S. 491 (1942)).  The Ninth Circuit and courts in this Circuit have held

12   that a plaintiff's declaratory judgment action would serve no useful purpose and is

13   properly denied where the action is merely a preemptive strike against another party who

14   sues the plaintiff for actual damages or coercive relief in another court. *Dizol,* 133 F.3d

15   at 1225; *Exxon Shipping Co. v. Airport Depot Diner, Inc.,* 120 F.3d 166, 168-70 (9th Cir.

16   1997);; *Phoenix Assurance PLC v. Marimed Foundation for Island Health Care*

17   *Training,* 125 F. Supp. 2d 1214, 1221 (D. Hawaii 2000); *Xoxide, Inc. v. Ford Motor Co.,*

18   448 F. Supp.2d 1188, 1192-94 (C.D. Cal. 2006).

19       In fact, it is Ninth Circuit law that "[i]f there are parallel state proceedings

20   involving the same issues and parties pending at the time the federal declaratory action is

21   filed, there is a *presumption* that the entire suit should be heard in state court." *Dizol,*

22   133 F.3d at 1225 (emphasis added) (citing *Chamberlain v. Allstate Ins. Co.,* 931 F.2d

23   1361, 1366-57 (9th Cir. 1991)).[3]  The presumption is such that this rule applies even

24   where the state suit is filed *after* the declaratory action.  The Ninth Circuit does not

25   _____

26   [3] Even where the issues in the declaratory action and the pending state action are not the same, however,
     the Ninth Circuit has dismissed the declaratory action and held that "it is enough that the state
27   proceedings arise from the same factual circumstances." *Golden Eagle Ins. Co. v. Travelers Cos.,* 103
     F.3d 750, 754-55 (9th Cir. 1996) overruled on other grounds by Gov't Employees Ins. Co. v. Dizol, 133
28   F.3d 1220 (9th Cir. 1998) (holding that question of whether declaratory judgment is appropriate need not
     be raisesd *sua sponte* by the court).

8

1 | adhere to a strict 'first to file' rule in situations where a declaratory judgment action
2 | appears to have been filed to preempt litigation in another forum. *Alltrade, Inc. v.*
3 | *Uniweld Products, Inc.,* 946 F.2d 622, 628 (9th Cir. 1991) ("The circumstances under
4 | which an exception to the first-to-file rule typically will be made include bad faith,
5 | anticipatory suit, and forum shopping ....") (citations omitted); *Xoxide,* 448 F. Supp. at
6 | 1192-93 (declaratory judgment plaintiff was first to file but because the record showed
7 | that defendant had provided plaintiff with "specific concrete indications that a suit by
8 | [defendant] was imminent," the declaratory suit is dismissed.). [4]

9 |      Here, the presumption for dismissal is even stronger in light of the fact that the
10 | University's New York Complaint was filed first.  The University also served its New
11 | York Complaint first, having served it on Ligand on March 4; whereas Ligand did not
12 | serve its California Declaratory Judgment Complaint on the University until March 6,
13 | 2008.  Discovery in the University's New York action is underway, as the University
14 | served Ligand with its First Set of Requests for Production on March 6, 2008, with a
15 | response due from Ligand on March 26.  In determining priority, courts must take into
16 | consideration not only the filing date, but also the progress of the litigation, which in this
17 | case has advanced further in the New York state action. *Moses H. Cone Memorial*
18 | *Hospital v. Mercury Const. Corp.,* 460 U.S. 1, 21 (1983) ("Priority should not be
19 | measured exclusively by which complaint was filed first, but rather in terms of how much
20 | progress has been made in the two actions.").

21 |      Ligand's California Declaratory Judgment action should be dismissed in deference
22 | to the University's New York state court action. There can be no doubt that Ligand's
23 | declaratory judgment lawsuit, filed after the University's warning of legal action against
24 | it, was an attempted "preemptive strike." Moreover, the New York state action was filed
25 | and served first, and discovery is underway. The New York forum is more convenient

26 |

---

27 | [4]   Although not discussed by the Supreme Court as a basis for its decision in either case, the
28 | plaintiffs in both *Brillhart* and *Wilton* filed their declaratory judgment actions in federal court
before being sued in state court by the defendants. *See Brillhart,* 316 U.S. at 492-93; *Wilton,* 515 U.S. at 280.

9

08-CV-401 BEN WMC

1  for many key witnesses, including Dr. Darnell, who is 82 years old.  Finally, although not

2  explicitly required by the precedent set forth above, the issues that Ligand seeks to be

3  decided in this declaratory action—whether the products at issue are subject to the

4  payment provisions of the 1992 Agreement and whether the 1992 Agreement has been

5  terminated—undoubtedly will be decided in the University's New York state court action

6  against Ligand for damages, specific performance and declaratory relief in connection

7  with Ligand's breach of the 1992 Agreement (among other causes of action).

8         C.    Dismissal Of A Federal Declaratory Judgment Action Is Particularly

9  Appropriate Where The Other Pending Action Is A State Court Proceeding Involving

10  Issues Predominantly Of State Law.

11        Not only does binding Ninth Circuit precedent support dismissal of a "preemptive

12  strike" declaratory judgment action such as that filed by Ligand in favor of a separate

13  pending action for actual damages or coercive relief, and not only should a second-filed

14  declaratory action be dismissed in favor of a first-filed coercive action, but also the U.S.

15  Supreme Court has held that such dismissals are especially appropriate where the pending

16  state court action for coercive relief involves issues solely of state, not federal, concern.

17  The Supreme Court has held that "it would be *uneconomical* as well as *vexatious* for a

18  federal court to proceed in a declaratory judgment suit where another suit is pending in a

19  state court presenting the same issues, not governed by federal law, between the same

20  parties." *See Brillhart*, 316 U.S. at 495; *see also Wilton*, 515 U.S. at 283 (reaffirming and

21  following *Brillhart*).  The Court specifically warned lower federal courts against

22  "[g]ratuitous interference with the orderly and comprehensive disposition of a state court

23  litigation" in such a situation, stating: "[w]e are concerned … with the duty of the federal

24  courts to determine legal issues governing the proper exercise of their jurisdiction."

25  *Brillhart*, 316 U.S. at 1176-77 (reversing and remanding the appellate court's direction

26  that the district court determine the merits of a declaratory judgment action).

27        The University's Complaint in New York presents issues solely of state law. (*See*

28  Hakim Decl., Exhibit 1).  The allegations are premised on New York state law, as they

---

10

Exhibit J
Page 14
Exhibit "7"
170

1  arise out of Ligand's breach of the 1992 Agreement. The 1992 Agreement also provides

2  that this license is to be interpreted and governed according to New York state law. The

3  University's Complaint and Ligand's California Declaratory Judgment Complaint, which

4  seeks a declaration as to how the 1992 Agreement should be interpreted, raise issues of

5  state law concern and do not implicate any federal law or interest. Based on Ninth

6  Circuit and Supreme Court precedent, this Court should defer to the New York state court

7  and dismiss this declaratory action. To hold otherwise would result in litigation in two

8  fora, which would be wasteful of the resources of the judiciary, the parties and their

9  counsel, and offend bedrock principles of federalism and comity between state and

10 federal courts.

11        Indeed, even where a declaratory action raises some federal issues, "where state

12 law concerns predominate," it is appropriate for a district court to apply the *Brillhart*

13 factors to the analysis. *See Phoenix Assurance PLC*, 125 F. Supp. 2d at 1222 (referring

14 to declaratory judgment cases brought in admiralty and state claims; analyzing *Brillhart*

15 factors and declining jurisdiction under Declaratory Judgment Act). The Ninth Circuit

16 has observed that the fact that state law remedies sought may tangentially involve issues

17 of patent ownership does not convert the state causes of action into federal law claims.[5]

18 *See Prize Frize, Inc. v. Matrix (U.S.) Inc.*, 167 F.3d 1261, 1264 (9th Cir. 1999) (citing

19 *Jim Arnold Corp. v. Hydrotech Systems, Inc.*, 109 F.3d 1567, 1572 (Fed. Cir. 1997))

20 *superseded* on other grounds by 28 U.S.C. § 1453(b) (changing law governing removal of

21 class actions). Moreover, where a claim is supported by alternative theories in a

22 complaint, that claim does not form the basis for Section 1338(a) jurisdiction unless

23 patent law is essential to each of those theories. *See Christianson v. Colt Indus.*

24 *Operating Corp.*, 486 U.S. 800, 807-08 (1988). In other words, a tangential patent

25 allegation is not sufficient if the "clear gravamen of the complaint" sounds in contract.

26 

27 [5] Pursuant to 28 U.S.C. §1338(a), federal courts have original, exclusive jurisdiction over civil actions relating to patents. It is "well-settled" that if "a patentee pleads a cause of action based on rights created by a contract, . . . the case is not one 'arising under' the patent laws." *Jim Arnold Corp. v. Hydrotech*

28 *Sys., Inc.*, 109 F.3d 1567, 1572 (Fed. Cir. 1997)).

11

1 | *Applera Corp. V. Illumina, Inc.*, 282 F.Supp.2d 1120, 1124 (N.D. Cal. 2003) (citing *Air*
2 | *Products & Chemicals, Inc. v. Reichhold Chemicals, Inc.*, 755 F.2d 1559, 1561 (Fed. Cir.
3 | 1985)). The significance of this precedent is two-fold: Not only does it mean that even if
4 | Ligand's Declaratory Judgment Complaint raises a mix of state and federal issues, it
5 | should still be dismissed in favor of the University's New York state case, but it also
6 | indicates that this Court lacks subject matter jurisdiction in this case under 28 U.S.C.
7 | §1338.[6]

8 |        There is extensive precedent holding that suits over failure to pay royalties under a
9 | license agreement brought in federal court fail to posit subject matter jurisdiction under
10 | 28 U.S.C. §1338(a). The analysis involves a determination as to whether the complaint
11 | pleads claims under the patent laws. Courts have consistently distinguished the latter
12 | from cases in which construction or enforcement of a contract or license is the issue, and
13 | for which state court, not federal court, subject matter jurisdiction lies. *See Luckett v.*
14 | *Delpark*, 270 U.S. 496, 510-11 (1926) ("Where a patentee complainant makes his suit
15 | one for recovery of royalties under a contract of license or assignment, or for damages for
16 | a breach of its covenants, or for a specific performance thereof, . . he does not give the
17 | federal district court jurisdiction of the case as one arising under the patent laws."); *Jim*
18 | *Arnold Corp.*, 109 F.3d 1567, 1578-79 (Fed. Cir. 1997) (remanding plaintiff's case to
19 | state court after improper removal because federal court did not have subject matter
20 | jurisdiction; holding that plaintiff's suit premised on state-law-based set of claims arising
21 | out of alleged breaches of the assignment agreements).

22 |        D.    Any Jurisdiction And/Or Venue Arguments Ligand May Seek To
23 | Raise In Connection With The New York State Suit, Are Properly Considered By New
24 | York Courts Rather Than This Court.

25 |        The Ninth Circuit has clearly stated that "[d]eclaratory relief is not authorized so
26 | that lower federal courts can sit in judgment over state courts, and it is not a substitute for

27 | _____

28 | [6] In paragraph 10 of its Declaratory Judgment Complaint, Ligand asserts that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1332, 1338 and 2201.

08-CV-401 BEN WMC

Exhibit J
Page 16

Exhibit "7"
172

1  removal." *Exxon Shipping Co.*, 120 F.3d 166, 170 (9th Cir. 1997) (holding that district

2  court abused its discretion in granting declaratory relief to preempt a ruling on federal

3  law issues by state court); *Shell Oil Co. v. Frusetta,* 290 F.2d 689, 694 (9th Cir. 1961)

4  (declaratory relief not available because of "fears" that state court will not provide fair

5  trial; Congress provided for protection through removal statue, not Declaratory Judgment

6  Act); *H.J. Heinz Co. v. Owens,* 189 F.2d 505, 508 (9th Cir. 1951) ("The wholesome

7  purposes of declaratory acts would be aborted by its use as an instrument of procedural

8  fencing either to secure delay or to choose a forum.  It was not intended by the act to

9  enable a party to obtain a change of tribunal and thus accomplish in a particular case what

10 could not be accomplished under the removal act . . . ").  As a result, the Court should

11 decline any invitation by Ligand to deny this Motion based on an argument that the New

12 York court lacks jurisdiction -- Ligand's declaratory action is not the proper vehicle for

13 such a challenge. [7] *Exxon,* 120 F.3d at 168 ("It should go without saying that a

14 declaratory judgment action must serve some purpose in resolving a dispute.  If the relief

15 serves no purpose, or an illegitimate one, then the district court should not grant it.").

16      Likewise, this Court should decline to adjudicate any venue arguments that Ligand

17 may raise, such as alleged inconvenience or hardship, in deference to the New York

18 court. [8] *See Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.,*  819 F.2d 746, 750 n. 6

19 (7th Cir. 1987) (venue contentions, "e.g. [the] contention that the claim arose in Illinois

20 [the jurisdiction in which the declaratory judgment action was filed] rather than

21 Connecticut [the other jurisdiction]," should be addressed by the court handling the

22 action for coercive relief, not the court in which the declaratory judgment action was

23 filed); *Trippe Mfg. Co. v. Am. Power Conversion Corp.,* 46 F.3d 624, 629 (7th Cir. 1995)

24

---

25 [7] Any such challenge to the New York court's jurisdiction would be futile.  The University's New York
26 Complaint leaves no doubt that the University's suit is premised on a state-law based set of claims arising
   out of an alleged breach of the 1992 Agreement.

27 [8] Any attempt to remove and then transfer the New York case to this Court would fail in any event, as
   there is no basis for federal question jurisdiction over the New York case and the transfer factors under 28
28 U.S.C. §1404 favor the University.

1 ("Trippe's venue arguments may properly be addressed to and decided by the Rhode

2 Island court, even though the action was first filed in Illinois.") In any event, having filed

3 with the New York Department of State to do business in New York, Ligand should not

4 be permitted to argue that New York is not a convenient forum for litigation of this New

5 York-based license agreement with a New York university.

6 **II.**      **IN THE ALTERNATIVE, THIS ACTION SHOULD BE STAYED.**

7        Pursuant to the clear precedent set forth above, the University believes that this Court

8 should decline to exercise jurisdiction over this declaratory action and dismiss the case. The

9 University recognizes, however, that this Court has the inherent authority to stay this matter

10 pending the resolution of the New York state court litigation. A federal court's power to stay

11 proceedings "is incidental to the power inherent in every court to control the disposition of the

12 causes on its docket with economy of time and effort for itself, for counsel, and for litigants."

13 *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936); *see also Wilton,* 515 U.S. at 288-89 (district

14 court may use its discretion to stay or dismiss an action seeking a declaratory judgment).

15 Although the Court has the authority to stay this case until the final disposition of the New York

16 state litigation, the University believes that an order of dismissal is the preferred remedy, based

17 on the precedent set forth above, and because there is no advantage to a stay where the

18 disposition of the state court litigation will moot this action.

19                                             **CONCLUSION**

20        For the reasons set forth above, The Rockefeller University respectfully requests that this

21 Court dismiss this action or, in the alternative, stay this action in deference to the New York state

22 court's resolution of the University's litigation against Ligand Pharmaceuticals, Inc.

23

24 Dated: March 11, 2008                FOLEY & LARDNER LLP
                                        KENNETH S. KLEIN
25

26                                      By: /s/
27                                            KENNETH S. KLEIN
                                              Attorneys for Defendant The Rockefeller
28                                            University, a New York not-for-profit
                                              corporation

                                            14

# EXHIBIT K

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------X

THE ROCKEFELLER UNIVERSITY,

             Plaintiff,

        v.

LIGAND PHARMACEUTICALS, INC.,

             Defendant.

-----------------------------------------------------------X

**SUMMONS**

Index No. 08/600638

Date Purchased: 3/4/08

Plaintiff designates New York
County as the place for trial

To the above named Defendant:

       YOU ARE HEREBY SUMMONED to answer the complaint in this action, and to
serve a copy of your answer, or if the complaint is not served with this summons, to serve a
notice of appearance, on the plaintiff's attorneys within 20 days after service of this summons,
exclusive of the day of service (or within 30 days after the service is complete if this summons is
not personally delivered to you within the State of New York); and in the case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

       The basis of the venue designated is NY CPLR § 503(a).

Dated: New York, New York
       March 4, 2008

Plaintiff's Address:
The Rockefeller University
1230 York Avenue
New York, New York 10065

NEW YORK
COUNTY CLERK'S OFFICE

MAR 0 4 2008

NOT COMPARED
WITH COPY FILE

FOLEY & LARDNER LLP

By: *Peter N. Wang* (DH)
    Peter N. Wang
    Anat Hakim
    Douglas S. Heffer
    90 Park Avenue
    New York, New York 10016
    (212) 682-7474
    Attorneys for Plaintiff

NYC_154136.1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

THE ROCKEFELLER UNIVERSITY,         :     Index No.

              Plaintiff,    :

       v.               :     **COMPLAINT**

LIGAND PHARMACEUTICALS, INC.    :     **JURY TRIAL REQUESTED**

            Defendant.   :

-------------------------------------------------------------------X

      Plaintiff, The Rockefeller University, by its attorneys, Foley & Lardner LLP, complains and alleges as follows:

### NATURE OF THE ACTION

      The Rockefeller University (the "University") owns groundbreaking inventions that are powerful tools to screen for therapeutic drugs and that were discovered by its esteemed faculty member Dr. James E. Darnell Jr. The University exclusively licensed this valuable technology to defendant Ligand Pharmaceuticals, Incorporated ("Ligand") in 1992 ("1992 Agreement"). Working under a 1994 agreement with its exclusive sublicensee SmithKline Beecham ("SKB", now GlaxoSmithKline) ("1994 SKB/Ligand Agreement") and using the University's inventions, Ligand identified several pharmaceutical molecules and received several milestone payments from SKB. Ligand has failed to pay the University its contractual share of these milestone payments according to the 1992 Agreement, despite the University's repeated requests. Instead, in August 2007, shortly before SKB requested approval from the Food and Drug Administration of Promacta®, one of the pharmaceutical molecules identified under the 1994 SKB/Ligand Agreement, and before royalties on Promacta® are anticipated to be paid by SKB to Ligand, Ligand notified the University that Ligand was unilaterally terminating the 1992 Agreement, although not permitted to do so by its terms. The University, having fully performed

NEW YORK
COUNTY CLERKS OFFICE

MAR 0 4 2008

NOT COMPARED
WITH COPY FILE

NYC_154137.1

its contractual obligation and faced with Ligand's refusal to honor its payment obligations under the 1992 Agreement, has no other recourse but to file this action.

## PARTIES

1.    Plaintiff The Rockefeller University is, and at all times mentioned herein was, a New York corporation whose principal place of business is at 1230 York Avenue, New York, NY 10065.

2.    Defendant Ligand Pharmaceuticals, Inc. is, and at all times mentioned herein was, a Delaware corporation whose principal place of business is at 10275 Science Center Drive, San Diego, CA 92121. Ligand is a biotechnology company engaged in the discovery and development of new drugs.

## JURISDICTION AND VENUE

3.    This Court has personal jurisdiction over defendant pursuant to CPLR § 301, 302.

4.    Venue is proper in this county pursuant to CPLR § 503(a).

## BACKGROUND OF THE UNIVERSITY-LIGAND COLLABORATION

5.    Founded in 1901, Plaintiff The Rockefeller University is the nation's first biomedical research university. Today, it is internationally renowned for research and graduate education in the biomedical sciences, chemistry and physics. A total of 21 scientists associated with the University have received the Nobel Prize in medicine and physiology or chemistry, 17 University scientists have received Lasker Awards, five have been named MacArthur Fellows and 11 have garnered the National Medal of Science. More than one-third of the current faculty are elected members of the National Academy of Sciences.

6.    Dr. James E. Darnell Jr., M.D. has been a professor at The Rockefeller University since 1974. A pioneering researcher in the field of gene regulation, he is The Rockefeller University Vincent Astor Professor and head of the University's Laboratory of Molecular Cell Biology. Dr. Darnell is an elected member of the National Academy of Sciences.

7.    Prior to Dr Darnell's pioneering research, it was not understood how a large and diverse group of regulatory proteins called cytokines cause cells in the human body to change

2

NYC_154137.1

their behavior in response to changes in the environment. Cytokines play an important role in regulating the human body, for example, stimulating the immune system to fight infection and activating red blood cell or platelet formation. Among Dr Darnell's many discoveries, he elucidated how the binding of a cytokine to a cell surface receptor is communicated to the nucleus of a cell to regulate the expression of a small and select number of genes. The pathway Dr Darnell discovered involves the binding of a cytokine to a cell surface receptor causing certain proteins, which he called Signal Transducers and Activators of Transcription, or STAT proteins, to accumulate in the nucleus, bind to specific genes, cause them to be expressed and thereby change cell behavior ("STATs Pathway").

8.    Dr. Darnell received numerous awards for his pioneering discovery and characterization of the STAT pathway, including the 2002 Albert Lasker Award for Special Achievement in Medical Science: "For an exceptional career in biomedical science during which he opened two fields in biology - RNA processing and cytokine signaling - and fostered the development of many creative scientists." In 2003, the White House awarded Dr. Darnell the National Medal of Science, the nation's highest honor for lifetime achievement in fields of scientific research. Other awards Dr. Darnell has received include the 1997 Passano Award, the 1994 Paul Janssen Prize in Advanced Biotechnology and Medicine and the 1986 Gairdner Foundation International Award.

9.    Dr Darnell invented, based on his understanding of the STAT pathway, a high throughput screen ("HTS") for discovery of new pharmaceuticals that are agonists or antagonists of cytokines. An agonist is a pharmaceutical that binds the same cell surface receptor as the cytokine, while an antagonist is a pharmaceutical that prevents binding of the cytokine to its cell surface. Dr. Darnell's HTS invention was disclosed in a Rockefeller University patent application filed in September 1993. In the HTS, a cell is exposed to a potential pharmaceutical and the activity of a reporter gene, designed by Dr Darnell based on his knowledge of the STATs Pathway, is monitored. Potential pharmaceuticals that mimic cytokine activity and therefore serve as agonists are identified.

3

NYC_154137.1

## 1992 LICENSE AGREEMENT BETWEEN THE UNIVERSITY AND LIGAND

10.    The pioneering STATs Pathway technology that Dr. Darnell discovered and developed while at the University (and which was owned by the University) promised to be a powerful tool to screen for therapeutic drugs. To allow Dr. Darnell's groundbreaking discovery to be utilized for the public good, the University entered into negotiations with Ligand to use this discovery, including HTS, to find valuable new pharmaceuticals.

11.    After negotiation, on September 30, 1992, the University and Ligand entered into a License Agreement. A true and correct copy of the 1992 Agreement is attached hereto as Exhibit A and incorporated herein by reference.

12.    In the 1992 Agreement, the University granted Ligand a sole exclusive world-wide license, under the University's broadly-defined Licensed Patent Rights and Technical Information relating to the STATs Pathway technology, "to make, have made, use and sell Products or practice Processes." *See Exhibit A at Section 2.1.* The license grant to Ligand included an exclusive world-wide license to all developments of Dr. Darnell's laboratory relating to the STATs Pathway technology, existing as of the effective date of the 1992 Agreement and for five years thereafter. *See id. at Section 1.4.* In connection with the 1992 Agreement, Dr. Darnell and members of his laboratory did in fact collaborate with Ligand for years regarding the STATs Pathway technology. Over the course of several years, Dr. Darnell provided essential technical information, materials and insight to Ligand relating to the STATs Pathway technology. In addition, the University filed several patent applications and was issued several patents, describing aspects of its pioneering STATs Pathway technology.

13.    The technical information and expertise about STATs Pathway technology that Ligand acquired from the University pursuant to the 1992 Agreement was essential to the development of, among other things, a HTS to identify cytokine agonists. The HTS was key to the identification and development of pharmaceutical drug candidates.

14.    In return for the University's exclusive world-wide license to this pioneering

STATs Pathway technology, Ligand obligated itself to:

    a.  "diligently seek to develop Products and/or Processes" using or based on the STATs Pathway technology provided to it under the 1992 Agreement. *See id. at Section 2.7;*

    b.  make certain cash payment to the University during the first five years of the Agreement and to give the University an equity interest in Ligand. *See id. at Sections 2.2 and 2.3; and*

    c.  pay the University a portion of any payments Ligand received from any third party "to secure the right to use Technical Information or to sell Products or Processes," (*see id. at Section 2.5*) and a royalty on Ligand's own "Net Sales of Products and on its net revenues . . . received from performance of Processes for a third party." (*see id. at Section 2.4*).

    15.    Section 2.5 of the 1992 Agreement, which addresses Ligand's payment obligations to the University with respect to milestone and royalty payments it receives from third parties provides:

> In the case of payments made to Ligand by a third party to secure the right to use Technical Information or to sell Products or Processes, Ligand will pay to Rockefeller and NYU twenty-five percent (25%) of the payments made to Ligand by the third party; provided, however, that in the situation where the payment to Ligand is based on the third party's revenues arising from sale of a Product or use of a Process, then Ligand shall pay to Rockefeller and NYU the lesser of twenty-five percent (25%) of the payment received from the third party or a royalty calculated pursuant to Section 2.4 by treating the third party's sales of such Products and Processes as Ligand sales. Payments by a third party to Ligand to purchase equity in Ligand and to fund research at Ligand which do not generate net revenue as defined in Section 2.4 shall not be subject to sharing under this Section 2.5.

    16.    Section 2.4 of the 1992 Agreement, which addresses Ligand's royalty payment obligations to the University based on Ligand's own sales of Products or performance of Processes, provides:

> Ligand will pay a royalty of five percent (5%) of its Net Sales of Products and on its net

5

revenues, i.e., gross revenues less fully burdened costs, received from performance of Processes for a third party. The royalty shall be paid for a term which is the longer of ten (10) years, or, on a country by country basis, expiration of the last patent in the Licensed Patent Rights having a claim which reads on the Product or Process or a method of making or using the Product or Process. Only one royalty will be owed on a Product or Process in the circumstance where the Product or Process is covered by multiple claims in the Licensed Patent Rights. Royalty payments made under this Section 2.4 and under Section 2.5 shall be made to Rockefeller and NYU in the ratio ninety percent (90%) to Rockefeller and ten percent (10%) to NYU.

17.     The 1992 Agreement provides that it "shall be interpreted and governed in accordance with the laws of the State of New York." *See id. at Section 13.*

## 1994 RESEARCH, DEVELOPMENT, AND LICENSE AGREEMENT BETWEEN LIGAND AND SMITHKLINE BEECHAM

18.     On December 29, 1994, Ligand entered into an exclusive research and development collaboration and license with SmithKline Beecham. On information and belief, under the 1994 SKB/Ligand Agreement, the HTS technology that was developed using the University's STATs Pathway technology was to be used by Ligand and SKB to discover and characterize small molecule, orally bioavailable drugs for the treatment of a variety of blood cell deficiencies. On information and belief, Ligand sub-licensed to SKB the STATs Pathway technology that the University exclusively licensed to Ligand.

19.     The 1994 SKB/Ligand Agreement entitles Ligand to payments from SKB for certain milestones reached in connection with the development of research compounds or products as well as royalty payments. In announcing Ligand's collaboration with SKB, Ligand's then-Senior Vice President and Chief Scientific Officer stated in a February 6, 1995 press release:

> We are delighted to have this, our second STATs collaboration within two years of licensing in this exciting technology from Rockefeller University. Our signal transduction area of research affords numerous drug targets to control gene expression. This alliance with the excellent research team at SB provides critical mass and expertise to exploit our recent insights in STATs and HGFs to create new medicines.

6

## DISPUTE BETWEEN THE UNIVERSITY AND LIGAND CONCERNING THE DEVELOPMENT OF PHARMACEUTICAL CANDIDATES

20.    The SKB/Ligand collaboration has led to the identification and development of several pharmaceutical compounds that act via the STATs Pathway, including but not limited to PROMACTA®/REVOLADE® ("PROMACTA®"), an orally active, non-peptide, small molecule thrombopoietin ("TPO") mimetic for the treatment of thrombocytopenia. Thrombocytopenia, or a low number of platelets in the blood, can be a life-threatening condition. Platelets are necessary to the normal process of blood clotting. When someone experiences thrombocytopenia, a cut or bruise might not heal quickly, or at all, without medical intervention. Therefore, patients with a low platelet cell count must take special precautions, and suffer significant risk.

21.    On information and belief, in the fourth quarter of 2007, SKB submitted to the Food & Drug Administration a New Drug Application for PROMACTA® for the treatment of short-term idiopathic thrombocytopenic purpura (ITP). ITP is a disorder characterized by low platelet counts leaving patients at risk of episodes of spontaneous bruising, mucosal bleeding, and in severe cases intracranial hemorrhage. On information and belief, if approved, PROMACTA® would be the first approved oral TPO mimetic. On information and belief, in the fourth quarter of 2007, SKB initiated two Phase III trials in connection with the use of PROMACTA® for hepatitis C, and SKB is studying PROMACTA® for chemotherapy-induced thrombocytopenia (CIT). On information and belief, at least one additional pharmaceutical compound, SB-559448, also developed as part of the SKB/Ligand collaboration, and described as a backup compound to PROMACTA®, is in Phase I clinical trials.

22.    On information and belief, Ligand also has its own thrombopoietin program, which it commenced after its research program with SKB ended, and that program has resulted in the identification and development of Ligand's lead, small-molecule TPO mimetic, LGD-4665, which acts via the STATs Pathway by binding to the thrombopoietin receptor in a manner

7

NYC_154137.1

similar to TPO and activates the production of platelets by the bone marrow. As of December

2007, Ligand reported that LGD-4665 generated positive Phase I results. Ligand also has stated

that it expects to advance the development of LGD-4665 for multiple indications. On

information and belief, several additional next generation molecules are in the research phase at

Ligand with promising TPO mimetic activities.

23.     On information and belief, each of the compounds described in Paragraphs 20 -22

above, constitute a "Product", as that term is defined in Section 1.5 of the 1992 Agreement.

Section 1.5 of the 1992 Agreement defines "Product" as follows:

> any product which embodies or the use of which employs any invention(s) described or
> claimed in Licensed Patent Rights or for which Technical Information was essential to
> the discovery or development thereof.

24.     The 1992 Agreement defines "Licensed Patent Rights" as follows:

> (a) the patent application(s) set forth on Exhibit "A" attached hereto and all patents which
> may issue thereon;
> (b) the patent applications which are divisionals, continuations, continuations-in-part,
> reissues, renewals, foreign counterparts, extensions or additions of the patents and/or
> applications described in (a) and (b) of this paragraph 1.3, and all patents which may
> issue thereon;
> (c ) and all other patent applications, and patents issuing thereon, filed to cover Technical
> Information, including divisionals, continuations-in-part, reissues, renewals, foreign
> counterparts, extensions or additions and patents which may issue thereon.

25.     The 1992 Agreement defines "Technical Information" as follows:

> any and all technical data, information processes, materials and know-how, whether or
> not patentable, owned by Rockefeller and existing or capable of description in a tangible
> form relating to peptidyl hormone mediated gene expression (a) developed in the
> laboratory of Dr. James Darnell of Rockefeller or Dr. David Levy of NYU as of the
> Effective Date and (b) which is subsequently developed at Rockefeller in the laboratory
> of Dr. James Darnell during the period ending five (5) years form the Effective Date.

26.     Consequently, under Section 2.5 of the 1992 Agreement, the University is entitled

to at least 25% of milestone and royalty payments paid to Ligand by SKB to date in connection

with such Products. Similarly, to the extent that Ligand has entered into collaborations with

8

other third parties from which Ligand has received or is entitled to receive payments for Products subject to Section 2.5 of the 1992 Agreement, the University would be entitled to 25% of such payments.

27.    This includes at least $1.91 Million Dollars, which is equal to 25% of the Eight Million Dollars in milestone payments SKB has already made to Ligand to date in connection with the development of PROMACTA® and SB-559448, minus amounts Ligand previously paid the University. *See Exhibit A at Section 2.5.* In addition, to the extent that the Ligand/SKB collaboration results in additional milestone payments by SKB to Ligand in connection with the continued development of PROMACTA®, SB-559448 or the development of other compounds, the University would be entitled to 25% of such milestone payments.

28.    To date, Ligand has refused to pay the University its portion of the milestone payments and has taken the position that no further milestone payments are or will be owing to the University.

29.    In addition to 25% of milestone payments received by Ligand, the University is also entitled to 25% of any royalty payments that SKB would pay to Ligand on sales of PROMACTA®. To the extent that the Ligand/SKB collaboration results in the commercialization of products other than PROMACTA®, such as, for example, products based on SB-559448, the University would be entitled to 25% of royalty payments made to Ligand based on sales of those products as well. Ligand has taken the position that the University is not entitled to any royalties under the 1992 Agreement.

30.    A couple of months before SKB submitted its New Drug Application for PROMACTA® to the Food & Drug Administration, and by letter dated August 9, 2007, Ligand informed the University that Ligand was providing written notice that "Ligand is exercising its right to terminate the above-referenced Agreement. Pursuant to Section 11.2, this termination will be effective on November 7, 2007."

31.    On September 25, 2007, representatives of Ligand and the University met to discuss Ligand's purported termination notice and the University's position that the 1992

9

Agreement could not be terminated after full performance by the University. At the meeting, the University notified Ligand that it was exercising its audit rights under Section 4.2 of the 1992 Agreement.

32.    On October 10, 2007, the University sent Ligand its preliminary audit request and a tolling agreement, which was effective through January 31, 2008.

33.    On or about November 13 or 14, 2007, the University initiated its audit of Ligand. To date, Ligand has refused to fully and adequately comply with the University's audit requests, as amended.

34.    On January 17, 2008, the University and Ligand entered into an Amended Tolling Agreement, which was effective through March 3, 2008.

## FIRST CAUSE OF ACTION

### (Breach of Contract Against Ligand)

35.    Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 34 of this Complaint as though fully set forth herein.

36.    The 1992 Agreement between the University and Ligand is a valid and binding contract between the University and Ligand.

37.    Upon information and belief, Plaintiff alleges that Defendant has failed to perform and is in material breach of at least its payment obligations under the 1992 Agreement as described in the foregoing paragraphs of this Complaint. As a direct and proximate result of the breach, the University has been damaged in an amount according to proof at trial, but no less than $1.91 Million Dollars.

38.    Plaintiff the University has fully performed all of its obligations and otherwise complied with all the terms and conditions of the 1992 Agreement.

39.    Plaintiff the University is entitled to recover damages from Defendant for Defendant's material breach of the 1992 Agreement alleged in this Complaint in an amount to be proven at trial.

10

NYC_154137.1

## SECOND CAUSE OF ACTION

### (Unjust Enrichment/Constructive Trust)

40.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 39 of this Complaint as though fully set forth herein.

41.     A civil plaintiff may recover under the doctrine of unjust enrichment by showing that (a) the plaintiff conferred a benefit on the defendant; (b) the defendant appreciated or enjoyed such benefit; and (c) under the circumstances, it was unfair for the defendant to accept or retain the benefit without paying for it.

42.     At Ligand's specific request, and since 1992, the University provided to Ligand valuable information, know-how and services since 1992 relating to STATs Pathway technology.

43.     The University shared such information, know-how and services while Ligand and the University were in a confidential relationship.

44.     Ligand enjoyed such information, know-how and services and was and has been enriched by such information, know-how and services.

45.     Ligand was and has been unjustly enriched at the University's expense because Ligand has not compensated the University for such information, know-how and services.

46.     The reasonable value of the information, know-how and services that the University provided to Ligand and for which the University has not been compensated to date is no less than $1.91 million.

47.     In equity and good conscience, Ligand should be required to return no less than $1.91 million to the University.

48.     The University has no adequate remedy at law by which it can be compensated for this injury.

49.     By virtue of the foregoing, the University has been damaged in an amount to be proven at trial, but in no event less than $1.91 million.

50.     The University also is entitled to a constructive trust on past and future payments made to Ligand by third parties in connection with the valuable information, know-how and

11

services that the University transferred to Ligand, including but not limited to past payments received and future payments in connection with PROMACTA® and/or SB-559448.

### THIRD CAUSE OF ACTION

#### (Quantum Meruit)

51.    Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 50 of this Complaint as though fully set forth herein.

52.    Since 1992, the University provided to Ligand valuable information, know-how and services relating to STATs Pathway technology in good faith and with the expectation, based on the parties' discussions, that the University would receive compensation for this valuable information, know-how and services.

53.    Ligand accepted the benefit of the University's valuable information, know-how and services, but has not compensated the University

54.    By virtue of the foregoing, the University has been damaged in an amount to be proven at trial, but in no event less than $1.91 million.

### FOURTH CAUSE OF ACTION

#### (Specific Performance of Contractual Right to Perform Audit)

55.    Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 54 of this Complaint as though fully set forth herein.

56.    The University is entitled to conduct an audit under Section 4.2 of the 1992 Agreement in order to determine the payments due from Ligand to the University under the 1992 Agreement.

57.    The records that would enable the University, through its auditor, to determine the payments due from Ligand to the University under the 1992 Agreement, are within Ligand's possession and control.

58.    Ligand has failed to provide many records that were requested by the University to its auditor.

59.    The University has no adequate remedy at law.

12

NYC_154137.1

60.    The University is thus entitled to perform an audit of Ligand pursuant to Section 4.2 of the 1992 Agreement.

## FIFTH CAUSE OF ACTION

### (Declaratory Relief Against Ligand)

61.    Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 60 of this Complaint as though fully set forth herein.

62.    An actual controversy now exists as to the rights and obligations of Plaintiff the University and Defendant Ligand with respect to the 1992 Agreement. Upon information and belief, Plaintiff the University contends that it is entitled to certain milestone and/or royalty payments provided for under the 1992 Agreement in connection with Defendant's identification and continued development of at least PROMACTA® and SB-559448. Defendant Ligand disputes Plaintiff the University's contention, and asserts that it has no obligation to Plaintiff the University under the 1992 Agreement in connection with PROMACTA® or any other compound or product.

63.    Plaintiff University desires a declaration from this Court as to its rights and Defendant's obligations under the 1992 Agreement confirming that:

a.    PROMACTA®, SB-559448, and LGD 4665 each are a "Product", within the meaning of term as defined in the 1992 Agreement;

b.    The University is entitled to, and Ligand is obligated to pay, 25% of all milestone payments and other consideration related to PROMACTA® and/or SB-559448, now due under the 1992 Agreement, including 25% of the milestone payments of $2 Million, $1 Million, $2 Million, and $1 Million relating to PROMACTA® and 25% of the milestone payment of $2 Million relating to SB-559448, as provided by Section 2.5 of the 1992 Agreement.

13

NYC_154137.1

c.  The University is entitled to, and Ligand will be obligated to pay in the future, 25% of all milestone and/or royalty payments and other consideration related to PROMACTA® and/or SB-559448 which shall become due under the 1992 Agreement hereafter.

d.  The University is entitled to 25% of milestone and/or royalty payments paid to Ligand by any third party in connection with any Product as that term is defined in the 1992 Agreement.

e.  The University is entitled to a 5% royalty on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own, and not in connection with a third party, as set forth in Section 2.4 of the 1992 Agreement.

64.    A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights and obligations under the 1992 Agreement and Plaintiff the University may obtain the relief to which it is entitled.

WHEREFORE, The Rockefeller University prays for judgment as follows:

1.    Damages according to proof at trial, including interest;

2.    Specific performance of the audit initiated by the University, pursuant to Section 4.2 of the 1992 Agreement;

3.    A constructive trust imposed on payments (milestone and royalty) received from a third-party by Ligand, including but not limited to such payments made in connection with PROMACTA® and/or SB-559448, and on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own;

4.    A Court Declaration confirming that:

14

a.  PROMACTA®, SB-559448, and LGD 4665 each are a "Product", within the meaning of the term as defined in the 1992 Agreement;

b.  The University is entitled to, and Ligand is obligated to pay, 25% of all milestone payments and other consideration related to PROMACTA® and/or SB-559448, now due under the 1992 Agreement, including 25% of the milestone payments of $2 Million, $1 Million, $2 Million, and $1 Million relating to PROMACTA® and 25% of the milestone payment of $2 Million relating to SB-559448, as provided by Section 2.5 of the 1992 Agreement.

c.  The University is entitled to, and Ligand will be obligated to pay in the future, 25% of all milestone and/or royalty payments and other consideration related to PROMACTA® and/or SB-559448 which shall become due under the 1992 Agreement hereafter.

d.  The University is entitled to 25% of milestone and/or royalty payments paid to Ligand by any third party in connection with any Product as that term is defined in the 1992 Agreement.

e.  The University is entitled to a 5% royalty on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own, and not in connection with a third party, as set forth in Section 4.2 of the 1992 Agreement.

5.    Costs of suit; and

6.    Such other and further relief as the Court may deem just and proper.

15

Exhibit "7"
191

7.    The University requests a jury trial on all issues so triable.

Dated: New York, New York
       March 4, 2008

                                    FOLEY & LARDNER LLP

                                    By: *Peter N. Wang*
                                        Peter N. Wang
                                        Anat Hakim
                                        Douglas S. Heffer
                                        90 Park Avenue
                                        New York, New York 10016
                                        (212) 682-7474
                                        Attorneys for Plaintiff The Rockefeller
                                        University

16

NYC_154137.1

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK     )
                               ) ss.:        Case No. 08 CV 2755 (KPC)(HP)
COUNTY OF NEW YORK   )

SEAN CAMERON, being duly sworn, deposes and says:

I am not a party to this action, am over 18 years of age and reside in Brooklyn, New York 11217.

On March 21, 2008, I served the within Notice of Motion by depositing a true copy thereof enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the United States Postal Service within New York State, addressed to each of the following persons at the last known address set forth after each name.

Anat Hakim
FOLEY & LARDNER LLP
*Attorneys for Plaintiff*
3000 K Street, N.W.
Suite 500
Washington, DC 20007
(202) 672-5300

Peter Wang
Douglas S. Heffer
FOLEY & LARDNER LLP
*Attorneys for Plaintiff*
90 Park Avenue
New York, NY 10016
(212) 682-7474

Exhibit "7"

SEAN CAMERON

Sworn to before me this
21st day of March, 2008.

Notary Public

CHRISTY SCHAEFFER
Notary Public, State of New York
No. 31-4769958
Qualified in New York County
Commission Expires August 31, 2010